### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **KEVIN TURNER** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 1:07cv863-MEF** |
| | ) | **1:03cr219-MEF** |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |

### UNITED STATES' RESPONSE TO § 2255 MOTION

Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and, in compliance with this Court's order, responds to Defendant/Movant Kevin Turner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, Or Correct Sentence By a Person In Federal Custody, as follows:

### I.  PROCEDURAL HISTORY AND RELEVANT FACTS

On September 23, 2003, a grand jury sitting in the Middle District of Alabama issued a seven-count indictment against Kevin W. Turner (Turner). (R1 Court Docket of case CR-03-F-219-S) Count 1 charged that from January 1998 through December 1998, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did use, persuade, induce and entice M.S., a person under the age of 18, to assist and engage in sexually explicit conduct, including but not limited to fellatio, and lascivious exhibition of the genitals and the pubic area of said minor for the purpose of producing visual depictions of such conduct, which visual depictions were produced using materials that had been transported in interstate commerce, in violation of Title 18 U.S.C. § 2251(a).  Count 2 charged that from July 1, 2000 through July 5, 2000, exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly make, print, publish and transport in interstate commerce by computer, a notice and advertisement, seeking or offering to display and distribute, visual depictions of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct, in violation of Title 18 U.S.C. § 2251(c)(1)(A). Count 3

charged that from July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly transport in interstate and foreign commerce by computer, visual depictions of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct, in violation of Title 18 U.S.C. § 2252(a)(1).  Count 4 charged that from August 1998 through July 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly receive and distribute visual depictions that were mailed, shipped and transported in interstate and foreign commerce by any means, including by computer, and reproduced said visual depictions for distribution in interstate and foreign commerce and said visual depictions involved the use of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct, in violation of Title 18 U.S.C. § 2252(a)(2).  Count 5 charged that on or about July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly mail, transport and ship in interstate commerce, by computer, child pornography, in violation of Title 18 U.S.C. § 2252A(a)(1).  Count 6 charged that on or about July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, the defendant did knowingly reproduce child pornography for distribution through the mails and in interstate and foreign commerce by any means, including by computer, in violation of Title 18 U.S.C. §2252(a)(3).  Count 7 charged that on or about July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly possess film, video tape, computer disk and other materials that contain images of child pornography that have been mailed, shipped and transported in interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, shipped, and transported in interstate and foreign commerce by any means including by computer, in violation of Title 18 U.S.C. § 2252A(5)(B). (R1-1.)

Turner made his initial appearance before United States Magistrate Judge Delores R. Boyd on September 29, 2003. (R1-3.) Turner was arraigned before United States Magistrate Judge Vanzetta P. McPherson on October 8, 2003, entering a plea of not guilty. (R1-10.)

2

On November 20, 2003, Turner filed a Notice of intent to change plea. (R1-19.)

On November 21, 2003, an Order was filed denying as moot Turner's Motion to Suppress by Magistrate Judge McPherson. (R1-23.)

On December 1, 2003, Turner entered a plea of guilty to counts 3, 4, 5, 6, and 7 of the indictment before Magistrate Judge McPherson. (Exhibit A - Copy of Transcribed Plea Hearing of December 1, 2003.)

On March 2, 2004, an arrest warrant was issued for Turner by District Court Judge Mark E. Fuller. (R1-36.)

On March 4, 2004, a status conference was held regarding Turner's release. An oral motion to withdraw plea of guilt was made by Turner and granted by District Court Judge Fuller. (Exhibit B - Copy of Transcribed Status Conference)(R1-39.)

On March 9, 2004, a detention hearing was held and Magistrate Court Judge Vanzetta P. McPherson found that Turner should be detained. (R1- 42,44.)

On May 3, 2004, Turner filed a Notice of intent to change plea. (R1-55.)

On May 14, 2004, Turner entered a plea of guilty to Counts 3, 4, 5, 6, and 7 of the Indictment, pursuant to Rule 11(c)(1)(a) of the Federal Rules of Criminal Procedure. (R1-61.)(Exhibit C - Copy of Transcribed Plea Hearing of May 14, 2004.)

On August 26, 2005, sentencing was held. The district court found that an enhancement pursuant to USSG 2G2.2(b)(2) was warranted finding that Turner had distributed child pornography with the intent to receive a thing of value. Further, the district court found that an enhancement pursuant to 5K2.0 and 5K2.8 was warranted finding that Turner's conduct was extreme and outside of the "heartland" of cases. Turner was sentenced to 360 months imprisonment and 5 years supervised release on counts 3, 4, 5, and 6, 120 months imprisonment and 3 years supervised release on count 7, all counts to run concurrent, and $500 in special assessment fees. (Exhibit D - Copy of Transcribed Sentencing Hearing of August 26, 2005)R1-84.)

On August 31, 2005, Turner filed a timely Notice of Appeal. (R1-89.)

3

On January 12, 2006, Turner filed his brief with the United States Court of Appeals for the Eleventh Circuit. (Exhibit E - Copy of Appellant Brief.)

On March 6, 2006, the United States filed a response to Turner's appeal. (Exhibit F - Copy of Appellee's Brief.)

On July 28, 2006, the United States Court of Appeals for the Eleventh Circuit issued its judgment as mandate affirming Turner's sentence and conviction. (Exhibit G - Copy of Eleventh Circuit Court of Appeals Judgment.) No record exists of Turner filing a motion for writ of certiorari with the United States Supreme Court.

On September 27, 2007, Turner filed the present motion. Turner is currently incarcerated by the Bureau of Prisons.

## II.  CLAIMS RAISED IN THE § 2255 MOTION

As far as the United States can discern, Turner raises the following issues in his § 2255 motion:

1.  The guilty plea entered on or about December 1, 2003,  was enforceable; and

2.  The guilty plea entered on or about May 14, 2004 was not made knowingly and voluntarily; and

3.  The Petitioner received ineffective assistance of counsel; and

4.  The prosecutor engaged in misconduct by breaching the plea agreement; and

5.  The Petitioner is innocent of the counts of conviction in this case.

## III.  RESPONSE TO CLAIMS FOR RELIEF

### A.  Turner Has Not Met The One-Year Statute Of Limitations Deadline For The Filing of Claims Under 28 U.S.C. § 2255.

The United States notes at the outset that Turner has filed his motion in an untimely manner under paragraph six of 28 U.S.C. § 2255, which provides a one-year period of time to file a motion to vacate, set aside, or correct sentence under the rule.  The applicable provision in this case requires that a movant file his § 2255 motion within one year from "the date on which the judgment of conviction became final."

The judgment against Turner was entered by the District Court on August 30, 2005. Turner timely filed his notice of appeal and filed his appeal on January 12, 2006. The Eleventh Circuit Court of Appeals issued its mandate on July 28, 2006. Although not specifically addressing the application of the statute of limitations to the 10-day notice of appeal requirement, the Eleventh Circuit has held that a judgment of conviction becomes final for someone who appeals to an appellate court when the time for seeking certiorari review in the Supreme Court expires. *See Kaufman v. United States,* 282 F.3d 1336, 1337-39 (11th Cir.2002). Likewise, a judgment of conviction becomes final for someone who does not appeal when the time for seeking that appeal expires. Turner had ten days from the July 28, 2006, entry of judgment by the Eleventh Circuit Court of Appeals to seek certiorari review by the Supreme Court for the United States; he did not. Turner's judgment of sentence, therefore, became final on August 7, 2006. Thus, under Title 28, United States Code, § 2255, Turner had until August 7, 2007, to file his motion. Therefore, Turner's filing of his § 2255 motion post August 7, 2007, renders it untimely, and procedurally barred and it should be dismissed with prejudice

**B.    Turner's Claims, Excepting Ineffective Assistance Of Counsel And Prosecutorial Misconduct, Should Be Rejected Because They Are Barred And Without Merit.**

Turner is not entitled to relief on those claims that he did raise on appeal which were rejected and those claims he did not raise at or prior to his conviction and sentencing or on appeal, but he could have.

A motion under § 2255 cannot be used as a substitute for appeal, *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998), and claims not raised at trial or on direct appeal that could have been are generally barred from review in § 2255 proceedings, *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001), *cert. denied*, 122 S.Ct. 2362 (2002). In *Mills v. United States*, 36 F.3d 1052 (11th Cir. 1994), the Eleventh Circuit succinctly summarized the law concerning procedural default as follows:

> Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a § 2255 proceeding.... A ground of error is usually "available" on direct appeal when its merits can be reviewed without further factual development.... When

a defendant fails to pursue an available claim on direct appeal, it will not be considered in a motion for § 2255 relief unless he can establish cause for the default and actual prejudice resulting from the alleged error....  Alternatively, under the fundamental miscarriage of justice exception, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."...

*Id*. at 1055-56 (internal citations omitted).  *See also*, *McCoy v. United States, 266 F. 3d at 1258* ("A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal.").  The burden of demonstrating cause and prejudice or a miscarriage of justice is on the movant.  *See, e.g., Bousley v. United States, 523 U.S. 614, 622 (1998)* ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,'...or that he is 'actually innocent[.]'").

In this case, Turner's claims that: 1. His first plea/agreement was enforceable; and, 2. His second plea was not knowingly and voluntarily given because of his unstable mental condition, breach of the plea agreement by the prosecutor, the court's imposition of the maximum sentence, and coercion, are clearly defaulted. Turner has not alleged and established any cause and prejudice and, though he does claim 'actual innocence', he offers no proof of innocence either by way of affidavit or records establishing said innocence, to overcome these procedural defaults.

All of these claims either were raised on appeal and rejected by the Eleventh Circuit Court of Appeals, or could have been raised on appeal and were not. There is no claim by defendant that he could not have and did not know of the above-stated "facts" prior to filing his appeal brief, therefore, pursuant to *Bousley*,  Turner's arguments fail and his claim should be denied because he is not entitled to relief on those claims that he did not raise at or prior to his conviction and sentencing or on appeal, but he could have.

1.        **December 1, 2003 Plea Agreement**

Turner claims that his plea of guilty pursuant to an agreement reached by the parties under the terms of Federal Rule of Criminal Procedure 11(c)((1)(C) was enforceable.

Turner and his attorney were apprised, prior to March 4, 2004, when the parties met for an objection conference and it was made clear by the Pre-Sentence Report, that the range of punishment considered by the parties was not available as an option for the Court to consider, and again on March 4, 2004 by the District Court. The Court gave notice to Turner and his attorney that it would not accept the agreement and would permit him to withdraw the plea of guilty. Turner chose to withdraw his guilty plea.(Exhibit B at 15-16.)

The plea agreement in this case was made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Rule 11(c)(3)(A) states that: To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.

Rule 11(c)(5) sets out that if the court intends to reject a plea agreement made under 11(c)(1)(C) it must inform the parties; advise the defendant that the court is not required to follow the plea agreement ; and allow the defendant an opportunity to withdraw his guilty plea.

In the present case, Turner and his attorney were apprised, at the time of the objections conference, that the range of punishment considered by the parties was not available as an option for the Court to consider, and was again so informed on March 4, 2004, by the District Court. The Court gave notice to Turner and his attorney that it would not accept the agreement and would permit him to withdraw the plea of guilty. Turner chose to withdraw his guilty plea.(Exhibit B at 15-16.)

Proper procedure was followed and, as made clear by the record, the defendant affirmed his intention to withdraw his guilty plea:

| | |
|---|---|
| The Court: | Mr. Turner, do you understand what your client – or what your attorney is representing for you? |
| The Defendant: | Yes, sir. |
| The Court: | Do you understand that by withdrawing your plea of guilty to the offenses for which you pled guilty in January of this year, that you will now be standing charged with all seven counts as opposed to counts three through seven for which you pled guilty? |
| The Defendant: | Yes, sir. |
| The Court: | Is it your desire to withdraw your plea of guilty at this time? |

The Defendant:    Yes, it is.

(Exhibit B at 15.)

Because the Court rejected the plea agreement made pursuant to Rule 11(c)(1)(C) and followed proper procedure in doing so, the plea agreement was not enforceable and Turner's claim fails and should be dismissed as without merit.

2.    **"Mental Condition"**

Turner claims that his second plea, given on May 14, 2004, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A), was not made knowingly and voluntarily because his mental state was impaired , that the government failed to meet its obligations pursuant to the plea, that he was not aware that he could receive a sentence of 360 months, and because defense counsel coerced him into entering the guilty plea.

There is nothing in the record that establishes that Turner's second plea of guilty was given at a time when he was impaired to the extent that he could not enter a knowing and voluntary plea. In fact, the record reflects the opposite:

The Court:    Okay. How old are you?

The Defendant:    39.

The Court:    How far did you go in school?

The Defendant:    Graduated high school, two years of vocational.

The Court:    Have you been treated for any mental illness or addiction to narcotic drugs of any kind?

The Defendant:    No, ma'am.

The Court:    Are you currently under the care of a physician?

The Defendant:    Yes, ma'am.

The Court:    What is the condition you are being treated for?

The Defendant:    Bipolar disorder.

The Court:    You have never been confined to any institution for that condition?

The Defendant:    No, ma'am.

| | |
|---|---|
| The Court: | Are you now receiving counseling or medication or both? |
| The Defendant: | When I was out I was receiving both. Nom I am still on medication. |
| The Court: | What medication? |
| The Defendant: | Nine hundred milligrams of Lithium a day, 40 milligrams of Prozac, one hundred milligrams of Seraquel. |
| The Court: | What consequences are there to your failure to take your medication? |
| The Defendant: | Depression. |
| The Court: | Anything else? What about your conduct? |
| The Defendant: | It would – it could have an effect on my conduct. |
| The Court: | Have you taken your medication as prescribed while you have been confined? |
| The Defendant: | Every day. |
| The Court: | And what is the consequence of your taking it? |
| The Defendant: | I feel normal, I can deal with situations as someone can that's not on medication. |
| The Court: | Does taking the medication have any impact on your ability to understand these proceedings? |
| The Defendant: | No, ma'am. |
| The Court: | Has it affected your ability to understand your lawyer's representations or to make representations to him or to express your desires to him regarding a plea agreement? |
| The Defendant: | No, ma'am. |

(Exhibit C at 4 - 6.)

The respondent has not received an affidavit from Turner and is not aware that one has been filed, therefore, the only record that exists counters Turner's claim that he was impaired to such an extent that his plea was not knowingly and voluntarily entered. Turner's claim should be dismissed

Turner claims that his plea was not knowingly and voluntarily entered because the prosecutor failed to file a motion for downward departure pursuant to United States Sentencing Guideline, Section 5K1.1 and Federal Rule of Criminal Procedure 35.

9

The government is uncertain how the government's failure at sentencing to file said motion(s) impacted the knowingness and voluntariness of Turner's plea, given a year before, but responds as follows:

The government agreed to file a 5K1.1 motion of Rule 35 motion for Turner's substantial assistance to the government. To date Turner has not provided substantial assistance to the government. The government is not in breach of the agreement as Rule 35 permits the government to file a motion for downward departure for substantial assistance at any time after a sentence and conviction is entered as long as the information provided by the defendant was provided within one year of sentencing, but did not become useful to the government until more than one year after sentencing.

Turner's claim fails because it is without merit and should be dismissed.

Turner claims that his plea was not made knowingly and voluntarily because he was not aware that he could receive a sentence of 30 years or 360 months. This claim fails because it is clear, both from the record and from Turner's own argument, that he was aware, at least as of March 4, 2004, of the Presentence Investigation Report and the maximum statutory penalty of 360 months. Further, prior to taking the guilty plea, it is clear that Turner had a copy of the plea agreement which contained the limits of punishment, as evidenced by his signature, as well as a copy of the Presentence Investigation Report. (Exhibit C at p 6, 9, 19 .)

Turner claims that he did not knowingly and voluntarily enter his guilty plea because he was coerced by counsel. This claim must fail as it is not supported by the record, and in fact is refuted by the record:

| | |
|---|---|
| The Court: | Did you have a full opportunity to sit with Mr. Parkman, review the terms of this plea agreement, read it for yourself before you signed it? |
| The Defendant: | Yes, ma'am. |
| The Court: | Do you have any questions you wish to ask the court at this time about any of those provisions? |
| The Defendant: | No, ma'am. |

The Court:          Are you fully satisfied with the counsel, representation and advice given to you in this case by Mr. Parkman?

The Defendant:      Absolutely.

(Exhibit C at p.6.)

The Court:          Other than the terms of the plea agreement has anyone made any promises to you or given you any assurances as to what will happen to you if you plead guilty?

The Defendant:      No, ma'am.

(Exhibit C at p. 7.)

**C.    Turner's Claim That He Received Ineffective Counsel Should be Dismissed As It Is Without Merit.**

Turner alleges his trial counsel was ineffective for: (1) withdrawing Turner's guilty plea; (2) failing to prepare /investigate ; (3) failing to mitigate Turner's crimes of convictions at sentencing; (4) failing to argue that the Protect Act did not most likely bar a downward departure; failed to cross examine Probation Officer David Conoly; (5) failing to seek a variance; and, (6) failing to seek a mental evaluation.  As is demonstrated below, Turner was not denied the effective assistance of counsel as he claims.

To succeed on a claim of ineffective assistance of counsel, a defendant must prove both that his counsel's performance was deficient and that that deficient performance prejudiced his case. *Strickland v. Washington,* 466 U.S. 668 (1984); *see also*, *Bell v. Cone,* 122 S. Ct. 1843 (2002) (Supreme Court reaffirming the *Strickland v. Washington* standard for reviewing ineffective assistance of counsel claims); *Caderno v. United States*, 256 F.3d 1213, 1217 (11th Cir. 2001) (Eleventh Circuit applying two-part test of *Strickland v. Washington*), *cert. denied,*122 S. Ct. 1185 (2002).  More specifically, Williams must show that (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) that his counsel's alleged errors or omissions resulted in prejudice to him to such an extent that, without counsel's alleged errors or omissions, there is a reasonable probability that the outcome of his trial would have been different.  *Yordan v. Dugger,* 909 F.2d 474, 477 (11th Cir. 1990).

11

In analyzing counsel performance under the performance prong of *Strickland*, this Court must presume that the conduct of counsel was reasonable, *Yordan v. Dugger,* 909 F.2d at 477.  A "[d]efendant must prove deficient performance by a preponderance of competent evidence, and the standard is 'reasonableness under prevailing professional norms.'" *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1303-04 (11th Cir. 2000)(footnotes omitted).  The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
>> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ...  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.
>>
>> ... Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have take the*
>>
>> *action that his counsel did take....*

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (some internal citations omitted).

The Eleventh Circuit has described a defendant's burden in demonstrating that his counsel's deficient performance prejudiced his case as "high", noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding.  *Robinson v. Moore*, 300 F.3d 1320, 1343-44 (11th Cir. 2002).  To succeed on the ineffective assistance of counsel claim, the defendant must show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.  In the guilty plea context, to satisfy the prejudice requirement, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Pease*, 240 F.3d

938, 941 (11th Cir.)(*citing Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985)), *cert. denied*, 122 S. Ct. 381 (2001).

Finally, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord, Robinson v. Moore*, 300 F.3d at 1343.

Turner's claims of ineffective assistance of counsel are all refuted by the record and by the affidavit prepared and filed by trial counsel James Parkman, III. (Exhibit H.)

The record is clear that Parkman is aware of the facts of the case, the evidence held by the government, and that in every representation of Turner before the Court Parkman consults with his client, informs the court of his client's wishes and of his client's health status. As Parkman states, his client was consulted and agreed with the strategy established.

It should be noted no affidavit of Turner has been presented to the government refuting Parkman's assessment of his actions, contained in his affidavit. (Exhibit H.) It should also be noted that the District Court clearly heard all of the facts and evidence in this case and reached an appropriate sentence, taking all of those issues into consideration, as well as the factors of United States Code, Section 3553(a), which sentence was affirmed by the Eleventh Circuit Court of Appeals.

As to each of his claims of ineffective assistance of counsel, Turner has failed to plead facts sufficient to demonstrate that counsel was deficient and that he was prejudiced by any of counsel's actions.  For that reason, his § 2255 motion should be summarily dismissed.

**D.    Turner's Claim Of Prosecutorial Misconduct Should Be Dismissed Because It Is Without Merit.**

As has been discussed earlier in this response, Turner's claim that prosecutors engaged in misconduct should be denied as without merit because the prosecution did not fail in its responsibilities under the terms of the plea agreement. The prosecution dismissed counts 1 and 2 of the indictment,  filed for a downward motion pursuant to 3E1.1, as agreed, and still has the intention

to file a Rule 35 should Turner give substantial assistance to the government in the investigation and prosecution of others engaging in violations of federal child pornography and obscenity laws. For that reason, Turner's motion should be summarily dismissed.

**F.      Turner's Claim that He Is Actually Innocent Should Be Dismissed As It Is Without Merit and Is Procedurally Barred.**

Finally, the claim that Turner is actually innocent should be rejected because it is meritless, and is a bare bones assertion without affidavits, facts or argument that supports the contention.

## IV.  A HEARING IS NOT APPROPRIATE IN THIS MATTER

Turner has not pleaded facts or presented sufficient evidence or argument which, if true, show that he is entitled to an evidentiary hearing, and his claims for relief should be denied without an evidentiary hearing.  See Blacklidge v. Allison, 431 U.S. 63, 73-74 (1977); Tejada v. Dugger, 941 U.S. 1551, 1559 (11th Cir. 1991); United States v. Laetividal-Gonzalez, 939 F. 2d 1455, 1465 (11th Cir. 1991).  Should this Court determine that Turner has made any arguments not addressed in this response, the United States would request the opportunity to further respond to those arguments.

## V.  CONCLUSION

For the above reasons, Defendant/Movant Kevin Turner has failed to demonstrate that he is entitled to any relief from this Court, and his § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted this the 4th day of February, 2008.

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Susan R. Redmond
SUSAN R. REDMOND
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280     (334) 223-7135 fax
susan.redmond@usdoj.gov

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KEVIN TURNER** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 1:07cv863-MEF** |
| | ) | **1:03cr219-MEF** |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Susan G. James, Esq.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Susan R. Redmond
SUSAN R. REDMOND
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7138 fax
susan.redmond@usdoj.gov

15

1          IN THE UNITED STATES DISTRICT COURT FOR

2              THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5

6   UNITED STATES OF AMERICA

7

8        Vs.                    CR. NO. 03-219-S

9

10  KEVIN W. TURNER

11

12         *    *    *    *    *    *    *    *

13                 CHANGE OF PLEA HEARING

14         *    *    *    *    *    *    *    *

15         Before Hon. Vanzetta Penn McPherson,

16         Magistrate Judge, at Montgomery, Alabama,

17         Commencing on December 1, 2003

18         *    *    *    *    *    *    *    *

19

20

21  APPEARANCES: For the Government: Susan Redmond

22                                   Assistant U.S. Attorney

23              For the Defendant:  James Parkman and

24                                   Martin R. Adams,

25                                   Attorneys at Law

GOVERNMENT'S
EXHIBIT

A

PENGAD 800-631-6989

2

```
 1              (The above case coming on for hearing at Montgomery,
 2    Alabama, December 1, 2003, before Honorable Vanzetta Penn
 3    McPherson, Magistrate Judge, the following proceedings were
 4    had commencing at 10:30 a.m.:)
 5              THE COURT:  Good morning, counsel.
 6              MR. PARKMAN:  Good morning.
 7              MR. ADAMS:  Good morning.
 8              MR. PARKMAN:  How was Thanksgiving?
 9              THE COURT:  Very pleasant, thank you.  I hope yours
10    was as well.
11              MR. PARKMAN:  Good to hear.
12              THE COURT:  United States of America versus Kevin
13    Turner, case number 03-219-S. Mr. Turner.
14              MR. PARKMAN:  This is Mr. Turner.
15              THE COURT:  Please raise your right hand to be
16    sworn.
17              THE CLERK:  You do solemnly swear or affirm that the
18    testimony you give in this cause to be the truth, the whole
19    truth, and nothing but the truth, so help you God.
20              THE DEFENDANT:  Yes.
21              THE COURT:  The Defendant is before the Court having
22    indicated that he wishes to change his plea of not guilty to
23    a plea of guilty. He stands represented by counsel on this
24    date and has entered written consent to enter his plea of
25    guilty before a United States Magistrate Judge. Mr. Turner,
```

3

1    please state your full name.

2           THE DEFENDANT:  Kevin Lamar Turner.

3           THE COURT:  How old are you?

4           THE DEFENDANT:  38.

5           THE COURT:  How far did you go in school?

6           THE DEFENDANT:  12 years high school, two years, I

7    can't think.

8           THE COURT:  College?

9           THE DEFENDANT:  No, technical.

10          THE COURT:  Technical school. Did you graduate?

11          THE DEFENDANT:  Yes.

12          THE COURT:  The Court has conferred with the

13   probation officer in this case and is therefore aware that

14   you are undergoing psychological counseling at this time, so

15   I want you to explain to the Court the nature of that

16   counseling and how often you go.

17          THE DEFENDANT:  I go to see my psychiatrist once

18   every three months.

19          THE COURT:  This is a psychiatrist and not a

20   psychologist, a doctor?

21          THE DEFENDANT:  Be Handall, Nelson Handall.

22          MR. PARKMAN:  He is a psychiatrist.

23          THE COURT:  Psychiatrist, thank you.

24          THE DEFENDANT:  And they do a lithium level check on

25   me because I am on Prozac, Lithium, and Seraquel.

4

1         THE COURT:  And that's once every three months?

2         THE DEFENDANT:  Yes, ma'am.

3         THE COURT:  Do you have any other counseling?

4         THE DEFENDANT:  Yes.

5         THE COURT:  What is the nature of it and how often

6    do you go?

7         THE DEFENDANT:  Weekly, to Rose Blakey Phillips at

8    Magnolia Counseling Center.

9         THE COURT:  Where?

10         THE DEFENDANT:  In Dothan.

11         THE COURT:  And is she a psychologist?

12         THE DEFENDANT:  No, she is an LPC.

13         THE COURT:  All right. How long have you been going

14    to her?

15         THE DEFENDANT:  I have been seeing Rose on and off

16    for probably two years.

17         THE COURT:  Are you on any psychological or

18    psychotropic medications?

19         THE DEFENDANT:  Yes.

20         THE COURT:  How often do you take that medication?

21         MR. PARKMAN:  That's the Lithium.

22         THE DEFENDANT:  I take 40 milligrams of Prozac a day

23    and nine hundred milligrams of Lithium a day and then at

24    night I take a hundred milligrams of Seraquel.

25         THE COURT:  How long have you been taking that

5

1   medication?

2          THE DEFENDANT:  A year.

3          THE COURT:  It is prescribed, is it not?

4          THE DEFENDANT:  It is.

5          THE COURT:  Is it prescribed by your medical doctor

6   or your psychiatrist?

7          THE DEFENDANT:  My psychiatrist.

8          THE COURT:  Are you taking any medication for any

9   other condition?

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  I am assuming that you have consumed the

12   medication that you just described to me this morning?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Did you consume any other medication

15   this morning?

16          THE DEFENDANT:  No.

17          THE COURT:  Have you within the last 48 hours

18   consumed any alcoholic beverage?

19          THE DEFENDANT:  In the last four years?

20          THE COURT:  In the last 48 hours, two days.

21          THE DEFENDANT:  No, ma'am.

22          THE COURT:  We would have to clear the courtroom,

23   Mr. Turner, if I asked that question. This question is very

24   important. I realize that you have been taking the medication

25   for a year. Does the taking of that medication affect in any

6

1    way your ability to understand the nature of these

2    proceedings? Do you understand my question?

3            THE DEFENDANT:  I don't know how to answer it.

4            THE COURT:  Does taking the medication keep you from

5    understanding what you are here for today?

6            THE DEFENDANT:  No. No.

7            THE COURT:  Has taking the medication prevented you

8    from assisting your lawyers in representing you,

9    communicating with them, giving them information, responding

10   to their inquiries, helping them to analyze your position and

11   so forth?

12           THE DEFENDANT:  No, ma'am.

13          THE COURT:  Do you believe that you have been able

14   to function in what you would consider a normal way, even

15   though you have been taking the medication you have

16   described?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Mr. Parkman, do you believe that your

19   client has been able to be responsive to you in a manner that

20   you deem normal, not withstanding his taking of the

21   medication?

22         MR. PARKMAN:  Yes, ma'am.  Other than some anxiety

23   and depression that I think normally goes along with the

24   situation that exists with the case, I haven't seen anything

25   that doesn't -- indicates to me that he doesn't understand.

7

1    Some areas that we went into involving the case, and they

2    were very technical in nature, and I think he understood

3    everything that we talked about and some analysis of where we

4    thought we were and what we should do.  So yes, ma'am, other

5    than that I think he understands exactly what is taking

6    place.

7            THE COURT:  All right. Mr. Turner, have you read

8    fully a copy of the indictment in this case, the document

9    that charges you with committing a crime? Do you remember the

10   document that described the charges that the government filed

11   against you?

12           THE DEFENDANT:  Yes.

13           THE COURT:  That document that said what you

14   allegedly did?

15           THE DEFENDANT:  Yes.

16           THE COURT:  The dates, the place says, et cetera?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Do you understand those charges?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Have you discussed them in full with

21   your lawyers?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Are you fully satisfied with the

24   counsel, representation and advice given to you in this case

25   by your attorneys?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Is your willingness to plead guilty

3    today the result of discussions that you have had with your

4    lawyers?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And the result of discussions your

7    lawyers have had with the government's lawyer?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Have they reported bark to you what they

10   have discussed with the government's lawyer?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And have you had an opportunity to

13   review that and make up your own mind about what you should

14   do?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Has anyone said or done anything that

17   forced you to plead guilty?

18         THE DEFENDANT:  No.

19         THE COURT:  Are you entering this plea of guilty

20   today of your own free will?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Has anyone made any promises to you or

23   assurances to you about what will happen to you if you plead

24   guilty that's not included in the plea agreement?

25         MR. PARKMAN:  That's not included in the plea

1   agreement.

2          THE COURT:  I understand there are some assurances

3   and some agreements in the plea agreement, but other than

4   what is in the plea agreement has anyone pulled you aside and

5   told you anything in addition to that?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  All right. Do you understand that the

8   terms of the plea agreement are merely recommendations to the

9   Court, and the Court does not have to follow those

10  recommendations?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Your plea agreement indicates that you

13  are entering a plea pursuant to Rule 11(c)(1)(C). That is a

14  rule of criminal procedure, Mr. Turner, that allows you to

15  withdraw your plea if the Court varies from the sentence that

16  you and the government have agreed to in the plea agreement;

17  do you understand that?

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  And do you understand that if the Court

20  sentences you to a harsher or higher sentence that you will

21  be allowed to withdraw your plea and go to trial?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  Do you understand, however, that you

24  will be under no obligation to withdraw your plea?

25         THE DEFENDANT:  Yes, ma'am.

1     THE COURT:  Have you discussed the sentencing

2  guidelines with your lawyers? The rules about sentencing, the

3  levels of punishment that can be imposed upon you, how your

4  criminal history affects what punishment you receive?

5     THE DEFENDANT:  Yes, ma'am.

6     THE COURT:  You have discussed that with your

7  lawyers?

8     THE DEFENDANT:  Yes, ma'am.

9     THE COURT:  And do you understand it?

10    THE DEFENDANT:  Yes, ma'am.

11    THE COURT:  Do you understand that the offenses to

12 which you are pleading guilty are felony offenses, and that

13 if your plea is accepted you will be adjudged guilty of those

14 offenses, and the adjudication will deprive you of certain

15 valuable civil rights, such as the right to vote, the right

16 to hold public office, the right to serve on a jury and the

17 right to possess any kind of firearm?

18    THE DEFENDANT:  Yes, ma'am.

19    THE COURT:  Do you understand that once you enter a

20 plea of guilty and are found guilty that it will be against

21 federal law for you even to possess a firearm whether you use

22 it, carry it, point it at anyone or otherwise have it in your

23 possession?

24    THE DEFENDANT:  Yes, ma'am.

25    THE COURT:  Let's now review the terms, the specific

1    terms of the plea agreement. You were charged in an

2    indictment that had seven counts. You have agreed to plead

3    guilty to counts three, four, five, six and seven; is that

4    correct?

5            THE DEFENDANT:  Yes, ma'am.

6            THE COURT:  Counts three, four, five and six of the

7    indictment carry the same punishment and count seven carries

8    a different one. But the only difference between the

9    punishment for count seven and the others is that the maximum

10   term of imprisonment for count seven is ten years while the

11   maximum term of imprisonment for the other four is 30 years;

12   do you understand that?

13           THE DEFENDANT:  Yes, ma'am.

14           MS. REDMOND:  Judge, excuse me, may I interrupt for

15   just a moment, there's one other difference in count seven

16   than the others and that is that count seven with an

17   enhancement carries a mandatory-minimum term I believe of two

18   years.

19           THE COURT:  Yes, it does. Not less than two, that's

20   correct. Thank you. If you are convicted after your plea of

21   guilty, Mr. Turner, to the offenses in counts three, four,

22   five and six, the mandatory-minimum is five years, that is,

23   the Court must sentence you to at least five years; do you

24   understand that?

25           THE DEFENDANT:  Yes, ma'am.

12

1          THE COURT:  And the Court may sentence you to not

2   more than 30 years; do you understand that?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Now, I understand that one of the

5   provisions in your plea agreement is that you and the

6   government have agreed that the Court's sentencing you to the

7   mandatory-minimum of five years will run concurrent for each

8   of these counts; do you understand concurrent?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  That is run together instead of on top

11   of each other.

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  And I am assuming that that includes or

14   subsumes the two year minimum in count seven; is that

15   correct, Ms. Redmond?

16          MS. REDMOND:  Yes, ma'am.

17          THE COURT:  All right. There is a fine applicable in

18   all of these counts of not more than or up to two hundred 50

19   thousand dollars, or you may be both fined and sentenced

20   within these ranges. There is a five year -- not more than

21   five year supervised release, not more than three years in

22   count seven, and there's a one hundred dollar assessment fee

23   due and payable on each separate count. Do you understand

24   that?

25          THE DEFENDANT:  Yes, ma'am.

13

1          THE COURT:  And do you understand that the

2    assessment fee can not be plea bargained away, it must be

3    paid?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  Do you understand, Mr. Turner, that upon

6    entry of your plea and the Court's acceptance of your plea

7    that the probation officer will prepare a presentence

8    investigation report?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  You will be expected to cooperate with

11    the probation officer.

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  You will be expected to provide

14    information, to answer questions.

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Do you fully understand that you will be

17    given an opportunity to review that presentence report before

18    it is turned in to the Court?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  And give any objections that you have.

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  Do you also understand that you will be

23    allowed to make any further objections at the sentencing

24    hearing?

25          THE DEFENDANT:  Yes, ma'am.

1    THE COURT:  Let us now review the charges in the

2    offenses. And when we get to your guilty plea it will not be

3    necessary for you to repeat the elements of the offense, I

4    just want to make sure you understand what you are being

5    charged with and what your plea agreement says you are going

6    to plead guilty to; do you understand?

7    THE DEFENDANT:  Yes, ma'am.

8    THE COURT:  You are charged with knowingly

9    transporting and shipping visual depictions in interstate or

10   foreign commerce by any means, which said depictions involved

11   the use of a minor engaging in sexually explicit conduct.  Do

12   you understand that charge?

13   THE DEFENDANT:  Yes, ma'am.

14   THE COURT:  You are further charged with receiving

15   or distributing a visual depiction that has been mailed,

16   shipped or transported in interstate or foreign commerce by a

17   means, or reproducing any visual depiction for distribution

18   which said depiction involves the use of a minor child

19   engaged in sexually explicit conduct.  Do you understand that

20   charge?

21   THE DEFENDANT:  Yes, ma'am.

22   THE COURT:  You are further charged with knowingly

23   mailing, transporting or shipping child pornography in

24   interstate or foreign commerce.  Do you understand that

25   charge?

15

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  You are further charged with knowingly

3   reproducing child pornography for distribution through the

4   mails or in interstate or foreign commerce.  Do you

5   understand that charge?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  And finally, you are charged with

8   knowingly possessing any film, video tape, computer disk or

9   other material that contains an image of child pornography

10  which has been mailed, shipped or transported in interstate

11  or foreign commerce.

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  And which when found in your possession

14  constituted child pornography.  Do you understand that charge?

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  And is it your intent, Mr. Turner, to

17  enter a plea of guilty to each of these charges?

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  Do you understand that if you are

20  sentenced to serve a term of imprisonment you will not be

21  released on parole because parole has been abolished in the

22  federal system?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  The plea agreement, Mr. Turner,

25  indicates further that you have waived your right to appeal

16

1    any sentence imposed upon you, assuming, of course, that the

2    Court accepts the recommendations in the plea agreement. Is

3    that correct?

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  And do you understand that?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  Do you understand that not withstanding

8    that waiver you reserve the right to appeal based upon

9    ineffective assistance of your lawyers or misconduct by the

10   prosecutor; do you understand that?

11           THE DEFENDANT:  Yes, ma'am.

12           THE COURT:  Do you further understand that merely

13   because you have waived your right to appeal the government

14   has not waived its right to appeal; do you understand that?

15           THE DEFENDANT:  Yes, ma'am.

16           THE COURT:  But if the government exercises its

17   right to appeal you may then appeal. Do you understand?

18           THE DEFENDANT:  Yes, ma'am.

19           THE COURT:  Even though you waived in your

20   agreement, if the government appeals you may then appeal.

21           THE DEFENDANT:  Yes, ma'am.

22           THE COURT:  You also have reserved in the agreement

23   a right to file a direct appeal from an upward departure. And

24   I am assuming as usual that this is an alternative to with-

25   drawing your plea; do you understand that? Let me explain it.

1    You have agreed to enter a plea based upon the government's

2    recommendations that you be sentenced at a certain level; is

3    that correct?

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  Your further agreement is that if the

6    Court sentences you to a higher sentence, you may withdraw

7    your plea and say I have changed my mind, I want to go to

8    trial.

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  The other alternative that you have is

11   you may appeal that upward departure to the Court of Appeals

12   in Atlanta; do you understand that?

13           THE DEFENDANT:  Yes, ma'am.

14           THE COURT:  All right. Do you also understand that

15   in exchange for your agreement to plead guilty to counts

16   three through seven, the government has agreed to dismiss

17   counts one and two?

18           THE DEFENDANT:  Yes, ma'am.

19           THE COURT:  And that if you plead guilty to counts

20   three through seven and that plea is accepted and you are

21   sentenced, you will have no responsibility for answering to

22   the charges in counts one and two.

23           THE DEFENDANT:  Yes, ma'am.

24           THE COURT:  Do you understand, Mr. Turner, that you

25   have a continuing right to plead not guilty in this case?

18

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  That no one can force or coerce you to

3   plead guilty?

4        THE DEFENDANT:  Yes, ma'am.

5        THE COURT:  Do you understand that in this criminal

6   proceeding you are presumed innocent until you are proven

7   guilty beyond a reasonable doubt?

8        THE DEFENDANT:  Yes, ma'am.

9        THE COURT:  Do you understand that you may go to

10  trial on these charges and that at a trial you would have the

11  following constitutional rights: The right to the assistance

12  of both your lawyers for your defense?

13       THE DEFENDANT:  Yes, ma'am.

14       THE COURT:  The right to see and hear all of the

15  witnesses against you and have them cross-examined by your

16  lawyers?

17       THE DEFENDANT:  Yes, ma'am.

18       THE COURT:  The right to testify on your own behalf

19  or to decline to testify if you chose not to do so?

20       THE DEFENDANT:  Yes, ma'am.

21       THE COURT:  And the right to decline to testify

22  without having that used against you?

23       THE DEFENDANT:  Yes, ma'am.

24       THE COURT:  Do you also understand that you would

25  have the right to the issuance of subpoenas or compulsory

1    process to compel the attendance of witnesses to testify for
2    you?

3             THE DEFENDANT:  Yes, ma'am.

4             THE COURT:  Do you understand that if you enter a
5    plea of guilty which is accepted you will have waived all of
6    those constitutional rights?

7             THE DEFENDANT:  Yes, ma'am.

8             THE COURT:  That there will be no trial unless, of
9    course, the Court sentences you to a harsher sentence.

10            THE DEFENDANT:  Yes, ma'am.

11            THE COURT:  You have indicated to the Court that you
12   understand the charges against you, you have also indicated
13   to the Court that you understand and agree to the elements of
14   those offenses, that is, what you have to do to commit the
15   offense. You have also told the Court that you understand the
16   waiver of your constitutional rights by entering a guilty
17   plea. Having stated this to the Court tell the Court how you
18   plead?

19            THE DEFENDANT:  Guilty.

20            THE COURT:  Do you plead guilty, Mr. Turner, to
21   count three as the Court recited it to you?

22            THE DEFENDANT:  Yes, ma'am.

23            THE COURT:  Do you plead guilty to count four as
24   recited to you?

25            THE DEFENDANT:  Yes, ma'am.

20

1          THE COURT:  Do you plead guilty to count five as

2     recited to you?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Do you plead guilty to count six as

5     recited to you?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  And do you plead guilty to count seven

8     as recited to you?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  Mr. Turner, did all of the offenses,

11     that is, counts three through seven, occur in the Middle

12     District of Alabama?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  The offense in count three is alleged to

15     have occurred from July 1, 2000 through July 5, 2000, do you

16     plead guilty under those circumstances?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  The offense in count four is alleged to

19     have occurred from August, 1998 through July, 2000, do you

20     agree and plead guilty?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  Count five, that offense is alleged to

23     have occurred from July 1, 2000 to July 5, 2000.  Do you

24     understand -- do you plead guilty under those circumstances?

25          THE DEFENDANT:  Yes, ma'am.

1    THE COURT:  The offense in count six is alleged to

2 have occurred from July 1, 2000 through July 5, 2000, do you

3 plead guilty to that offense under those circumstances?

4    THE DEFENDANT:  Yes, ma'am.

5    THE COURT:  And the offense in count seven is

6 alleged to have occurred from July 1, 2000 to July 5, 2000,

7 do you plead guilty under those circumstances?

8    THE DEFENDANT:  Yes, ma'am.

9    THE COURT:  Mr. Parkman, satisfied?

10    MR. PARKMAN:  Yes, ma'am.

11    THE COURT:  Ms. Redmond?

12    MS. REDMOND:  Satisfied, Your Honor.

13    THE COURT:  It is the finding of the Court in the

14 case of United States versus Kevin W. Turner that the

15 Defendant is fully competent and capable of entering an

16 informed plea, that the Defendant is aware of the nature of

17 the charges and the consequences of the plea, and that the

18 Defendant's plea of guilty is a knowing and voluntary plea to

19 each of the offenses recited in counts three through seven of

20 the indictment, that the Defendant's plea is supported by an

21 independent basis in fact containing each of the essential

22 elements of the offenses to which he pled guilty. The Court

23 will therefore recommend that the Defendant's pleas of guilty

24 be accepted by the Court and that he be adjudged guilty of

25 these offenses. After conferring with the probation officer,

1    Mr. Turner, the Court has determined that you should be

2    released and that the terms of your release should continue.

3    That includes your counseling with Doctor Handall and it also

4    includes your counseling with your LPC.

5         MR. PARKMAN:  Yes, ma'am.

6         THE DEFENDANT:  Yes, ma'am.

7         THE COURT:  Please remember that you must avoid all

8    contact with victims or other potential witnesses in this

9    case, and that you must report any contact with law

10   enforcement to your supervising officer, even if you are

11   stopped for a driver's license check or arrested for

12   speeding, you must report to that to your pretrial services

13   officer; do you understand that?

14        THE DEFENDANT:  Yes, ma'am.

15        THE COURT:  Sentencing in this case is set for 2

16   March, 2004 at 9:00 a.m.

17        MR. PARKMAN:  Your Honor, if that's the end may we

18   be excused at this time?

19        THE COURT:  Yes.

20        MR. PARKMAN:  May I see the Court at side-bar for

21   just a minute, please?

22        THE COURT:  Certainly.

23        MR. PARKMAN:  Thank you.

24        (At which time a side-bar conference was had between

25   the Court and counsel, which conference was not attended by

23

1    the court reporter.)

2          (At which time, 11:07 a.m., the hearing was

3    adjourned.)

4                    *    *    *    *    *

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7    This the 22nd day of December, 2005.

8

9                                    _____

10                                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States of America v. Kevin W. Turner                                    March 4, 2004

Page 1

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE MIDDLE DISTRICT OF ALABAMA
 3                             SOUTHERN DIVISION
 4
 5     UNITED STATES OF AMERICA
 6           vs.                    CASE NO:  1:03cr219-F
 7     KEVIN W. TURNER,
 8              Defendant.
 9
10
11
                        *  *  *  *  *  *  *  *  *  *  *
12
                            STATUS CONFERENCE
13
                        *  *  *  *  *  *  *  *  *  *  *
14
15           BEFORE THE HONORABLE MARK E. FULLER, UNITED STATES

       DISTRICT JUDGE, at Montgomery, Alabama, on Thursday, March 4,
16
       2004, commencing at 2:00 p.m.
17
       APPEARANCES:
18
19     FOR THE GOVERNMENT:        Ms. Susan R. Redmond
                                  Assistant United States Attorney
                                  OFFICE OF THE UNITED STATES ATTORNEY
20                                One Court Square, Suite 201
                                  Montgomery, Alabama  36104
21
22     FOR THE DEFENDANT:         Mr. James W. Parkman, III
                                  Attorney at Law
                                  PARKMAN, ADAMS & WHITE
23                                739 West Main Street
                                  Dothan, Alabama  36301-1559
24
                        Proceedings reported stenographically;
25                          transcript produced by computer.
```

GOVERNMENT'S
EXHIBIT
B
PENGAD 800-631-6889

2

1    (The following proceedings were heard before the Honorable
2    Mark E. Fuller, United States District Judge, at
3    Montgomery, Alabama, on Thursday, March 4, 2004, commencing
4    at 2:00 p.m.:)
5    (Call to Order of the Court)
6        THE COURT:  I call the case of United States of America
7    versus Kevin Turner.  Pursuant to an order, Mr. Turner, I
8    entered March 3rd in reviewing the status of this case pending
9    actions that were taken on January the 6th upon your entry of a
10    plea of guilty in this case, I have reviewed your conditions of
11    release and ordered that you be detained pending this hearing
12    today.
13        I have reviewed the code sections which govern the
14    conditions of release and/or your detention.  In particular,
15    Title 18, United States Code, Section 3142, would dictate the
16    conditions of release prior to conviction.  After the plea of
17    guilty to counts three through seven in the indictment on
18    January the 6th, your detention is governed by Title 18, United
19    States Code, Section 3143.
20        Are you prepared today to argue any conditions or bring
21    any information to the Court's attention concerning your
22    detention?  And if so, I will allow you or your attorney in this
23    case, Mr. Parkman, to make any argument you wish to at this
24    time.
25        MS. REDMOND:  Judge, excuse me.  Susan Redmond for the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

4

1        So in this particular case, what's happened is we
2    received a very substantial documentation from the sentencing
3    officer in this case with the Sentencing Commission, and it had
4    in there quite a bit of new law that I've never seen before and
5    new issues that I've never seen before.  So with that in mind in
6    talking to the prosecutor in this case, we both agreed that the
7    best thing to do was to give me some time to take a look at what
8    has been happening in the Eleventh Circuit, but more
9    importantly, on issues that are not presented to the Eleventh
10    Circuit, what's happening outside of that, to get some kind of
11    feel for where the law was headed with regards to some of these
12    arguments.  That's why the motion to continue this sentencing
13    hearing was filed.
14        Also, I want to point out to the Court that during the
15    time period that he has remained out pending the sentencing, I
16    don't think there's been any issue whatsoever of any violation
17    that's occurred or anything that has been given to me by anyone,
18    including the U.S. Attorney or the U.S. Marshal Service, that he
19    has violated any of the terms that he was previously set upon by
20    the magistrate judge when they released the defendant after the
21    plea and before the plea.
22        So what we're saying in this particular case is that in
23    this particular instance, we know that there is not going to be
24    any problems that he's had being out pending the sentencing,
25    because he hasn't had any.  And there's been no indication that

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

3

1    government.
2        THE COURT:  Yes, ma'am.
3        MS. REDMOND:  Prior to the defense making any argument,
4    I would state pursuant to 3143(a)(2), that we are not in this
5    case going to recommend that no sentence of imprisonment be
6    imposed on the person.
7        THE COURT:  Thank you, Ms. Redmond.
8        Mr. Parkman, you may proceed.
9        MR. PARKMAN:  May it please this Honorable Court.  I
10    want to do this twofold, if I can, explain to the Court why I
11    believe that his release pending the sentencing is appropriate
12    in this matter.  And I want to begin with -- in your citation of
13    the law under 3143, you make it clear that unless certain things
14    are found, like the likelihood that it will be a trial, a new
15    trial, or something like that.  Well, let me say to the Court
16    this, that in the plea agreement that we had in this case, if --
17    and I know the Court is certainly well aware of this and has
18    read this.  But if it would take notice of this, we did the plea
19    pursuant to 11(c)(1)(C) in that we agreed that the sentence in
20    this case would be for a period of not longer than five years.
21    It's also reserved to the defendant the right, if it's not
22    granted or the Court does not see fit in granting that, that it
23    does go back and the pleas are withdrawn.  They're not going to
24    be used against the defendant.  And we're therefore set back to
25    trial, exactly where we would have been to begin with.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

5

1    he has violated any laws of the United States or of the state
2    that are -- or that he's done anything that would in any way
3    even raise a suspicion that there would be a problem with him
4    regarding these charges or with anyone else or this victim.
5        I think next comes the issue of the Court that in
6    deciding what to do and deciding what the defense is going to do
7    after we take a look at the law -- for example, if we have that
8    right to withdraw the plea and we do that, we really are back at
9    square one, and we really are back with a presumption of -- that
10    he is innocent until proven guilty.  So in this particular case,
11    it is just a little bit different, I believe, Your Honor, than
12    we see in a lot of other cases.  And second of all, I think it's
13    clear that since he has not violated any of the rules of
14    condition of release or that he has violated any laws or
15    anything else with regards to his release pending the
16    sentencing, that there should be some leeway given him with
17    regards to him being out pending the sentencing or pending what
18    takes place at the sentencing.  I also think in this particular
19    instance that, you know, there's no flight risk.  If there was,
20    you know, he would have already fled by now.  They didn't have
21    any problem finding him when they went to arrest him.  He was at
22    his home, where he was.  Nothing occurred there out of the
23    ordinary.
24        So I understand what you did and I understand the law
25    and why you did it.  So let me say this if I can, too.  Because

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

**6**

1  of the extraordinary circumstances, I think that there are some
2  other extraordinary things that this Court might consider by
3  leaving him out pending the sentencing. And hopefully we can
4  resolve the sentencing prior to the May date. I believe it's
5  May 5th.
6      THE COURT: May 24.
7      MR. PARKMAN: Please forgive me, Your Honor. May 24.
8  I think there's some things that we can do to assure the Court
9  of certain things. That being, for example, I think the Court
10  can take a look at electronic monitoring. I think the Court can
11  look at the fact that he lives with an adult, his wife, in a
12  home. He's not left there alone. I think the Court can also
13  look at certain orders. For example, we know of no indication
14  of any type of -- further type of searches on the Internet that
15  you're seeing here in this particular case; but I think the
16  Court can also order that, you know, he not be available to any
17  computer whatsoever, no matter where the source, whether it be
18  at a friend's house, whether it be at the mall, whether it be
19  through another business. I think the Court can also ensure
20  stabilization of this particular area by also saying that, of
21  course, not only as he hasn't been around the victim, but also
22  that he stay away from any children whatsoever, including any
23  retail or wholesale settings. And that would be at stores or
24  malls or whatever like that. And we're not saying not be there
25  where they are, but not having any contact with any, no

**8**

1  indicate he's trying to flee the jurisdiction of the Court. He
2  has been around and has been working and trying to earn money
3  and living with a wife. So we would take that and ask you to
4  consider those factors, too, please.
5      THE COURT: Let me just make sure the record is clear.
6      MR. PARKMAN: Sure.
7      THE COURT: I'm not saying nor have I based my decision
8  on anything that --
9      MR. PARKMAN: Yes, sir.
10      THE COURT: -- Mr. Turner has done --
11      MR. PARKMAN: Right.
12      THE COURT: -- prior to his plea but after he was
13  arrested and after his plea, before today's date.
14      MR. PARKMAN: Correct.
15      THE COURT: I'm just saying based upon my review of the
16  status of the file and the law, as I understand it to be, under
17  18, United States Code, Section 3143, I see no option under that
18  provision for your client's release. I fully appreciate the
19  ability for him to withdraw his guilty plea and the terms of the
20  plea under 11(c)(1)(C), as you have discussed, and have no
21  problem if you wish to discuss doing that. But I would
22  certainly want you to discuss that with your client and with
23  Ms. Redmond before today so that we can consider how the case is
24  going to proceed.
25      MR. PARKMAN: Sure.

**7**

1  discussions, no stopping them, no talking to them or anything
2  along those lines.
3      So we believe that there are certain things that the
4  Court can do in this case to ensure some type of stabilization
5  of the issue and at the same time recognize that I do not
6  believe that he is a threat, nor has he indicated anything to my
7  knowledge that indicates any threat to any person or to himself
8  or is a flight risk whatsoever.
9      Then taking into consideration the 11(c)(1)(C) issue
10  that we have, certainly I hope the Court would take notice that
11  counsel is trying to resolve this issue before the May 24th
12  hearing and that way resolve having to go through a lengthy
13  trial, that way having to resolve having to deal with a very
14  lengthy situation in which the victim would have to be present.
15  And we are trying and attempting to do that, and I think the
16  Court could take notice of the fact that by his efforts in doing
17  that, too, would show good faith on his part. And I think it
18  would be in the interests of all parties involved in this case
19  to allow him out even if you put certain of these stipulations
20  on him that I've mentioned.
21      So with that, Your Honor, I will leave it to you. But
22  I do believe that his past conduct after the arrest in this case
23  clearly shows that he has not done anything to warrant any type
24  of examination on his behalf of doing anything wrong with any
25  others or with the victim himself or that he's done anything to

**9**

1      THE COURT: And particularly, the detention of your
2  client is going to proceed, should that decision be made. But I
3  just wanted to make the record clear that I was not making any
4  accusations or making any findings of fact that there has been
5  any type of conduct that would have been in violation of any
6  terms of his release since he has been on release.
7      MR. PARKMAN: And I took it that way. What I was
8  trying to get over by my argument with this -- you'll have to
9  forgive me. I've been sick with this stuff that we've had, and
10  I probably sound that way, also. And the medication I'm on
11  doesn't help a lot. But what I was trying to get over to the
12  Court is we're not saying that you made any allegation, but I
13  think it's important under the provisions of the law that you
14  set out in 3143 that if it could be shown that there is a
15  possibility that a new trial would be grant -- well, we're not
16  talking about a new trial in this instance, but we are talking
17  about the right that we have to withdraw it and have a new trial
18  in the case and start from square one. Also, that, coupled with
19  the fact that if he has not committed any type of conduct that
20  would warrant picking him up or warrant any suspicion being cast
21  upon him, if that's not happened, then to me, that would fulfill
22  the third part of this test. And that would be that he is not a
23  danger to the community, as shown by his actions since the date
24  of the arrest, and that, of course, he's been in the area and is
25  not prone to flee. So that's where I was going with that.

10

1  THE COURT: Let me hear from Ms. Redmond.

2  MR. PARKMAN: Thank you, Your Honor.

3  MS. REDMOND: Judge, if you will, my argument is

4  basically the same argument I made at the time of detention

5  hearing. And that is that I did not believe that there were any

6  condition of release which could be established for this

7  particular defendant which can ensure the safety of any person

8  in the community or of the community. And specifically, I'm

9  speaking of the fact that this is a person who is an expert in

10  the use of computers. He has Internet access. He continues to

11  have Internet access. At the time of the detention hearing, the

12  Court allowed it because of his livelihood. I expressed my

13  concerns about his Internet access.

14      Additionally -- and we're not even talking about,

15  Judge, just within his home. As long as he was free to move

16  about within that community, there are cafes, libraries, so

17  forth, which he could use -- with simply a credit card and any

18  information that he cared to provide, he could create

19  subscriber -- a new subscription to any Internet service and,

20  therefore, access.

21      I am in no way, shape, or form suggesting that

22  Probation has failed in its duties as set out by the Court. It

23  is simply that Mr. Dillon, through his efforts, cannot maintain

24  this defendant. And I maintain that he continues to be a danger

25  to the community, in addition to which -- and I think the Court

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

12

1  fashion that there is no way Probation can maintain that. Those

2  are some just some areas that I'd like the Court to consider.

3  Thank you, Your Honor.

4      THE COURT: Mr. Parkman, anything else?

5      MR. PARKMAN: It's hard to fight possibilities, and

6  she's given us a list of possibilities that could occur. But

7  the real thing is -- dealing with the Internet and what I've

8  learned about it is if you are on the Internet and you are

9  trying to link up with stuff that is the basis of this charge,

10  they're going to know about it, because the providers keep

11  records. The FBI's monitoring it. I know for a fact that I've

12  had three calls in Dothan alone, not involving him, but

13  involving other people who have been on the Internet and had

14  looked at some of this stuff before. So they can monitor it.

15  They know what's going on and who's doing it and can trace it.

16  In this particular instance, though, what we're talking about is

17  whether he has done it or whether he hasn't or whether he will.

18      Now, one thing that I think is important, too, to note

19  is in the report that you somehow got or read or looked at, you

20  know, he's been seeking treatment, too, and has been under the

21  care of three people at one time, including medication. So it's

22  not like he's just turned his back on all of this and said, hey,

23  I'm going to continue my path; I'm going to continue this

24  going -- no. He's been meeting regularly with these people on a

25  regular basis, seeking the help that he thinks he needs and that

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

11

1  may be aware of this. I believe it should be in the file, the

2  conditions of release. I argued and requested that the Court

3  not allow him access to any individuals under the age of 18.

4  The Court -- I think it was Ms. Freeman at the time requested

5  and shared the information that there was an underage

6  relative -- and I believe it was a nephew -- who had a

7  relationship with not only the defendant but the defendant's

8  wife. It is my belief that that signifies a possible safety

9  concern to that specific person.

10      The reality is in this case the defendant has entered a

11  plea of guilty to charges which, by their very nature, are

12  crimes of violence. And unless the Court and the defense and

13  Probation can come up with terms and conditions, which I don't

14  believe they can, which would effectively assure the safety of

15  the community, I don't believe the Court has any choice at this

16  time.

17      Let me just say one other thing, Judge. And in no way,

18  shape, or form am I suggesting that the defendant has access to

19  vast amounts of wealth. I am not suggesting that. But as long

20  as he has access to computer equipment -- and so the Court

21  knows, I think we heard testimony at pretrial. He also fixes

22  computers, which means that he has that degree of expertise to

23  create computers. He also, in being out and having access to

24  retail resources, has the ability with simply the purchase of a

25  PDA or some telephone, has access to the Internet in a mobile

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

13

1  he is getting.

2      So I submit to the Court that this is not an individual

3  who has been made to do this. This is someone who has taken it

4  upon himself voluntarily to try to get the treatment and find

5  out what the underlying basis is, and he believes that he has

6  found that out through the help of these doctors. So I say to

7  the Court, yes, there are cafes in Dothan; there are libraries.

8  But in this particular instance, there hasn't been any flag

9  raised by anyone that he's doing any of this or talking to any

10  nephew or being around any of these people. And so we submit to

11  the Court that certainly under the plea agreement that we had,

12  there ought to be something given regarding that and the fact

13  that he has not done these things that everybody's worried

14  about. And I still believe this Court can set out certain

15  factors and do certain things to even ensure that he's not doing

16  what he's not doing. And I've talked about those different

17  things with the Court and different options that are available

18  or all options that are available to you. Thank you, Your

19  Honor.

20      THE COURT: Mr. Parkman, let me just say, as the case

21  stands right now, with his convictions through a plea of guilty

22  to counts three through seven, those counts are contained or

23  those charges are brought pursuant to 18, United States Code,

24  Section 2252 and subsections. Under the requirements that I

25  have with the definitions of the crimes that these fall under,

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. Kevin W. Turner                     March 4, 2004

14

1    under a crime of violence, by their very nature, they are
2    classified under Chapter 110 of the United States Code as a
3    crime of violence. And as such, my options are extremely
4    limited under those circumstances.
5         I want to see counsel briefly back in chambers. We're
6    going to take just a momentary recess --
7         MR. PARKMAN: Yes, sir.
8         THE COURT: -- so that we can discuss what the nature
9    of the discussions, if there are any discussions, under your
10   plea agreement are because I know the case was set for
11   sentencing earlier this week; and it is my understanding through
12   no discussion with either side that there has been some
13   difference of opinion, possibly, on the sentence and, thus,
14   resulting in a continuance until the latter part of May. But I
15   would like to find out what the nature of those discussions are,
16   as far as reaching a solution, not what y'all were discussing
17   about any type of plea, but are we working towards getting the
18   dispute worked out, or is it something that your client may
19   indeed be interested in looking at withdrawing his plea of
20   guilty. And then we need to look at another code section, as
21   far as his detention.
22        MR. PARKMAN: Okay.
23        THE COURT: But if I could, let me see counsel briefly.
24        MR. PARKMAN: All right, sir.
25        THE COURT: We'll take about a two-minute recess.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Kevin W. Turner                     March 4, 2004

15

1         MR. PARKMAN: Thank you, Your Honor.
2         THE CLERK: Court will be in recess.
3         (Recess at 2:22 p.m. until 2:57 p.m.)
4         THE COURT: Mr. Parkman, have you and Ms. Redmond had
5    an opportunity to discuss what you would like to do under this
6    case?
7         MR. PARKMAN: We've had discussions to try to resolve
8    this. And at this time, I feel like that the only way to
9    resolve this matter at this moment is that on behalf of Kevin
10   Turner, we're going to have to withdraw our pleas of guilty at
11   this time and move forward toward trial and on the motion to
12   suppress, also, that was previously filed.
13        THE COURT: Mr. Turner, do you understand what your
14   client -- or what your attorney is representing for you?
15        THE DEFENDANT: Yes, sir.
16        THE COURT: Do you understand that by withdrawing your
17   plea of guilty to the offenses for which you pled guilty in
18   January of this year, that you will now be standing charged with
19   all seven counts as opposed to counts three through seven for
20   which you pled guilty?
21        THE DEFENDANT: Yes, sir.
22        THE COURT: Is it your desire to withdraw your plea of
23   guilty at this time?
24        THE DEFENDANT: Yes, it is.
25        THE COURT: I will grant your request. Your plea of

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Kevin W. Turner                     March 4, 2004

16

1    guilty under Rule 11(c)(1)(C) and the plea agreement entered
2    between the government and the defendant dated December 1 -- or
3    filed December 1, 2003, Document Number 25, is hereby set aside
4    or vacated. You are now charged based upon the charges as set
5    forth in the original indictment. Do you wish to be rearraigned
6    on those charges, or are you satisfied with the arraignment that
7    was held initially?
8         MR. PARKMAN: Oh, we're satisfied with the arraignment
9    that was held. It was done in detail. We certainly understand
10   all the charges and understand what the penalties are.
11        THE COURT: I am going to order that you be held in
12   detention pending a hearing before the magistrate judge assigned
13   in this case for the conditions of release, should there be any,
14   as determined by the Court pursuant to 18, United States Code,
15   Section 3142. And I will make this known to the magistrate
16   judge today so that if there is any opportunity to have any kind
17   of expedited hearing, that you would be able to do so,
18   Mr. Parkman, on behalf of your client.
19        Is there anything, Ms. Redmond, that you wish to
20   express to the Court before we recess?
21        MS. REDMOND: Yes, sir. Actually, I'd like to just
22   state for the record that the government renews its motion for
23   detention pursuant to 18, 3142.
24        THE COURT: You will be given an opportunity, I'm sure,
25   before the magistrate judge in this case. And certainly should

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. Kevin W. Turner                     March 4, 2004

17

1    either side not be satisfied, that you both know the remedy
2    would be to appeal that detention order to this Court. Is there
3    anything else we need to cover before we adjourn today?
4    Anything on behalf of the government?
5         MS. REDMOND: No, sir.
6         THE COURT: Anything on behalf of the defendant?
7         MR. PARKMAN: No, sir. I take it we'll be notified
8    about the hearing before the magistrate?
9         THE COURT: If you would like to check with Judge
10   McPherson's office today -- it's my intention when I leave here
11   to call her so that she can be notified of the status of this
12   case today.
13        MR. PARKMAN: I'll call. Thank you very much, Your
14   Honor.
15        THE COURT: We'll be in recess.
16        MS. REDMOND: Thank you, Your Honor.
17        THE CLERK: Court is in recess.
18        (Proceedings concluded at 3:01 p.m.)
19               * * * * * * * * * *
20            COURT REPORTER'S CERTIFICATE
21        I certify that the foregoing is a correct transcript
22   from the record of proceedings in the above-entitled matter.
23        This 27th day of December, 2005.
24
25            RISA L. ENTREKIN, RDR, CRR
              Official Court Reporter

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

1    RECEIVED IN THE UNITED STATES DISTRICT COURT FOR

2                    THE MIDDLE DISTRICT OF ALABAMA
     2004 JUN 22 ⊃ 2: 52
3                        SOUTHERN DIVISION
     DEBRA P. HACKETT, CLK
4     U.S. DISTRICT COURT
     MIDDLE DISTRICT ALA

5

6    UNITED STATES OF AMERICA

7

8          Vs.                    CR. NO. 03-219-S

9

10   KEVIN W. TURNER

11

12

13              *    *    *    *    *    *    *    *

14                   CHANGE OF PLEA HEARING

15              *    *    *    *    *    *    *    *

16           Before Hon. Vanzetta Penn McPherson,

17           Magistrate Judge, at Montgomery, Alabama,

18           Commencing on May 14, 2004

19              *    *    *    *    *    *    *    *

20

21   APPEARANCES: For the Government: Susan Redmond

22                                    Assistant U.S. Attorney

23           For the Defendant:  James Parkman,

24                                Attorney at Law

25

GOVERNMENT
EXHIBIT
C

1            (The above case coming on for hearing at Montgomery,

2    Alabama, May 14, 2004, before Honorable Vanzetta Penn

3    McPherson, Magistrate Judge, the following proceedings were

4    had commencing at 9:00 a.m.:)

5            THE COURT:  United States of America versus Kevin W.

6    Turner, case number 03-219-S. The Defendant, Kevin Turner is

7    represented by his attorney, Mr. James Parkman.  Appearing

8    for the government is Assistant U.S. Attorney Susan Redmond.

9    Mr. Turner, please approach the bar, raise your right hand to

10   be sworn. The Defendant appears in this proceeding for the

11   purpose of changing his plea of not guilty to a plea of

12   guilty pursuant to a plea agreement previously submitted to

13   the Court.

14           THE CLERK:  You do solemnly swear or affirm that the

15   testimony you give in this cause to be the truth, the whole

16   truth, and nothing but the truth, so help you God.

17           THE DEFENDANT:  I do.

18           THE COURT:  Mr. Turner, the Court has been notified

19   that you wish to change your plea of not guilty to a plea of

20   guilty.

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  Before the Court proceeds to the

23   traditional colloquy, the Court wishes to make sure that the

24   record reflects your own voluntary decision to enter this

25   plea. The Court is, of course, aware that you have entered a

1  plea before, and that you have proceeded to the District

2  Court level, withdrawn your plea and now you return to

3  reenter a plea; is that correct?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  The Court further assumes that the plea

6  agreement to which you and the government have signed on to

7  contains provisions which are different from the plea

8  agreement or plea that you entered before; is that correct?

9        THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  The Court further assumes that you fully

11  understand the differences and the difference in the

12  implications for punishment or sentencing between this plea

13  agreement and the previous plea agreement.

14        THE DEFENDANT:  Yes, Your Honor.

15        THE COURT:  The Defendant has signed a consent to

16  enter his plea before a United States Magistrate Judge. Mr.

17  Parkman, do you represent that the signed original plea

18  agreement just tendered to the Court is the same document as

19  the draft tendered to the Court before?

20        MR. PARKMAN:  Yes, ma'am, I do, Your Honor.

21        THE COURT:  No changes?

22        MR. PARKMAN:  No changes, Your Honor.

23        THE COURT:  All right. Mr. Turner, what is your full

24  name?

25        THE DEFENDANT:  Kevin Lamar Turner.

1          THE COURT:  There is no W?

2          THE DEFENDANT:  No, ma'am.

3          THE COURT:  Okay. How old are you?

4          THE DEFENDANT:  39.

5          THE COURT:  How far did you go in school?

6          THE DEFENDANT:  Graduated high school, two years of

7    vocational.

8          THE COURT:  Have you been treated for any mental

9    illness or addiction to narcotic drugs of any kind?

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  Are you currently under the care of a

12    physician?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  What is the condition you are being

15    treated for?

16          THE DEFENDANT:  Bipolar disorder.

17          THE COURT:  You have never been confined to any

18    institution for that condition?

19          THE DEFENDANT:  No, ma'am.

20          THE COURT:  Are you now receiving counseling or

21    medication or both?

22          THE DEFENDANT:  When I was out I was receiving both.

23    Now I am still on medication.

24          THE COURT:  What medication?

25          THE DEFENDANT:  Nine hundred milligrams of Lithium a

1  day, 40 milligrams of Prozac, one hundred milligrams of

2  Seraquel.

3        THE COURT:  What consequences are there to your

4  failure to take your medication?

5        THE DEFENDANT:  Depression.

6        THE COURT:  Anything else? What about your conduct?

7        THE DEFENDANT:  It would -- it could have an effect

8  on my conduct.

9        THE COURT:  Have you taken that medication as

10  prescribed while you have been confined?

11        THE DEFENDANT:  Every day.

12        THE COURT:  And what is the consequence of your

13  taking it?

14        THE DEFENDANT:  I feel normal, I can deal with

15  situations as someone can that's not on medication.

16        THE COURT:  Does taking the medication have any

17  impact on your ability to understand these proceedings?

18        THE DEFENDANT:  No.

19        THE COURT:  Has it affected negatively in any way

20  your ability to negotiate this plea agreement?

21        THE DEFENDANT:  No, ma'am.

22        THE COURT:  Has it affected your ability to

23  understand your lawyer's representations or to make

24  representations to him or to express your desires to him

25  regarding a plea agreement?

1          THE DEFENDANT:  No, ma'am.

2          THE COURT:  Other than the medication you have

3  recited to the Court are you currently under the influence of

4  any drug or alcohol?

5          THE DEFENDANT:  No, ma'am.

6          THE COURT:  Have you within the last 48 hours

7  consumed any alcohol?

8          THE DEFENDANT:  No, ma'am.

9          THE COURT:  Did you have a full opportunity to sit

10  with Mr. Parkman, review the terms of this plea agreement,

11  read it for yourself before you signed it?

12          THE DEFENDANT:  I did.

13          THE COURT:  Do you understand all of the terms of

14  the plea agreement?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Do you have any questions you wish to

17  ask the Court at this time about any of those provisions?

18          THE DEFENDANT:  No, ma'am.

19          THE COURT:  Are you fully satisfied with the

20  counsel, representation and advice given to you in this case

21  by Mr. Parkman?

22          THE DEFENDANT:  Absolutely.

23          THE COURT:  Is your willingness to plead guilty the

24  result of discussions that you and Mr. Parkman have had with

25  each other and the result of discussions that Mr. Parkman has

1    in turn had with Ms. Redmond?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Does this plea agreement represent in

4    its entirety all of the agreements you have with the

5    government? My question is, is there any agreement you

6    believe that you have with the government that is not

7    represented in the plea agreement?

8            THE DEFENDANT:  No, ma'am.

9            THE COURT:  Other than the terms of the plea

10   agreement has anyone made any promises to you or given you

11   any assurances as to what will happen to you if you plead

12   guilty?

13           THE DEFENDANT:  No, ma'am.

14           THE COURT:  Do you understand that the terms of the

15   plea agreement are merely recommendations to the Court that

16   are not binding on the Court?

17           THE DEFENDANT:  Yes, ma'am.

18           THE COURT:  Mr. Parkman?

19           MR. PARKMAN:  Yes, ma'am.

20           THE COURT:  The plea agreement provides -- I checked

21   the rule book regarding 11(c)(1)(A), and frankly I failed to

22   discern the provision permitting withdrawal under (c)(1)(A)

23   at the bottom of page four.

24           MR. PARKMAN:  I am familiar with what you are

25   talking about where we are not allowed to withdraw the plea

1    and proceed to trial.

2              THE COURT:  At the bottom of page four it says if

3    the terms of the plea agreement are not accepted by the Court

4    the Defendant will be allowed to withdraw --

5              MR. PARKMAN:  Right.

6              THE COURT:  -- his plea and proceed to trial, is

7    that the agreement?

8              MR. PARKMAN:  Yes, ma'am. The difference -- can I

9    state the difference that we are talking about? And let me

10   explain to you what has happened, Your Honor. If you will

11   recall you did the original plea agreement in this case, then

12   it came back to you for another hearing and now we are back

13   on another plea agreement.

14             THE COURT:  Yes.

15             MR. PARKMAN:  What has happened in the meantime is

16   that we are expecting, although we understand that the Court

17   does not have to accept it, however, that's only based upon

18   the idea that the government doesn't do the following, and

19   that is, ask for substantial assistance points in this case.

20   We know based on my negotiations and discussions with the

21   prosecutor what has taken place in between the last time we

22   were in court and what has happened now, so we are under the

23   understanding that is going to be maintained and offered to

24   the Court for a reduction for the substantial assistance, and

25   we have already discussed that. So what has happened in this

1    plea agreement is we are not doing what we did the last time

2    by saying this is what the points are going to be, this is

3    what the sentence is going to be, what we are headed for is

4    looking at the same presentence investigation now with an eye

5    towards what he has already done and what we expect the

6    government to do as a result of what he has done.

7        THE COURT:  I see.

8        MR. PARKMAN:  So it's not in here about you are

9    going to receive this amount of time or reach this goal at

10   this point, that's what the difference is in the two plea

11   agreements.

12       THE COURT:  So the gravamen of this plea agreement

13   under consideration now is substantial assistance.

14       MR. PARKMAN:  Absolutely, and that's what the bottom

15   line is in this plea agreement.

16       THE COURT:  And you understand that, Mr. Turner?

17       THE DEFENDANT:  Yes, ma'am.

18       THE COURT:  As opposed to a specific sentence or a

19   specific term.

20       THE DEFENDANT:  Yes, ma'am.

21       THE COURT:  Do you understand that pursuant to the

22   plea agreement if the Court chooses not to follow the terms

23   of the plea agreement, the Court will give you an opportunity

24   to withdraw your plea?

25       THE DEFENDANT:  Yes, ma'am.

1        THE COURT:  That should that happen you will then

2   proceed to trial.

3        THE DEFENDANT:  Yes, ma'am.

4        THE COURT:  Has anyone attempted in any way to force

5   you to plead guilty in this case?

6        THE DEFENDANT:  No, ma'am.

7        THE COURT:  Do you understand that the offenses to

8   which you are pleading, counts three through seven,

9   constitute felony offenses, and if your plea is accepted you

10  will be adjudged guilty of those offenses?

11       THE DEFENDANT:  Yes, ma'am.

12       THE COURT:  Do you understand that once you are

13  adjudicated guilty you may be deprived of the right to vote,

14  the right to hold public office, the right to sit on a jury

15  and the right to bear a firearm?

16       THE DEFENDANT:  Yes, ma'am.

17       THE COURT:  Do you understand that after an

18  adjudication of guilt on these offenses, a final

19  adjudication, that is, that the mere possession of a weapon

20  will constitute a federal crime?

21       THE DEFENDANT:  Yes, ma'am.

22       THE COURT:  Do you understand, Mr. Turner, that if

23  you are sentenced pursuant to this agreement that a portion

24  of that sentence will be a term of supervised release?

25       THE DEFENDANT:  Yes, ma'am.

1    THE COURT:  And that if you violate the conditions

2  of supervised release, even after you get out of prison, and

3  you are found guilty of those violations you may be returned

4  to prison?

5    THE DEFENDANT:  Yes, ma'am.

6    THE COURT:  And that should that happen it will not

7  violate the terms of the plea agreement.

8    THE DEFENDANT:  Yes, ma'am.

9    THE COURT:  Do you further understand that you will

10  not be released from prison on parole because parole has been

11  abolished?

12    THE DEFENDANT:  Yes, ma'am.

13    THE COURT:  That if you are sentenced to a fixed

14  termed you will serve all or most of that term without being

15  released on parole.

16    THE DEFENDANT:  Yes, ma'am.

17    THE COURT: Now, because there are five elements

18  here, five offenses here, which are related but charge

19  separate conduct, I am going to ask either Ms. Redmond or Mr.

20  Parkman to go through the terms of the plea agreement

21  individually. It doesn't matter which one.

22    MS. REDMOND:  The terms of the agreement, Your

23  Honor?

24    THE COURT:  The terms of the agreement. And I am

25  going to ask Mr. Turner some followup questions after you do.

12

1          MS. REDMOND:  Judge, the terms of the agreement, the

2     government's provisions, is that what we are referring to?

3          THE COURT:  Yes.

4          MS. REDMOND:  Yes, ma'am.  Upon entering a plea of

5     guilty by the Defendant to the offenses charged in counts

6     three, four, five, six and seven of the indictment the

7     attorney for the government or the government agrees to do

8     the following: We agree that pursuant to Rule 11(c)(1)(A)

9     that at sentencing we will dismiss counts one and two of the

10    indictment; we agree that a two level reduction in the

11    applicable offense level is appropriate for Defendant's

12    acceptance of responsibility, and that if we find that he has

13    permitted the government to avoid preparing for trial and

14    permitted the government and the Court to allocate their

15    resources efficiently we will move at sentencing for a

16    further reduction of one level pursuant to sentencing

17    guideline 3E1.1(b). That obligation -- or rather that

18    determination is at the sole discretion of the United States.

19          Further, we agree to file a motion for a three level

20    downward departure pursuant to United States Sentencing

21    Guidelines Section 5K1.1, and Federal Rules of Criminal

22    Procedure 3553(e) for the Defendant's substantial assistance

23    to the United States in the investigation and prosecution of

24    other violations of federal child pornography and obscenity

25    laws. The Defendant's provisions are as follows, Your Honor.

1          THE COURT:  Before you go to that --

2          MS. REDMOND:  I apologize.

3          THE COURT:  That's all right. Mr. Turner, do you

4    understand that what is contemplated in the government's

5    provisions is a potential total of three level reduction in

6    the applicable offense level?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  That first of all it is contemplated

9    that the government may make a recommendation for as much as

10   a three level reduction.

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Once it finds that you have cooperated

13   with, you have saved the government's expense to going to

14   trial and resources going to trial and you have fully

15   accepted your responsibility in these acts; do you understand

16   that?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  And have you discussed that aspect of

19   this with your lawyer, Mr. Parkman?

20         THE DEFENDANT:  I have.

21         THE COURT: Now, in addition, the government is

22   prepared to file a motion for a three level downward

23   departure; do you understand that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And do you understand that the motion

1    for a three level downward departure is separate from and in

2    addition to the potential three level reduction?

3            THE DEFENDANT:  Yes, ma'am.

4            THE COURT:  Finally, do you fully understand that

5    whether or not the government makes a recommendation for the

6    third level reduction is in the sole discretion of the

7    government?

8            THE DEFENDANT:  Yes, I do.

9            THE COURT:  That the government is not promising to

10   do this, it is based upon your cooperation and your

11   acceptance of responsibility.

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  All right. Proceed, Ms. Redmond.

14           MS. REDMOND:  The Defendant's provisions, Your

15   Honor, are as follows: That he plead guilty to counts three,

16   four, five, six and seven of the indictment; that he admit

17   that he does have a prior conviction for sexual abuse second

18   degree of a minor, and to the forfeiture of certain items

19   spelled out in the indictment.

20           THE COURT:  That are listed.

21           MS. REDMOND:  Yes, ma'am.  And to be specific,

22   specifically a computer and electronic equipment.  The

23   forfeiture in the indictment also had forfeiture of real

24   property, that is to say land and structures, and the

25   government is specifically removing itself from that within

1   this plea agreement. Also, Your Honor, for your information,
2   there is also a waiver of appeal and collateral attack that
3   is contained on page nine -- excuse me, pages nine and ten of
4   the plea agreement in which the Defendant agrees to waive
5   appeal and collateral attack with the following exceptions,
6   ineffective assistance of counsel, prosecutorial misconduct.
7   And he has the right to file a direct appeal of an upward
8   departure from the guideline range which the sentencing court
9   specifies at the time of sentencing as having been imposed.
10  In return for those waivers by the Defendant the government
11  does not give up its right to appeal nor its duty to appeal
12  in this matter.
13          THE COURT:  Mr. Turner, do you understand that you
14  stand presently charged with counts one through seven in the
15  indictment?
16          THE DEFENDANT:  Yes, Your Honor.
17          THE COURT:  And that in exchange for your plea of
18  guilty to counts three through seven the government is
19  willing to dismiss the first two counts at sentencing.
20          THE DEFENDANT:  Yes, ma'am.
21          THE COURT:  That if that happens you will no longer
22  be held responsible for the conduct charged in counts one and
23  two.
24          THE DEFENDANT:  Yes, ma'am.
25          THE COURT:  Do you further understand that you will

1    be required as a part of the -- of your agreement with the

2    government to acknowledge that you have a prior conviction

3    for sexual abuse in the second degree of a minor?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  And that you have agreed to forfeit the

6    electronic equipment and the land and structures mentioned by

7    Ms. Redmond as a part of this plea agreement.

8              MS. REDMOND:  Excuse me, Your Honor, specifically

9    not the land and the structures.

10             THE COURT:  Specifically not the land and the

11   structures, but the electronic equipment?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And that that means that once the

14   property is forfeited you will no longer have any right,

15   title or interest in that property.

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  Do you further understand that the

18   limitation on your right to appeal is your right to appeal an

19   upward departure made by the Court?

20             THE DEFENDANT:  Yes, ma'am.

21             THE COURT:  And that that right to appeal does not

22   include the right to appeal the Court's failure to make a

23   downward departure.

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  Do you understand that those are two

1  different things?

2          THE DEFENDANT:  I do.

3          THE COURT:  In your plea agreement you do not give

4  up your constitutional right to appeal your sentence based

5  upon ineffective assistance of counsel, that is, your 6th

6  Amendment right; do you understand that?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  And you do not give up your right to

9  appeal based upon prosecutorial misconduct; do you understand

10  that?

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  And do you understand that prosecutorial

13  misconduct pertains not just to Ms. Redmond but to her

14  office?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  And I don't mean in other cases, I mean

17  in your case.

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT: Now, your plea agreement does not

20  specifically say this but I want to make sure you understand

21  it, and the government and you have agreed to this, that as a

22  part of your substantial cooperation you will not be required

23  to make any cases for the government.

24          MS. REDMOND:  That's correct, Your Honor. I'm sorry.

25          THE COURT:  You will be required, however, to

1    cooperate, to testify truthfully when called upon to do so,

2    to provide any information you have regarding illegal

3    activity, to name names, to point fingers and to do other

4    things that enable the government to investigate federal

5    criminal offenses; do you understand that?

6              THE DEFENDANT:  I do.

7              THE COURT:  All right. Do you understand that if you

8    testify falsely that your testimony will not be usable

9    against you in this case but it could be usable against you

10   in a later prosecution for perjury?

11             THE DEFENDANT:  Yes.

12             THE COURT:  You were going to say something, Ms.

13   Redmond.

14             MS. REDMOND:  I am fine, Your Honor, please excuse

15   me.

16             THE COURT:  Do you understand, Mr. Turner, that your

17   waiver of your right to appeal except as I have stated it to

18   you and as Ms. Redmond articulated it does not mean that the

19   government has given up its right to appeal?

20             THE DEFENDANT:  Yes, ma'am.

21             THE COURT:  Do you understand that following your

22   plea of guilty -- and perhaps I should pause here because the

23   posture of this case suggests to me that a presentence report

24   may already have been done.

25             MS. REDMOND:  Yes, ma'am, that is correct.

1          THE COURT:  Okay. And do you contemplate that
2     another will be done, Mr. --
3          PROBATION OFFICER:  Your Honor, there will have to
4     be some updating because there were some mental health
5     records that were not provided to the probation officer at
6     the time of the Defendant's last sentence.  I think the
7     counsel and I have discussed this in the past, the Defendant
8     will make those records accessible and that is pretty much
9     all that needs to be done to the report just to update since
10    the last sentencing hearing.
11         THE COURT:  Do we have a date for sentencing, Mr.
12    Long?
13         THE CLERK:  I have got a proposed order here for
14    Judge Fuller that says August 16th at 9:00 a.m.
15         MR. PARKMAN:  Your Honor, may it please the Court.
16         THE COURT:  Yes, Mr. Parkman.
17         MR. PARKMAN:  I am -- because we have already --
18    really have the report ready and because really and truly the
19    only aspects that needs to be changed is what he indicated to
20    you about some medical records just to have that in there,
21    and because of the new addition of the possibility of a move
22    by the government for substantial assistance, I am going to
23    file a motion with the Judge in this case, Circuit Judge -- I
24    mean the District Judge to have an expedited sentencing in
25    this, so I will let the record know that because we are ready

1    to move on this as quickly as possible.

2         THE COURT:  I would think so.

3         MR. PARKMAN:  So I am going to do that as a matter

4    of fact.

5         THE COURT:  If everything is ready there's no reason

6    it shouldn't go forward before August. Is there any thought

7    to his getting credit, any time -- credit for time served?

8         MS. REDMOND:  The government would not oppose that.

9    It's not specifically provided in the written plea agreement

10   but we have no opposition.

11        THE COURT:  All right. Mr. Turner, do you understand

12   that you have the right to plead not guilty?

13        THE DEFENDANT:  Yes, ma'am.

14        THE COURT:  That you may insist on a not guilty plea

15   and you do not have to plead guilty and no one can force you

16   to do so?

17        THE DEFENDANT:  Yes, ma'am.

18        THE COURT:  Do you understand that if you persisted

19   in your right to plead not guilty you would continue to be

20   presumed innocent even if you went to trial?

21        THE DEFENDANT:  Yes.

22        THE COURT:  That it would be the government's burden

23   at trial to prove your guilt beyond a reasonable doubt.

24        THE DEFENDANT:  Yes, ma'am.

25        THE COURT:  Do you understand that at trial you

1   would have the constitutional right to the assistance of your

2   attorney to represent you?

3           THE DEFENDANT:  Yes, ma'am.

4           THE COURT:  The right to see and hear all of the

5   witnesses against you and have them cross-examined in your

6   defense?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  The right to testify on your own behalf

9   or if you declined to testify the right not to have that used

10  against you?

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  The right to the issuance of subpoenas

13  or compulsory process to compel the attendance of witnesses

14  at the trial for you?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Do you understand that by entering a

17  plea of guilty you are essentially waiving a trial and there

18  will be no trial and the case will proceed immediately to

19  sentencing?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  And that the only circumstance which

22  will allow you to withdraw your plea is if the Court

23  sentences you in a manner inconsistent with the terms of the

24  plea agreement?

25          THE DEFENDANT:  Yes, ma'am.

22

1      THE COURT:  But that if that does not happen you may

2   not later change your mind and decide to go to trial.

3      THE DEFENDANT:  Yes, ma'am.

4      THE COURT:  You are charged in count three and four

5   and five with distribution of child pornography. How do you

6   plead to counts three, four and five?

7      THE DEFENDANT:  Guilty.

8      THE COURT:  What did you do as it pertains to counts

9   three, four and five?

10      THE DEFENDANT:  Distribution of child porn.

11      THE COURT:  Distribution of child pornography?

12      THE DEFENDANT:  I used the internet to create a Web

13   site and published certain images on the Web site.

14      THE COURT:  You yourself published those images on

15   the Web site?

16      THE DEFENDANT:  Yes, ma'am.

17      THE COURT:  And what were the images?

18      THE DEFENDANT:  Images of the victim.

19      THE COURT:  Were they images of sexually explicit

20   conduct?

21      THE DEFENDANT:  Yes, ma'am.

22      THE COURT:  And did you know that when you were

23   doing it?

24      THE DEFENDANT:  Yes, ma'am.

25      THE COURT:  And were the depictions that you

1    published on the internet images of sexually explicit

2    conduct?

3            THE DEFENDANT:  Yes, ma'am.

4            THE COURT:  When did this occur?

5            THE DEFENDANT:  Your Honor, I --

6            THE COURT:  Period of time.

7            THE DEFENDANT:  June, July of 2000.

8            THE COURT:  Where?

9            THE DEFENDANT:  Dothan, Houston County.

10            THE COURT:  For the record, the Middle District of

11    Alabama. Did you also receive any visual depictions of

12    sexually -- depictions of sexual conduct shipped in

13    interstate or foreign commerce?

14            THE DEFENDANT:  Yes, ma'am.

15            THE COURT:  And did the depictions that you received

16    in interstate or foreign commerce involve the use of a minor

17    involved in sexually explicit conduct?

18            THE DEFENDANT:  Yes, ma'am.

19            THE COURT:  And was that visual depiction a

20    depiction of sexually explicit conduct by a minor?

21            THE DEFENDANT:  Yes, ma'am.

22            THE COURT:  Did you also knowingly mail or transport

23    or ship child pornography?

24            THE DEFENDANT:  Yes, ma'am.

25            THE COURT:  Through?

1          THE DEFENDANT:  Internet.

2          THE COURT:  The internet. And you did so yourself.

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  And you did so knowing that the

5     depictions that you were transporting over the internet were

6     going in interstate or foreign commerce.

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  Did you also knowingly reproduce child

9     pornography?

10         THE DEFENDANT:  Yes, ma'am.

11         THE COURT:  How so?

12         THE DEFENDANT:  Downloaded pictures over the

13    internet.

14         THE COURT:  All right. And so you copied them from

15    the internet to your own machine.

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  All right. For the purpose of

18    transporting them and distributing them?

19         THE DEFENDANT:  For use of them, yes.

20         THE COURT:  And did you know when you did so that

21    you were downloading or reproducing sexually explicit conduct

22    by a minor?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  Did you also know that when you

25    downloaded them or reproduced them that in essence you were

1    facilitating their distribution through interstate or foreign

2    commerce since you took it from the internet?

3         THE DEFENDANT:  Yes, ma'am.

4         THE COURT:  Did you also knowingly possess any film,

5    video tape, computer disk or other material that contained an

6    image of child pornography?

7         THE DEFENDANT:  Yes, ma'am.

8         THE COURT:  Did you know when you possessed it that

9    it had been mailed or shipped or transported over the

10   internet in interstate or foreign commerce?

11        THE DEFENDANT:  Yes, ma'am.

12        THE COURT:  And when you possessed that material did

13   you know or believe that those items constituted or contained

14   child pornography or sexually explicit conduct by a minor?

15        THE DEFENDANT:  Yes, ma'am.

16        THE COURT:  Did all of this conduct happen within

17   the Middle District of Alabama?

18        THE DEFENDANT:  Yes, ma'am.

19        THE COURT:  And did all of this conduct happen in

20   the year 2000 or thereafter?

21        THE DEFENDANT:  Yes, ma'am.

22        MS. REDMOND:  Judge, if I may, just briefly.

23        THE COURT:  Yes.

24        MS. REDMOND:  Mr. Turner, when you uploaded the

25   images to your Web site in July of 2000, did you know that

1  the images that you were uploading to the internet were of a

2  minor engaged in sexually explicit activity?

3        THE DEFENDANT:  I did not know he was a minor.

4        (At which time an off-the-record discussion was had

5  between the Defendant and his counsel.)

6        THE DEFENDANT:  Yes.

7        MS. REDMOND:  Satisfied, Your Honor.

8        THE COURT:  Satisfied. Mr. Parkman?

9        MR. PARKMAN:  Satisfied.

10        THE COURT:  It is the finding of the Court in the

11  case of United States versus Kevin Turner that the Defendant

12  is fully competent and capable of entering an informed plea,

13  that the Defendant is aware of the nature of the charges and

14  the consequences of the plea, and that the plea of guilty to

15  counts three, four, five, six and seven of the indictment is

16  a knowing and voluntary plea supported by an independent

17  basis in fact containing each of the essential elements of

18  the offenses. The Defendant's plea will be recommended for

19  acceptance and the Court will recommend that the Defendant be

20  adjudged guilty of these offenses. I will advise Judge Fuller

21  that you intend to move for an expedited sentencing.

22        MR. PARKMAN:  Thank you very much, Your Honor.

23        THE COURT:  Anything further?

24        MS. REDMOND:  No, ma'am.

25        MR. PARKMAN:  No, ma'am. Are we excused at this

1  time?

2         THE COURT:  You are excused and the Defendant is

3  remanded to the custody of the marshal.

4         MR. PARKMAN:  Let me thank this Court for an

5  expedited hearing for getting us up here to do this, so thank

6  you very much for taking that consideration, because we are

7  trying very hard to move forward. Thank you very much.

8         THE COURT:  All right.

9         (At which time, 9:40 a.m., the hearing was

10  adjourned.)

11                 *      *      *      *      *

12         I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14  This the 22nd day of June, 2004.

15

16                              _____

17                              Official Court Reporter

18

19

20

21

22

23

24

25

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR
 2              THE MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4
 5
 6   UNITED STATES OF AMERICA
 7
 8        Vs.                    CR. NO. 03-219
 9
10   KEVIN TURNER
11
12        *   *   *   *   *   *   *   *   *
13                  SENTENCE HEARING
14        *   *   *   *   *   *   *   *   *
15          Before Hon. Mark E. Fuller, Judge,
16        at Montgomery, Alabama, Commencing
17        on August 26, 2005
18        *   *   *   *   *   *   *   *   *
19
20
21   APPEARANCES: For the Government: Susan Redmond
22                              Assistant U.S. Attorney
23        For the Defendant:  James W. Parkman, III,
24                              Attorney at Law
25
```

Page 2

1          (The above case coming on for hearing at Montgomery,
2   Alabama, August 26, 2005, before Honorable Mark E. Fuller,
3   Judge, the following proceedings were had commencing at 9:10
4   a.m.:)
5          THE COURT: Call the case of United States of
6   America versus Kevin Turner, case number 03CR-219, in the
7   Middle District of Alabama, Northern Division. Mr. Parkman,
8   are you prepared to go forward with sentencing this morning
9   on behalf of your client?
10         MR. PARKMAN: I am, Your Honor.
11         THE COURT: Ms. Redmond, are you and Mr. Harmon
12   prepared on behalf of the United States?
13         MS. REDMOND: Yes, sir.
14         THE COURT: I understand that there are some
15   objections, and Mr. Parkman, you and your client may remain
16   at counsel table until those objections have been addressed.
17   Okay. Mr. Turner, today the Court will determine a reasonable
18   sentence in your case by considering the United States
19   Sentencing Guidelines which were promulgated pursuant to the
20   Sentencing Reform Act of 1984, and are now advisory, and by
21   considering the factors set forth in 18 United States Code
22   Section 3553(a). It appears that a plea agreement has been
23   reached in this case, specifically pursuant to Rule
24   11(c)(1)(A). Is that, in fact, correct, Ms. Redmond?
25         MS. REDMOND: Yes, sir.

Page 3

1          THE COURT: Is that correct, Mr. Parkman?
2          MR. PARKMAN: It is correct, Your Honor.
3          THE COURT: If one of the counsel for one of the
4   parties would represent to the Court the terms of the plea
5   agreement so that I can make a determination about either
6   accepting or rejecting the plea agreement.
7          MS. REDMOND: Judge, again, the plea agreement is
8   pursuant to 11(c)(1)(A). The terms of the plea agreement are
9   as follows: On behalf of the government, upon the Defendant
10  entering a plea of guilty to counts three, four, five, six
11  and seven of the indictment, the government agrees to dismiss
12  counts one and two of the indictment; agrees that a two level
13  reduction in the applicable offense level be given as well as
14  the third point for acceptance of responsibility should the
15  government make the determination that the third point for
16  acceptance of responsibility is due to the Defendant;
17  further, the government agreed to file a motion for three
18  level downward departure for the Defendant's substantial
19  assistance to the United States upon the United States'
20  making a finding that there had been substantial assistance
21  in the investigation and prosecution of other violations of
22  federal child pornography and obscenity laws.
23         The Defendant's provisions, Your Honor, were to
24  plead guilty to counts three, four, five, six and seven; he
25  agreed that he does, in fact, have a prior conviction for

Page 4

1   sexual abuse second degree of a minor; to the forfeiture of
2   certain items as set forth in paragraphs one, 3(a), 3(b) and
3   3(c) of the indictment; further, the Defendant agrees to
4   waive appeal and collateral attack with the exception of
5   prosecutorial misconduct or ineffective assistance of
6   counsel; and finally, he agrees to payment of the assessment
7   fee.
8          THE COURT: Does that accurately state the agreement
9   as you understand it to be involving your client, Mr.
10  Parkman?
11         MR. PARKMAN: In general it does.
12         THE COURT: Are there any additional?
13         MR. PARKMAN: Two added features I would like to add
14  to that.
15         THE COURT: Please.
16         MR. PARKMAN: One is they did agree to file a motion
17  for a three level downward departure for 5K1.1, and second,
18  my interpretation of this is we do waive appeal except under
19  circumstances which may be unforeseen, for example, an upward
20  departure by the Court which there would be no factual basis
21  for, seems to me we reserve the right by the Defendant to
22  appeal those issues.
23         THE COURT: Anything else?
24         MR. PARKMAN: No, sir, Your Honor.
25         THE COURT: I do have before the Court the United

GOVERNMENT EXHIBIT D

## Page 5

1  States' motion for downward departure for acceptance of
2  responsibility pursuant to Section 3E1.1(b) of the United
3  States Sentencing Guidelines. This is a request for the third
4  point reduction for acceptance of responsibility. Without
5  objection, that motion is granted. I also state for the
6  record that I find the plea agreement reached between the
7  United States and the Defendant acceptable and therefore I
8  accept the plea and will sentence Mr. Turner accordingly. Mr.
9  Turner, have you and your attorney had an opportunity to
10 review the presentence report before today's date?
11     THE DEFENDANT: Yes, Your Honor.
12     THE COURT: You need to stand, if you would.
13     THE DEFENDANT: Yes, Your Honor.
14     THE COURT: Do you have any objections to any of the
15 content of the presentence report?
16     MR. PARKMAN: Speaking for -- I think this is a
17 legal issue that I need -- and I don't mean to interpret you
18 or Mr. Turner.
19     THE COURT: You may interject here if you have
20 objections on his behalf.
21     MR. PARKMAN: I do have several if I could.
22     THE COURT: You may be seated, Mr. Turner, and I
23 will allow your attorney to proceed with the objections on
24 your behalf.
25     MR. PARKMAN: Your Honor, if I could, I am going to

## Page 6

1  do this in order but let me start with one issue that I need
2  to bring up to the Court because I want to correct something
3  if I can, because I do not want the Court to feel like it has
4  been misled by Mr. Turner or myself. About a week and a half
5  ago, two weeks ago we had a conference call at which point
6  you read an affidavit or a statement that was given to the
7  Court by a nurse by the name of Steven Smith. In there he
8  stated, and we had this issue come up that we put on the
9  record, that Mr. Turner was, in fact, on Depakote and had
10 been so since August the 10th.
11     Now, in dealing with this I knew different, and I
12 knew that was incorrect. So with that in mind this week I
13 sent to the Wetumpka jail where Mr. Turner is being held a
14 soon-to-be lawyer, hopefully in October, but a paralegal
15 that's been working in our office for three years by the name
16 of Mark Johnson. And he went up there for the purpose of
17 finding out what the true story was about the Depakote and
18 the nurse practitioner's, Steven Smith's allegation that, in
19 fact, he was on Depakote.
20     With me I have an affidavit, a sworn affidavit by
21 Mark Johnson, in which he states that he went to the jail, he
22 talked to the nurse that's on duty all the time. Steven Smith
23 is just a nurse that works with the doctor. Nurse Singleton
24 indicated to him that, in fact, as of August 1st of 2005
25 Steven Smith in fact had, in fact, cancelled all Lithium and

## Page 7

1  Depakote, and at the time that he was up there this week on
2  Tuesday, Depakote nor Lithium had ever been given to Kevin
3  Turner since August the 1st, and that the statement by Steven
4  Smith that he had been was incorrect and he -- or the nurse
5  indicated that that was just simply a mistake on their part,
6  and should have read otherwise.
7      Now, all that I want to file that with this Court
8  this morning because I want the Court to know that what we
9  told the Court previously on the record was true. What we
10 contend happened, happened, and that we weren't trying to in
11 any way hoo-doo the Court with regard to these medications. I
12 do think it's important to note though that this affidavit of
13 the nurse indicating to him what had or what had not been
14 done is important to let you know that what we did tell the
15 Court was true. So at this time I would like to present this
16 affidavit. It doesn't really have any effect on the
17 sentencing other than to clarify what I had told the Court
18 previously.
19     MS. REDMOND: And with respect, I don't know whether
20 I have an objection or not as I have not been presented with
21 this affidavit previous.
22     THE COURT: Why don't you take a look at it and see
23 if you would have any objection. Let me just say for the
24 benefit of all involved, it was my concern to have Mr. Turner
25 in a state mentally that he could understand and participate

## Page 8

1  in the sentencing in this case, and I ascribed no particular
2  interest in whatever motivation it was that caused the
3  sentence to be continued, and it certainly will not affect
4  the sentence that I will hand down in this case. So I
5  appreciate you verifying the facts, Mr. Parkman, and I know
6  you to be a very careful practitioner, especially things that
7  are represented to the Court, and I do appreciate you having
8  followed up on that, but it will not be used one way or the
9  other in calculating the sentence, a reasonable sentence in
10 this case.
11     MR. PARKMAN: Well, I wanted to go a step further
12 and let you know that I do believe that he should be on
13 Lithium, Depakote or some alternative thereto, but I wanted
14 to bring this to the Court's attention that he wasn't. And
15 also I want to say to the Court that I feel as the attorney
16 in this case that it's in our best interest to move forward
17 today with sentencing and not delay this because after Mr.
18 Johnson's checking at Wetumpka and their situation there, I
19 don't believe that there's going to be a resolution of this
20 medical situation there. And I think it would be in our best
21 interest to move on today. So that's the reason for the
22 affidavit and the reason I wanted to state on the record my
23 opinions about moving forward.
24     THE COURT: Ms. Redmond, do you have any opposition
25 to that exhibit being introduced as part of this record

Page 9

1  today?
2      MS. REDMOND: And Judge, let me say this, while I am
3  not necessarily challenging the veracity of the document, Mr.
4  Johnson --
5      MR. PARKMAN: Johnson.
6      MS. REDMOND: -- is a person who works for Mr. --
7  for counsel, Mr. Parkman, and could certainly have been
8  present today for Your Honor or for the government in
9  question. In addition, I would assume that, and I would
10  believe that the nursing staff at the jail could also if
11  needed have actually been -- an affidavit could have been
12  prepared and they could have been asked or subpoenaed to
13  appear before the Court. As for the information provided, I
14  have -- I do not have a reason to challenge the information
15  contained within the affidavit.
16      THE COURT: Let's receive the evidence. If you
17  would, present it to --
18      MR. PARKMAN: Permission to approach, if I may.
19      THE COURT: You may.
20      THE CLERK: Defendant's Exhibit 1?
21      MR. PARKMAN: Yes, ma'am.
22      THE COURT: It certainly will be considered by the
23  Court in ordering any medical care after Mr. Turner has been
24  placed in the Bureau of Prisons facility.
25      MR. PARKMAN: I don't want to put anybody on the

Page 10

1  spot but I did not feel like having Mark Johnson appear today
2  was that big of an issue, especially in light of the
3  affidavit, especially in light that it really has no effect,
4  and especially in light of the fact Mr. Conley, I talked to
5  him about this also and he agrees in my opinion from what he
6  told me that he also found that he's not on Lithium or
7  Depakote at this time. So, if there is a veracity problem
8  with the government, I feel like that Mr. Conley can back me
9  up on this and also verify that that's what he found also.
10      THE COURT: Let's move on.
11      MR. PARKMAN: All right, sir. The next issue that I
12  would like to take up is the recommendation or -- by Mr.
13  Conley concerning an upward departure on the basis of 5K2.8.
14  Now, this comes about really in his sentencing
15  recommendations, and in this he states in a paragraph, and I
16  think this is important, that the reason that he feels like
17  there should be an enhancement above what the guidelines say
18  because of Section 5K2.8 is because of, and he quotes, this
19  further prolonged the humiliation and pain and suffering of
20  the victim due to his identity being exposed.
21      Let me state that I did a complete search of the
22  case law dealing with this particular issue and I did find
23  only one 11th Circuit case that has dealt with this, and let
24  me cite that. That was cited as United States of America
25  versus Jose Blas, B-L-A-S. That is an 11th Circuit, 2004

Page 11

1  decision, cited as 360 F.3d 1268.
2      Now, I have also researched it with regards to some
3  other Circuits to find out what they say about this. And
4  there is one in particular that's a -- also a case involving
5  the 5th Circuit that dealt with this, United States of
6  America versus Anderson, cited as 5 F.3d 795, a 1993
7  decision.
8      Now, the Courts in dealing with this particular
9  issue are very, very specific about what is needed in order
10  to have an increase from the standard. And in there, the
11  11th Circuit follows what really is in the 5th Circuit also
12  and what they say about this, and I do want to talk to you a
13  little bit about this just a minute and show you the
14  differences in this case and the others. Every case that we
15  have says that what we are talking about here deals with
16  psychological harm, and in there psychological harm says that
17  it's an injury that is sufficiently severe where there exists
18  a substantial impairment of intellectual, psychological,
19  emotional, behavioral function of the victim which is
20  extended for a continuous duration or which manifests itself
21  by physical or psychological symptoms.
22      Now, the most important thing about every case that
23  I have got, whether it be from the 8th Circuit, whether it be
24  from the 5th Circuit, whether it be from the 11th Circuit,
25  that in every one of them there was either and/or a statement

Page 12

1  by the victim given, and/or a statement by a psychologist or
2  psychiatrist talking about the actual physical injury. Now,
3  what is important about this in this case is we have no
4  statement by the victim at all. One was asked for, it was not
5  received.
6      Mr. Conley though cites in his presentence report
7  that the mother makes a statement well, I don't know if he
8  will, he has had trouble. That, according to the 5th Circuit
9  case, indicates that that is not sufficient, that is not
10  firsthand knowledge, that is only a surmise or conjecture.
11  So, what is important in all of these cases, number one is,
12  is that there be proof given to the Court, not just guessing,
13  not just I feel like this happened this way or I feel like
14  it's different, or I feel like that it's heinous, there has
15  been proof done and that has not been done, even close to it.
16  Number two, I think what is important about this is in
17  dealing with this is it's not just somebody's opinion about
18  whether or not it's heinous, cruel or whatever, the law says
19  that the guidelines must be such to conclude that the
20  psychological harm was also greater than that suffered by
21  most victims of abuse.
22      Now, the difference comes with this. The 11th
23  Circuit case, and I want to talk about this just a minute,
24  and the 5th Circuit case, both found that there was
25  psychological harm. However, the cases, the 11th Circuit case

## Page 13

1  in so finding dealt with this set of facts: There was a 49
2  year old man who through the internet obtained the favor of a
3  14 and 15 year old girl through deception with regards to his
4  age and who he was. He ended up through this deception being
5  able to convince them to meet him. At that point in time he
6  did meet with them and did have sexual intercourse with them.
7  Now, that's not what the Courts referred to in the 11th
8  Circuit as heinous and cruel. What they did is they looked at
9  the fact that it was proven that the Defendant in the 11th
10 Circuit case had an HIV deadly virus. And two, that he knew
11 he had it at the time that he solicited the favors from the
12 two girls, and knew it at the time that he had the sexual
13 intercourse with the two girls. And they indicated in here
14 that because of that that it was such a situation that was
15 atypical because he was, in fact, injecting them with the
16 possibility of them being caused to die at some future date
17 because of his idea of what he wanted to do sexually.
18       Second, the 5th Circuit says that in this case when
19 they ruled that it was psychological harm was there was a --
20 I believe this was the lady -- two guys abducted a lady from
21 I believe a parking lot, traveled across country with her
22 over a period of numerous days.  It was a kidnapping.  They
23 forced her numerous times to have sex with them in every way
24 this Court could imagine. They -- there was a letter again
25 given by the Court -- to the Court from the victim stating

## Page 14

1  how horrible it was and what she had to endure.  And in here
2  I think it's even more important that the psychological harm
3  was not just the fact of the horrible different types of sex
4  they forced her into, but also they made note that there was
5  a fear for her life because repeatedly the two Defendants
6  told her if you don't do this we are going to kill you, we
7  are going to bury you, you will not be found, and repeatedly
8  they told her we have done this before and we have killed
9  before.
10      And so their theory on this issue was this was a
11 little different than what was suffered by most victims in a
12 case like this, and they indicated that this really involved
13 more of a conduct that was more of a torture to her, and the
14 fact that it continued to torture her because she feels like
15 threats of death upon her would have been taken at that time
16 and would continue to be taken if something wasn't done with
17 these two Defendants.
18      I want to point out in looking at the cases, for
19 example, in the 8th Circuit, this was a case in which the
20 four year old daughter of the man, he had sex with her
21 repeatedly over a long period of time, and the Court noted
22 that it caused her -- through psychological exams that they
23 had and through the victim's statement that it caused her to
24 scream again and again in pain and agony on the different
25 times that it took place, and they believed that because of

## Page 15

1  the four year old, the screaming, the pain, the suffering,
2  that that did create extreme conduct.
3       So, with that in mind, Your Honor, I submit that to
4  vary from this case is -- and to go upward because of 5K2 is
5  not warranted in this case because A, all the cases that I
6  have read, the facts generally indicate something more than
7  just a voluntary consent to have sex by someone.  It
8  generally involves some type of force, kidnapping, it
9  generally involves some type of threat, and certainly in
10 every case it was cited that the victim and/or the
11 psychologist or psychiatrist gave a statement, a detailed
12 statement of what had happened, how they were affected, and
13 what it would have caused in long-term duration. So in that
14 issue, Your Honor, we believe that an increase in there would
15 not be warranted in that case. And finally -- in this case.
16      And finally, I think it was interesting to note that
17 with regard to the cases cited, they were nowhere close to
18 what this officer has recommended to the Court for
19 sentencing. Even the cases where I talked about, the 15 and
20 14 year old girl with HIV virus that was injected, I submit
21 to you that the sentencing in that case was a long way from
22 what has happened in this one. The incident where the lady
23 was raped continuously, different types, different occasions,
24 threatened psychological harm, there was a two hundred month
25 sentence given in that case.

## Page 16

1       And I submit also, for example, where there was a
2  young girl, the four year old girl who was screaming and
3  shouting on each occasion that took place over a period of
4  time, a hundred and 80 months of imprisonment was ordered in
5  that case. So I would submit, Your Honor, on that issue that
6  this is not called for with regard to the law or the facts.
7       I will say this, Your Honor, that the key to a
8  sentence to me in sentencing is not to inject someone's
9  personal opinion about what they think or what they feel
10 should happen or they don't like it. What we are here for is
11 to determine whether or not the facts measure up to what the
12 law says the Court can do. And in that I submit that these
13 cases I have got clearly indicate that there is no basis for
14 adjusting this for an upward departure recommended by the
15 sentencing officer in this case. My next objection --
16      THE COURT:  Well, let's take them up one at a time.
17      MR. PARKMAN:  Sure, Your Honor.
18      THE COURT:  Any response from the government?
19      MS. REDMOND:  And Judge, let me start by saying that
20 this was not an objection made to, as far as I am concerned,
21 either the probation officer, but certainly not to me, so as
22 far as researching the case law I am ill-prepared to give the
23 Court case law that would support my position at this point,
24 having just heard the objection.
25      THE COURT:  I understand.

## Page 17

1     MS. REDMOND: Let me say, Judge, however, that if I
2 understand the cases that Mr. Parkman has cited we are
3 talking about -- and correct me if I am wrong, Mr. Parkman --
4 what we are talking about is the proposition that the
5 physical abuse and lingering effects of that abuse are so far
6 outside of the heartland of cases that it rises to heinous,
7 atrocious, depraved activity; is that my understanding?
8     MR. PARKMAN: That's pretty much it, counsel, you
9 have hit the nail on the head pretty much.
10     MS. REDMOND: What we are talking about here, Judge,
11 is the difference between the physical ramifications of the
12 sexual abuse as opposed to in our case of psychological and
13 traumatic effects. And I think that's the difference. And
14 perhaps the reason the case law doesn't speak to it is, in
15 fact, because this type of case hasn't come about before,
16 which, of course, would necessarily set it apart from the
17 heartland of cases. In this case what we have is a grown man
18 who as a predator is preying on a 16 year old, 17 year old
19 boy, begins, all be it a consensual sexual relationship with
20 this boy, unbeknownst to him tapes or records this activity.
21 And here is the problem, and what rises -- what raises this
22 case to what I think the officer is citing as heinous, cruel,
23 depraved, the further activity not only of physically
24 sexually abusing this individual, but recording this activity
25 and then blackmailing this child into continuing this

## Page 18

1 activity under threat of exposure. And, in fact, does expose
2 this young man.
3     And let me just say, and while it may be my opinion
4 I think it's also borne out by the facts. The fact that this
5 young man will not -- will not come forward further to the
6 Court, to the probation officer, to the government, I think,
7 I believe speaks to the trauma that he is still dealing with.
8 Exposure was always, always the threat. And it is still the
9 threat. So again, I think that the facts of this case prove
10 what the probation officer has, in fact, put before the
11 Court, that it's that threat of exposure that rises, and that
12 raises the issue of heinous or depraved activity. And at this
13 point that's all I have to say, and perhaps Mr. Conley would
14 like to speak to his recommendation.
15     THE COURT: Mr. Conley, do you have anything to add?
16     MR. PARKMAN: Yes, Your Honor, I would like to
17 address the Court with the Court's indulgence. Your Honor,
18 in the presentence report under part E, factors that may
19 warrant a departure, I did list that the Court may be able to
20 consider departing on several different factors, three. The
21 Court could upward depart under USSG 4A1.3 for
22 underrepresentation of his criminal history if the Court
23 feels that his past criminal conduct -- the Criminal History
24 Category I does not adequately reflect the seriousness of his
25 past criminal conduct or the likelihood that he will commit

## Page 19

1 other crimes. I also indicated that the Court could upward
2 depart under USSG 5K2.0 because this case would go outside
3 the heartland of other individuals who have been convicted of
4 distributing child pornography. Thirdly, I did indicate and
5 cite the Court could upward depart under 5K2.8, extreme
6 conduct.
7     I would like to address counsel, Mr. Parkman's
8 argument with regards to the Blas case. I pulled the Blas
9 case in which I think it was stated -- cited by the 11th
10 Circuit, and in that they did authorize the Court to upward
11 depart seven levels to impose their sentence. But the 11th
12 Circuit made a distinction in that. They not only authorized
13 the Court to upward depart under 5K2.0. I would also like to
14 quote the last paragraph of that case where it says likewise
15 a District Court may upwardly depart if the case is atypical,
16 see 5K2.0. Departures under Section 5K2.0 are reserved for
17 unusual cases where there is something atypical about the
18 Defendant or the circumstances surrounding the commission of
19 the crime which significantly differ from the normal
20 heartland from the conduct in the commission of the crime.
21     Your Honor, in this case not only did I cite the
22 Court should upward departure for the heinous nature of the
23 extreme conduct on the victim, which I stand behind with the
24 statements that the government made, I also feel the Court
25 could upward depart under 5K2.0 because the nature and

## Page 20

1 characteristics of this case, the extortion, the blackmail
2 that Mr. Turner perpetrated upon a minor victim in this case
3 to maintain a relationship, a relationship that was derived
4 for sexual gratification, and in a letter prepared by Mr.
5 Turner to the victim, for monetary gain. Mr. Turner gave the
6 victim a computer which he wanted money back for. Once this
7 relationship was terminated he even sent a letter to the
8 victim saying you need to come back to this relationship or
9 you owe me, I think the amount was in excess of three
10 thousand dollars. I have a copy of the letter if you would
11 like me to submit it to the Court and for counsel.
12     Furthermore, Your Honor, there is another case that
13 deals with an upward departure in this nature. It is the case
14 of U.S. versus Hersh, cited as 297 F.3d 1233, July 17th,
15 2002, where the Court upward imposed a ten level upward
16 departure based on a sexual case. The sentence the Defendant
17 got in that case was a hundred and five years. The Court
18 upward departed to a hundred and five years based on 5K2.0,
19 along with other factors. I would simply supply that case to
20 the Court for its consideration in justifying my recommended
21 sentence. That is according to the guidelines, Your Honor.
22     But as the Court is aware, and all parties of
23 counsel is aware, we don't operate under a mandatory
24 guidelines sentence any more, we operate under an advisory
25 range of sentencing, with the Court now, while considering

**Page 21**

1 the guidelines, also considers the factors set forth in
2 3553(a). And under those circumstances, under those criteria
3 that the Court should consider, is also what I based my
4 justification for a recommendation of three hundred months. I
5 still stand on that recommendation. I think three hundred
6 months is a reasonable sentence in this case for the nature
7 and circumstances of this offense.
8       This Defendant did not simply possess child
9 pornography, he did not simply produce or make child
10 pornography, this Defendant actually molested a 17 year old
11 man, a boy, minor victim who is unable to give consent being
12 a minor, so he molested him. Unbeknownst to the victim the
13 Defendant video taped these. He even asked the victim
14 beforehand do you mind if we make these tapes, to which the
15 Defendant said no. The Defendant continued.
16      And upon the victim saying he wanted to get out of
17 the relationship, this Defendant said okay, if you do, I will
18 post these on the internet where your friends and family will
19 see them. The victim stayed in the relationship longer
20 until -- for approximately six months until he said I am out.
21 It was the next day, Your Honor, when this Defendant posted
22 these images and videos on the internet. They were accessed
23 53 times until AOL could pull them off.
24      The victim sought counsel, went to a local attorney,
25 the attorney contacted Mr. Turner, and so this victim did

**Page 22**

1 take steps to amend this situation. I think that does go to
2 show that he was affected by this case, the severity of it.
3 The family had to pay for this attorney to get involved, this
4 was not free counsel that they used. So based on all those
5 factors, the probation officer's opinion is that a three
6 hundred month sentence is reasonable, whether the Court goes
7 according to the guidelines and makes an upward departure or
8 whether the Court goes under the statutory circumstances in
9 this case. Thank you.
10      THE COURT: Any response, Mr. Parkman?
11      MR. PARKMAN: Yes, sir. Unfortunately everything you
12 just heard is not based on anything presented by the way of
13 documentation to this Court. You have heard counsel for the
14 government say well, because he didn't send in anything then
15 it must be. You are guessing. She is guessing. It's a
16 surmise. You don't know, we don't know. All we know is we
17 didn't happen. Nor was there ever any psychological
18 information given where he went to counseling supposedly,
19 which he didn't do. It's not there.
20      You have heard Mr. Conley stand up and recite the
21 law dealing with this, but the key to this is, is in
22 everything he said was followed by the relationship. It was a
23 relationship. That's different than every Court that has
24 been -- that I have looked at on these issues have dealt
25 with. It was a relationship. And the relationship was not

**Page 23**

1 based on any type of force, kidnapping, unusual conduct that
2 the relationship like that is going to have. We may not like
3 the conduct, but that's not a reason to start interjecting
4 opinions into sentencing. And so I say with that, Your Honor,
5 that the law is very clear in this that you can guess why
6 this happened or what happened, but unfortunately there's
7 just nothing there from the victim or any counselor or
8 psychologist to indicate otherwise. Thank you, on that issue.
9       THE COURT: Anything else from either the government
10 or probation?
11      PROBATION OFFICER: Your Honor, if the Court has not
12 seen the letter that the Defendant wrote to the victim I
13 would be more than happy to submit it to the Court and the
14 parties of counsel -- the counsel should have gotten it in
15 discovery -- which does show that this victim was maintained
16 through not voluntary means to be in this relationship. If
17 the Court would like to see it I will provide it to the Court
18 and parties of counsel if you feel it's necessary, Your
19 Honor.
20      MS. REDMOND: And Judge, I apologize, the only thing
21 that the government would add is that though we term it a
22 relationship, as Mr. Conley stated, again, we are talking
23 about a minor who is unable to give consent. And if you want
24 to term it, it is a relationship but it is a very one-sided
25 relationship as there's only one person preying on another

**Page 24**

1 individual.
2       THE COURT: Anything else?
3       MS. REDMOND: Nothing further from the government.
4       THE COURT: Let me state first that the sentencing
5 guidelines are advisory. I will repeat that a number of times
6 as we go through the procedure today. Mr. Parkman, you are
7 correct, the Court can not speculate on what, if any,
8 psychological injury the young victim suffered in this case,
9 but as I have briefly reviewed from the case that has been
10 cited to the Court, United States versus Blas, the Court may
11 consider as part of any upward departure or an upward
12 variance based upon the post Booker/Fanfan world of
13 sentencing, it may consider an upward departure on the basis
14 of the Defendant's knowledge, conduct, and gratuitous
15 infliction of injury to the minor victim in this case, and
16 for that reason I feel as though an upward deviation or an
17 upward departure is warranted under either 5K2.8 or 5K2.0.
18 Your objection is overruled. Do you have any other
19 objections?
20      MR. PARKMAN: I do have one I would like to speak to
21 because it's a little confusing if I could, though, but I
22 would speak to it briefly if I could, Your Honor.
23      THE COURT: Is it contained within the presentence
24 report investigation?
25      MR. PARKMAN: Yes, Your Honor, it was also objected

Page 25

1  to. It's dealing with 2G2.2, so an enhancement of five
2  levels. Let me find it.
3      THE COURT: Look at page one of the addendum, it is
4  the objection number two of the presentence report, in my
5  copy.
6      MR. PARKMAN: Which one are you looking at, Your
7  Honor?
8      THE COURT: Your objection as to the five level
9  increase pursuant to Section 2G2.2(b)(2) of the sentencing
10 guidelines is objection number two on page one of the
11 addendum to the presentence report, paragraph eight, nine and
12 ten. Eight is your objection, nine and ten is the probation
13 officer's response.
14     MR. PARKMAN: Correct.
15     THE COURT: As I understand your objection it deals
16 with whether there was distribution with pecuniary gain.
17     MR. PARKMAN: Sort of.
18     THE COURT: If that's not right --
19     MR. PARKMAN: You are sort of correct, I will
20 explain it.
21     THE COURT: Proceed.
22     MR. PARKMAN: Okay. Thank you, Your Honor. Let me
23 explain, I am not on good footing on this issue, but I wanted
24 to put it in there because of two things. Number one, a
25 change in the terminology by the guidelines, and two, a split

Page 26

1  among the Circuits with regard to this particular provision.
2  I will quote the 7th and the 9th, or -- in opposition to what
3  has been quoted in the other Circuits, for example, the 11th.
4  The 11th Circuit does indicate somewhat that I am not on good
5  footing to argue this, but there are two points I would like
6  to make with that. First of all it starts out that -- it
7  talks about distribution and then it goes into what is the
8  definition of distribution. And in the manual we are using I
9  don't believe from what I understand that it includes
10 pecuniary gain, however, it does deal with the other
11 elements, including production, transportation, possession
12 with intent to distribute. Now, in this particular instance
13 they came back later and added pecuniary gain and then the
14 courts dealt with that, and the 11th Circuit case that's
15 cited by the sentencing officer, United States versus Probel,
16 P-R-O-B-E-L, 214 F.3d 1285.
17     THE COURT: I have that case.
18     MR. PARKMAN: Yes, sir. My point with this is
19 something that was left out of all these cases that I have
20 read that have taken the majority opinion that it should
21 apply, in this case also, and that is -- and I thought this
22 was very interesting -- not one court dealt with the issue of
23 the simplest of statements in the law and that is when
24 dealing with criminal statutes they are to be strictly
25 adhered to, strictly read and strictly interpreted. Now, the

Page 27

1  11th Circuit in the other cases that have dealt with this did
2  not mention this basic principle. I have an idea why. I think
3  that they could not arrive at their conclusion and at the
4  same time quote that particular basic principle of law
5  because they went out on a limb to arrive at how to determine
6  what distribution is.
7      Second of all, as I think in this particular case
8  that -- the 11th Circuit made a statement, and I want to deal
9  with this, it talked about the different Circuits, and in
10 headnote four, a statement was made by the 11th Circuit and
11 it said in each of these other cases that we have examined
12 the District Courts found that the Defendant had received
13 some benefit from what he had done. Now, in this case I think
14 what you are going to hear is maybe from the government or
15 the sentencing officer that the benefit had to deal with some
16 type of forcing him to come back by putting it on the
17 internet. That wasn't a benefit because nothing happened. It
18 didn't happen the way any type of distribution wanted it to
19 happen. In fact, it worked the reverse of what was supposed
20 to happen. So I submit that in reading the law strictly as it
21 should be read, that there was, in fact, no benefit received
22 by Mr. Turner concerning the distribution of the picture of
23 the victim.
24     Now, the other issue that we are here about is there
25 were other pornographic pictures that were found in the

Page 28

1  search. It's important to note that none of those were
2  produced by the Defendant. None of those had anything to do
3  with the Defendant being in them. None of those had anything
4  to do with the Defendant taking those and distributing them
5  to someone else for either pecuniary or nonpecuniary gain.
6  So, with that, Your Honor, I wanted to make that statement
7  with regard to an objection on this particular grounds on 2G2
8  because of those reasons I have stated. Thank you.
9      THE COURT: And so the record is clear, your
10 objection is to the information contained in paragraph number
11 37 of the presentence report about the five level increase
12 pursuant to provisions of 2G2.2(b)(2) of the sentencing
13 guidelines.
14     MR. PARKMAN: You are correct, Your Honor.
15 Absolutely correct.
16     THE COURT: Response?
17     MS. REDMOND: If I understand the argument made by
18 counsel what he says is no pecuniary obviously because
19 there's no money that's contemplated or likewise exchanged of
20 product, in other words, other child pornography, et cetera.
21 He also says there's no benefit because what the Defendant
22 did in distributing the child pornography with the intent of
23 blackmailing the minor victim back into his life and back
24 into this relationship didn't work. And if I understand that
25 to be the Defendant's argument, that there was, in fact, no

## Page 29

1 benefit to the Defendant, I think that argument has to fail
2 because, Judge, what you have to remember is there's the
3 threat of distribution -- and let me go back for just a
4 second. What happens in this case is the victim says I want
5 out, the Defendant says no, you are staying, or I am going to
6 post these images. The victim goes back to the Defendant to
7 prevent that activity. And -- I'm sorry, Judge.
8     THE COURT: Don't the facts also indicate that the
9 victim intended to and attempted to remove those --
10     MS. REDMOND: Which is exactly the next point.
11     THE COURT: -- videos from the computers?
12     MS. REDMOND: And did. And what happens is, the
13 Defendant then distributes by reintroducing those images to,
14 not only his computer, but to other format as in CD, so forth
15 and so on. So there is, in fact, another distribution that
16 takes place. The Defendant -- excuse me, the victim, minor
17 victim believes that he's removed the images from the
18 Defendant's computer, from any electronic equipment, so forth
19 and so on, and again, for his own benefit, the Defendant says
20 it's back on, and if you don't come back to me, now let's up
21 it, I am going to, in fact, put it on the worldwide web. The
22 Defendant -- excuse me, the victim comes back to say don't do
23 that. But before he can act to come back into this
24 relationship or not, to make that decision, it's up on the
25 worldwide web. And that's the benefit, that the Defendant

## Page 30

1 manages to still maintain control over the minor victim. And
2 I accede to the sentencing officer at this point, Judge.
3     THE COURT: Anything else to add, Mr. Conley?
4     PROBATION OFFICER: Your Honor, I just -- with
5 regard to the pecuniary gain, as I mentioned earlier the
6 Defendant sent the victim a letter putting a monetary value
7 on the computers that he gave the victim, and according to
8 the letter the Defendant had an agreement with the victim
9 that he could have the computers as long as he stayed in and
10 provided sexual acts and sexual favors with the Defendant.
11 The Defendant put a pecuniary gain of -- said if you want to
12 pay me for these items -- hang on a minute. He said here's a
13 list of the items I want. It's about more than just the
14 laptop. If you could just keep your word then you can keep
15 everything. If not, I want this stuff back that was related
16 to sex. If you could just keep your word, then everything
17 becomes yours and that will be the end of it. Here's a list
18 of the items I want back. Goes through to describe several
19 computer components and their various costs, prices, and it
20 says if you want to pay me for these items the total cost is
21 one thousand four hundred 73 dollars. So I do also submit to
22 the Court that the Defendant put a pecuniary gain on some of
23 the items in here to maintain, to get back when the
24 relationship -- if the relationship ended.
25     MS. REDMOND: Judge, if I may, I don't disagree with

## Page 31

1 the probation officer, I do want to say this final thing.
2 Within that letter in terms of the pecuniary gain, the
3 Defendant actually establishes a price range, and I believe
4 that particular section of the sentencing guideline in terms
5 of pecuniary gain, the points that are associated have to do
6 with the amount, the monetary value. My argument is that, in
7 fact, the greatest gain to the Defendant, because this is the
8 whole point and this is the job I suppose of predators, is
9 that it's that control issue that is a benefit to the
10 Defendant. And although probation will argue as a secondary
11 argument that there's a monetary value to be placed, my
12 argument is that one can not, in fact, be assessed by the
13 Court because the benefit to the Defendant is the control,
14 sexual and mental, over this minor child. And therefore the
15 highest points associated and allowed by the sentencing
16 guidelines should be factored in and made a part of this case
17 by the Court.
18     PROBATION OFFICER: I'm sorry, Your Honor, just one
19 thing. This -- the guideline actually states if the offense
20 involved distribution increase by the number of levels from
21 the table in 2F1.1 corresponding to the retail value of the
22 material, but in no event by less than five levels. Five
23 levels is the minimum enhancement the Court could give. Five
24 levels was the enhancement the probation office recommended,
25 and it is the minimum level provided by the guidelines.

## Page 32

1     THE COURT: Irregardless of the pecuniary value
2 associated with the distribution?
3     PROBATION OFFICER: Yes, Your Honor, it says five
4 levels is the minimum.
5     THE COURT: Mr. Parkman, any response?
6     MR. PARKMAN: Absolutely. First of all, you know,
7 the pecuniary gain that they are talking about, they have
8 switched their course now and they have now gone to say when
9 in this he put in there and said I want my computers back,
10 then that's the pecuniary gain for the distribution of the
11 pictures. That's wrong. The distribution of the pictures was
12 an attempt to have him come back with him in a voluntary
13 relationship. The computers was a side item that had nothing
14 to do with the distribution. The distribution wasn't for if
15 you don't -- if you don't give me my money or bring my
16 computers back I am going to put it on there, that wasn't it
17 at all, nor has it ever been.
18     So I submit to the Court that in dealing with this
19 that there was -- and counsel said well, at one time he said
20 if you don't stay with me I will put it on there and he
21 stayed. That's not a distribution yet. She made the statement
22 there was another distribution. There wasn't another
23 distribution. There was one distribution. And with that, what
24 Mr. Conley failed to state to the Court, he ended with it
25 without stating it, was the fact that once the distribution

Page 33

1  on the web was done, a letter was sent by an attorney to Mr.
2  Turner and said take it off, and he did. And he wrote a
3  letter to the attorney saying I'm sorry, I shouldn't have
4  done it, and it happened and it's over with, it will never be
5  done here, it's gone. Thank you. So that was not said either
6  about the situation and why it occurred. So thank you, Your
7  Honor.
8      THE COURT: Anything else?
9      MS. REDMOND: No, sir.
10     MR. PARKMAN: Not on this issue. I have one other
11  matter.
12     THE COURT: As to this objection your objection
13  number two contained in the presentence report as to
14  paragraph 37 and its application relating to Section 2G2.2
15  subsection (b)(2) of the sentencing guidelines, first of all,
16  I will say that I hardly see how the distribution of pictures
17  would have had a victim come back to a voluntary relationship
18  in this case. But I don't think that the 11th Circuit has
19  made it any clearer than their opinion that has been cited in
20  response to your objection, United States versus Probel, in
21  which they indicate that based upon the plain language of the
22  guideline and the application notes, pecuniary or other gain
23  is not required for the enhancement to apply.
24     I find that pecuniary gain to Mr. Turner in this
25  particular case is not required in a monetary sense, but it

Page 34

1  is the gain or the benefit, or as the 11th Circuit has cited
2  on page 1290 of that opinion, any other gain that Mr. Turner
3  intended to receive by the distribution of these photographs
4  or these pictures on the internet. So to that extent your
5  objection is overruled and the Court will apply the minimum
6  five level enhancement without regard to the specific
7  monetary amount applicable to any calculation of the
8  distributed value of the material. Any other objections?
9      MR. PARKMAN: One more, Your Honor, if I could. It's
10  not an objection, it's something that deals with the upward
11  increase the Court has already ruled on. If I could, I wasn't
12  going to argue this but since we have gone into the upward
13  level of this, I feel like the Court ought to now consider a
14  downward from that on this basis: It's very clear in the
15  presentence report two things. Number one, that Mr. Turner
16  had had a very, very troublesome youth, and in there cited by
17  counselors, which Mr. Conley put in there, that this was the
18  reason for the conduct of Mr. Turner, and why the conduct has
19  occurred. And I think it's important to note that this
20  wasn't brought on necessarily by just the voluntary necessary
21  actions of someone but had been brought on to him by a very
22  youthful age, very, very youthful age and the consequences
23  that that arose in his psychological wellbeing also. So with
24  that I feel like we ought to take into consideration a
25  downward departure from the upward departure based on what

Page 35

1  his past history has been and why we got here today. Number
2  two --
3      THE COURT: Which cite would you give me to the
4  sentencing guidelines that would support the downward
5  departure?
6      MR. PARKMAN: Your Honor, I don't have the exact
7  cite with me because I didn't anticipate getting into that
8  today, but I think it goes under -- the guidelines did not
9  take into consideration a consideration for the Court in
10  looking at the guidelines, and that's not taken into
11  consideration that I know of in this case by any guidelines,
12  the fact that his youthful age and the -- what had happened
13  to him in a youthful situation in a family situation. So I
14  think that that can be looked at by the Court as an issue not
15  covered by the guidelines.
16     Let me add number two while we are here too because
17  it goes with this. And number two, it's in the report itself
18  also that Mr. Turner received, after all this came about,
19  voluntarily before any charges were pending or brought, that
20  he went to and received psychiatric and then other counseling
21  for the problems that had taken place in this case. I think
22  it's important for this Court to say that consideration
23  should be given for someone who has sought voluntary
24  treatment, not treatment pending a case. All this treatment
25  occurred before any charges.

Page 36

1      And I think that's important for a court to do
2  because what that does is say to people whether it's
3  involving a case like this or any other case where there may
4  have been psychological harm to someone as a youth that has
5  caused the showing out that he has done in this case, I think
6  it's important for the Court to recognize and to say publicly
7  that consideration should be given for voluntary treatment
8  that a person goes to and tries to obtain in order to not
9  have this kind of conduct happen again.
10     So, both of these issues I think go together in the
11  fact that the past history certainly indicates something that
12  happened to him as a young person that he couldn't control at
13  that time, and second, consideration for his treatment. I
14  believe both of those are not covered in the ordinary case
15  that we are dealing with here, nor are they considered in the
16  guidelines.
17     And although they are advisory now, I think it's
18  also important for the Court to take into consideration
19  someone's past history and what happened to them as a young
20  person, and out of their control, and second of all, show
21  that there is consideration given for someone who voluntarily
22  takes treatment. So whether it's in the guidelines or not in
23  the guidelines, I think that this Court -- these are two
24  things that have happened to this person that show something
25  different than what maybe others might want to do or show the

| Page 37 | Page 39 |
|---|---|

**Page 37**

1  Court or what happened to them and why we got here today.
2     THE COURT: Let's talk about the voluntary treatment
3  that Mr. Turner underwent. Are you saying that the treatment
4  that Mr. Turner subscribed to prior to his arrest in this
5  case was voluntary treatment for his conduct with this
6  victim? Or, would it have been treatment that he was ordered
7  to have undergone pursuant to his conviction for sexual abuse
8  in the second degree in August of 1995 where as part of the
9  probation sentence that he received that he was required to
10 undergo appropriate counseling with a qualified -- I don't
11 know what the W stands for, qualified health professional.
12    PROBATION OFFICER: Qualified, I think it's mental
13 health professional.
14    THE COURT: So it should be qualified M --
15    PROBATION OFFICER: Did I put Q-W-H-P?
16    THE COURT: It says Q-W-H-P.
17    PROBATION OFFICER: I apologize, Your Honor.
18    THE COURT: I know what the intent is, he was to
19 have been subject to qualified counseling at that time. Did
20 he ever undergo such counseling?
21    MR. PARKMAN: He did. And let me make this point
22 because you have asked a very good question. At the time all
23 this occurred he was off probation, which means he had
24 completed all of the treatment at that time. So the answer to
25 your question is, is the treatment that we are seeing in the

**Page 38**

1  presentence report with the psychiatrist and with the
2  counseling that he had at the same time is because of this
3  case, not because of the prior case.
4     THE COURT: Who did your client see for any type of
5  counseling before he saw his first counselor in regard to the
6  treatment he received for the offenses in this case?
7     MR. PARKMAN: My understanding is you are asking
8  about the treatment that he received for this case.
9     THE COURT: Well, let me ask another question, maybe
10 I can help clarify it. Who was the first doctor that he saw
11 or counselor he saw for the offenses in this case not
12 related to any other case?
13    MR. PARKMAN: It would be Doctor Nelson Handall. I
14 believe the sentencing officer has that information. He is a
15 psychiatrist in Dothan. And that's where it came with the --
16 by the way, Your Honor, that's where it came that the drugs
17 that were prescribed.
18    THE COURT: When did he first see Doctor Nelson
19 Handall?
20    MR. PARKMAN: I went and talked to the doctor. Do
21 you have a date?
22    PROBATION OFFICER: I do have a date, Your Honor.
23    MR. PARKMAN: I never got the records from him.
24    PROBATION OFFICER: He was first evaluated in
25 September of 2002 complaining of depression.

**Page 39**

1     THE COURT: By Doctor Nelson Handall?
2     PROBATION OFFICER: By Doctor Nelson Handall.
3     THE COURT: The presentence report indicates that he
4  had seen a Doctor Charles Hicks beginning in June of 1998,
5  then in February of '99, and finally in May of '99. And my
6  question or concern is, were those visits precipitated
7  because of the conviction for sexual abuse in state court or
8  was it an effort to receive treatment because of the conduct
9  that he was engaged in with the victim in this case?
10    MR. PARKMAN: He first went to see -- I think I may
11 have misunderstood your question. He first went to see this
12 Rose Blakey Phillips that's cited in the presentence report.
13 From there she recommended that he go to Doctor Handall. All
14 of this is the result of, and only the result of, the
15 incidents in this case.
16    THE COURT: So the records don't support that he
17 ever saw anybody in relation to the conviction for sexual
18 abuse second degree in state court.
19    MR. PARKMAN: Your Honor, I handled that case and I
20 hate to say it's been ten years ago. My recollection is that
21 he did, and I tell you why I remember it. I believe we filed
22 a paper with the Court on this, that he had completed it, or
23 else I can guarantee you Doug Valeska would have revoked his
24 probation for that.
25    THE COURT: Well, in either event it will not affect

**Page 40**

1  the sentence I will impose in this case. It certainly is
2  material to your argument that any voluntary treatment and I
3  suppose as it applies to what a reasonable sentence is in
4  this case. Anything else in support of your argument for a
5  downward departure?
6     MR. PARKMAN: No, sir, nothing other than what has
7  been stated.
8     THE COURT: Response from the government?
9     MS. REDMOND: No, sir, not as to Defendant's
10 voluntary treatment for this offense.
11    THE COURT: Anything from probation?
12    PROBATION OFFICER: Your Honor, the government is
13 making -- I'm sorry, defense counsel is making this motion
14 for downward departure subsequent to the Protect Act being
15 passed a couple of years ago. The Protect Act limited upon
16 the Court prohibited departures for several factors unless
17 they had been expressly enumerated in the sentencing
18 guidelines. Now, granted we are operating under the advisory
19 sentencing guidelines, but the Protect Act, to my knowledge
20 it's still valid and it prohibited the Court from downward
21 departing, again, for any reasons of, I will say lack of
22 guidance as a youth or similar circumstances, or any
23 post-rehabilitative efforts sought by the Defendant. It also
24 cites in 5K2.22 specific offense characteristics that are
25 grounds for departures in child crimes and sex offenses, it

## Page 41

1 says an individual's age may be a reason, and to the extent
2 permitted by 5H1.1, any extraordinary physical impairment as
3 allowed under 5H1.4, but it also cites that drug, alcohol or
4 gambling dependence or abuse is not a reason to depart
5 downward. So I do think that a downward departure may be
6 prohibited by the guidelines and maybe by the Protect Act,
7 Your Honor.
8    THE COURT: And we may be taking your motion up a
9 little out of order, Mr. Parkman. If this is, in fact, an
10 affirmative motion for downward departure I will allow it at
11 this time and will continue to take it up. Do you have
12 anything else to say in response to your motion for a
13 downward departure under either of the two grounds that you
14 have argued to the Court?
15    MR. PARKMAN: Well, other than let me just respond
16 to what the sentencing officer has said. The guidelines are
17 not applicable any more, advisory only. Now, if we get to a
18 point in our life where courts can not take into
19 consideration what has happened to someone and why they did
20 what they did, and it may be caused involuntarily by things
21 that have happened in their past that they didn't want to
22 have happen, if we can't take that into consideration any
23 more or a court can't, or the fact that someone voluntarily
24 comes in and tries to do the right thing after an act but
25 without the Court umbrella over him to try to come into court

## Page 42

1 and go look what I did. This is all before he knew there was
2 ever going to be any charges, and I think that's extremely
3 important for courts around our country to take into
4 consideration in any sentence of anyone for any charge. Thank
5 you. That's all, Your Honor.
6    THE COURT: I have considered your request for a
7 downward departure based upon either his voluntary desire for
8 some type of mental health or counseling treatment, as well
9 as the argument that you have made that he has suffered an
10 abusive upbringing which might have caused this conduct to
11 have been an involuntary response on his part. I would say
12 only as an addition to my finding that the evidence before
13 the Court in the presentence report history of conduct of Mr.
14 Turner indicates to this Court that if that argument were
15 true that there are now at least two and possibly three young
16 people who Mr. Turner has now turned into potential to be
17 sexual predators. Your request for a downward departure is
18 denied. Any other objections to the presentence report?
19    MR. PARKMAN: Not by the Defendant, Your Honor.
20    THE COURT: I have an objection listed in the
21 presentence report to paragraph 14. Are you withdrawing that
22 objection?
23    MR. PARKMAN: I am with drawing that, Your Honor.
24    THE COURT: You and your client can approach the
25 podium.

## Page 43

1    MR. PARKMAN: Thank you, Your Honor.
2    THE COURT: Having made findings as to the
3 objections to the presentence report, the Court adopts the
4 factual statements contained in the presentence report, with
5 specific findings under the guidelines that the Offense Level
6 is 32, the Criminal History Category is I, the guideline
7 range is from one hundred 21 months to one hundred 51 months.
8 The supervised release period for counts three through six is
9 from three to five years. The supervised release period for
10 count seven is from two to three years. And the fine range is
11 from 17 thousand five hundred dollars to one hundred and 75
12 thousand dollars.
13    The Court finds that an upward departure pursuant to
14 5K2.0 and 5K2.8 based upon the Defendant's conduct, which I
15 find under the circumstances of this case demonstrate that
16 Mr. Turner's manipulative, unusually heinous, cruel, brutal
17 and/or degrading behavior towards the young victim in this
18 case, as well as those reasons I will state later, is
19 appropriate. The Court finds that the Guideline Level should
20 be 40, which, when combined with the Criminal History
21 Category creates a guideline range of from two hundred 92
22 months to three hundred 60 months, and a fine range from 25
23 thousand dollars to two hundred and 50 thousand dollars.
24    This is a crime of sex and violence admittedly
25 committed against this young man for a period of almost 20

## Page 44

1 months. The victim does have a right to testify. However, it
2 is not unusual that the victim would elect not to testify in
3 a case such as this. And I understand from Mr. Conley and
4 from the Assistant U.S. Attorney in this case that the victim
5 has been contacted and does not wish to testify. Mr. Parkman,
6 do either you or your client have anything to say in
7 mitigation or otherwise before the Court pronounces the
8 sentence in this case?
9    MR. PARKMAN: Nothing other than what we have said
10 previously.
11    THE COURT: Mr. Turner, the sentence will now be
12 stated but you will have a final chance to make any legal
13 objections before the sentence is imposed. Mr. Turner, you
14 have single-handedly created an atmosphere of fear among the
15 parents and children in the Dothan area and victims of those
16 you have woven into your web of deceit. Your history as
17 presented to this Court shows that you developed a
18 relationship with a minor prior to 1995 and enticed that
19 child into a sexual relationship. Beginning in 1998 you
20 engaged the young victim in this case who was hunted,
21 identified, stalked and repeatedly victimized, then
22 manipulated against his will for nearly two years. For all
23 practical purposes the young victim in this case was held a
24 prisoner by you for your private pleasure and then when this
25 victim summoned up the courage to escape his doom with you in

## Page 45

1  2000 he was forced to endure further humiliation by having
2  the recorded evidence of this relationship placed on an
3  internet Web site. At the same time it was learned that you,
4  Mr. Turner, had begun to develop another relationship with
5  another young man to engage in this sinister cycle of
6  conduct.
7      Mr. Turner, you have proven to this Court that you
8  are a repeat sexual predator who has demonstrated a history
9  of selecting, stalking and destroying the lives of young
10  children. You are the reason our society must have prisons.
11  You have been on notice for many years that you suffer from
12  this problem and yet you have done nothing to stop the type
13  of criminal and pedophile desires that you have with young
14  boys.
15      Therefore, the only reasonable sentence available to
16  this Court, after considering Title 18 United States Code
17  Section 3553(a), the advisory guideline range, and the
18  applicable statutory factors, is for you, Mr. Turner, to be
19  committed to the custody of the Federal Bureau of Prisons to
20  be imprisoned for a total term of three hundred 60 months.
21  This term consists of three hundred 60 months on counts
22  three, four, five, and six, and one hundred 20 months on
23  count seven, all to run concurrently.
24      The Court recommends that you be designated to a
25  facility where intensive residential substance abuse

## Page 46

1  treatment and sex offender treatment is available through the
2  Bureau of Prisons. Based upon your inability to pay the Court
3  waives the imposition of a fine. However, you shall pay to
4  the United States District Court Clerk a special assessment
5  fee of five hundred dollars, which is one hundred dollars for
6  each of the five counts to which you have entered a plea of
7  guilty. Those fees are due immediately. The Court finds that
8  there is no identifiable victim who incurred a financial loss
9  as a result of this offense.
10      Upon release from imprisonment you shall be placed
11  on supervised release for a term of five years. This term
12  consists of five years on counts three, four, five and six,
13  and three years on count seven, all such terms to run
14  concurrently. Within 72 hours of release from custody you
15  shall report to the probation office in the District to which
16  you are released. While on supervised release you shall
17  comply with the mandatory and standard conditions of
18  supervised release on file with this Court.
19      The Court also orders the following special
20  conditions: The Defendant shall be subject to substance abuse
21  testing and treatment. You shall contribute to the cost of
22  any treatment based upon your ability to pay and the
23  availability of third-party payments. You shall attend and
24  participate in mental health testing and treatment to include
25  sex offender treatment as approved by the probation officer.

## Page 47

1  The Defendant shall abide by all policies and procedures of
2  the sex offender program. During the course of the treatment
3  the Defendant shall be subject to periodic and random
4  polygraph and plethysmograph examinations administered by the
5  sex offender contractor or their designee. You shall
6  contribute to the cost of any treatment, to include polygraph
7  and plethysmograph testing based upon your ability to pay and
8  the availability of third-party payments. Any refusal to
9  submit to such assessments or tests as scheduled is a
10  violation of the conditions of supervised release. You shall
11  waive your right of confidentiality in any records for mental
12  health treatment imposed as a consequence of this judgment to
13  allow the probation office to review the Defendant's course
14  of treatment and progress with the treatment provided.
15      Mr. Turner, it is ordered that you not have any
16  contact with children under the age of 18 years old unless
17  approved by this Court. The Defendant is not to loiter within
18  one hundred feet of school yards, parks, playgrounds, arcades
19  or other places primarily used by children under the age of
20  18. The Defendant shall have no contact with the victim,
21  including letters, communication devices, audio or visual
22  devices, visits or any contact through any third-party,
23  directly or indirectly, without prior permission of this
24  Court.
25      The Defendant shall not reside in any house or home

## Page 48

1  or residence where a child under the age of 18 lives, without
2  prior approval of this Court. The Defendant may change his
3  residence only at the approval of the probation officer and
4  with the approval of the Court. The Defendant shall not be
5  employed in any capacity, either for yourself or for others
6  which may cause you, Mr. Turner, to come into direct contact
7  with children under the age of 18. The Defendant shall not
8  participate in any voluntary activities that may cause the
9  Defendant to come into contact with children under the age of
10  18.
11      The Defendant shall not possess any sexually
12  stimulating or sexually oriented material and shall not
13  patronize any place where such material or entertainment is
14  available while on supervised release. The Defendant shall
15  not possess or use a computer with access to any online
16  computer service at any location, including your employment,
17  without approval of this Court. This includes any internet
18  service provider, bulletin board system or any other public
19  or private computer network. The Defendant shall not possess
20  or use any data encryption technique or program.
21      The Defendant shall submit to the probation office
22  and/or probation service representatives conducting periodic
23  unannounced examinations of the Defendant's computer
24  equipment, including any computers in the Defendant's
25  residence, which may include retrieval and coping of all data

Page 49

1  from the computer and any internal or external peripherals to
2  ensure compliance with the conditions of supervision and/or
3  removal of such equipment for the purpose of conducting a
4  more thorough inspection and to allow at the direction of the
5  probation officer installation on the Defendant's computer at
6  the Defendant's expense any hardware or software systems to
7  monitor the Defendant's computer use while under supervised
8  release.
9       The Defendant shall consent to a third-party
10  notification to any employer or potential employer by the
11  probation officer. The Defendant shall provide the probation
12  officer access to any requested financial information to
13  verify there have been no payments to an internet service or
14  entities that provide access to the internet. The Defendant
15  shall submit to a search of his person, residence, office or
16  vehicle pursuant to the search policy of this Court.
17       The Defendant shall register with the state and
18  local sex offender registration agency in any state where the
19  Defendant resides, is employed, carries on a vocation or is a
20  student at such time as directed by the probation officer.
21  The Defendant shall not possess any type of camera or video
22  recording device without approval of this Court. The
23  Defendant shall cooperate with the probation officer in the
24  collection of DNA.
25       The Court finds that the sentence that has been

Page 50

1  stated is reasonable based upon the reasons previously stated
2  and because the Defendant was previously convicted of second
3  degree sexual abuse, and within a short time of completing
4  the sentence in that case the Defendant lured a minor victim
5  via the internet chat room to meet him and sexually abused
6  him for over a year. Furthermore, the Defendant made a video
7  recording or recordings of their sexual encounters, some with
8  and some without the victim's knowledge, and distributed them
9  over the internet after the victim would not continue the
10  sexual encounters. Moreover, the Defendant possessed hundreds
11  of images of child pornography, many involving very young
12  children engaged in sexual acts.
13       The sentence imposed takes into account the nature
14  and circumstances of the offense conduct in this case as well
15  as the history and characteristics of this Defendant. The
16  Court finds that it is necessary to impose the stated
17  sentence in order to reflect the seriousness of the offense,
18  to promote respect for the law and to provide just punishment
19  for the offense. Additionally, the Court finds that the
20  stated sentence is necessary to afford adequate deterrence to
21  criminal conduct and to protect the public from further
22  crimes by you, Mr. Turner.
23       Finally, the Court finds that the stated sentence
24  provides this Defendant with the needed correctional
25  treatment in the most effective manner possible without

Page 51

1  endangering society. The Court further finds that any lesser
2  sentence would be insufficient to accomplish the purposes set
3  forth in Title 18 United States Code, Section 3553(a)(2).
4       Are there any objections to the sentence or to the
5  manner in which the Court pronounced it? For example, do you
6  have any objections to the Court's ultimate findings of fact
7  or conclusions of law?
8       MR. PARKMAN: We do, Your Honor. And those have been
9  previously stated and I want to add one to it if I can.
10       THE COURT: You may.
11       MR. PARKMAN: The three hundred and 60 months is the
12  maximum in this case. Taking into consideration other
13  sentences that have been dealt with of -- in other cases that
14  I cited to the Court, the facts warranting this particular
15  sentence is far less egregious than what we have seen in
16  other cases and therefore I would contend that the sentence
17  in this case is unduly harsh, is a violation of the 14th and
18  15th Amendment of the United States Constitution, and is
19  unusual and cruel punishment with regard to this particular
20  case as it relates to other cases and other sentences given
21  in relationship of the facts of this case and the facts of
22  the other cases. Other than the objections previous given
23  previously, which we will stand on, we have nothing further
24  at this time.
25       THE COURT: Your objections are noted. The same

Page 52

1  ruling as to the previous objections. As to your objections
2  about the sentence being unreasonably harsh, cruel or
3  unusual, under the circumstances of this case I find that the
4  sentence imposed is a reasonable sentence. I have reviewed
5  the plea agreement that has been executed between your client
6  and the United States in this case, and I specifically see on
7  page nine that there has been a waiver of certain rights of
8  appeal by Mr. Turner, but that does not include any upward
9  departure or imposition of a sentence pursuant to Section
10  5K2.0 of the sentencing guidelines, so I am confident that
11  you have reserved your right of appeal in that regard.
12       MR. PARKMAN: Thank you.
13       THE COURT: But your appeal is duly noted and
14  overruled.
15       MR. PARKMAN: Excuse me, you said my appeal.
16       THE COURT: Your objection is duly noted and
17  overruled. I'm sorry.
18       MR. PARKMAN: No, sir, I just wanted to make sure we
19  had that right on the record.
20       THE COURT: Any objections from the government?
21       MS. REDMOND: Judge, the government does not have
22  objections to the facts stated or the reasons given by the
23  Court. The government would like to ask the Court to make one
24  quick correction to the pronouncement of the findings of
25  fact, and that is that at no time did the minor victim

## Page 53

1 understand or agree to be recorded by the Defendant. And I
2 think what the Court said is may or may not have, but it's
3 clear from the writings and from the discovery provided to
4 the Defendant and Defendant's own words that the minor victim
5 at no time agreed to be recorded.
6     THE COURT: I was going on the representation that
7 you made earlier where you indicated that he had indeed
8 agreed to be video recorded in these sexual acts. And if you
9 said that mistakenly I need to correct that as part of the
10 facts, but I understood the facts to be different in the
11 presentence report, but you represented that he, in fact, had
12 agreed to be video taped.
13     MS. REDMOND: If I said that, Your Honor it was, in
14 fact, a misrepresentation, in fact, I will go so far as to
15 say a misstatement. He at no time agreed to be recorded.
16     THE COURT: Okay. That will not affect the sentence
17 I have imposed in this case. My sentence took into account
18 the video recording of this minor child without his
19 permission, and with the possibility that some of the video
20 recording was with his permission, it would not affect the
21 sentence that I imposed, and the sentence will remain the
22 same.
23     MR. HARMON: Your Honor, if I might interject here,
24 before the Court enters its final sentencing, there's a final
25 order of forfeiture that has been provided to the Court. The

## Page 54

1 United States would ask the Court to enter that order, make
2 the forfeiture as referenced therein part of its oral
3 pronouncement of sentence, and further request that the
4 forfeiture be entered on the written judgment of the case.
5     THE COURT: Any objection to the forfeiture that's
6 been submitted by the United States?
7     MR. PARKMAN: There's no objection if it is, in
8 fact, what I have been presented and that's dealing with only
9 a --
10     THE COURT: Why don't you look at what has been
11 presented to me, Mr. Parkman.
12     MR. HARMON: I have provided a copy to --
13     MR. PARKMAN: I have got a copy but I want to make
14 sure, because there are other issues. May I approach?
15     THE COURT: That's the copy I have been provided and
16 that's the order I would sign if there's no objection.
17     MR. PARKMAN: Okay. Thank you, Your Honor, let me
18 step back. Those five items are correct.
19     THE COURT: Any objection to the government's --
20     MR. PARKMAN: None.
21     THE COURT: -- motion for final forfeiture as
22 outlined in document number 80?
23     MR. PARKMAN: None, Your Honor.
24     THE COURT: I will enter this as a final order of
25 forfeiture and it will be included as part of the sentence

## Page 55

1 and judgment in this case.
2     MR. HARMON: Thank you, Your Honor.
3     THE COURT: Anything else, Mr. Harmon?
4     MR. HARMON: No, sir, not from the United States in
5 this matter.
6     THE COURT: Mr. Turner, the sentence is ordered
7 imposed as stated. The Court will now address your right of
8 appeal. You have a right to appeal. In order for you to
9 appeal or for your appeal to be timely you may need to file
10 your notice of appeal as soon as ten days from the day the
11 Court enters judgment in this case. If you can not afford the
12 cost of an appeal you may petition the Court for leave to
13 appeal in forma pauperis. Pursuant to the plea agreement that
14 I have referred to earlier, you have waived some or all of
15 your rights to appeal the sentence. Such waivers are
16 generally enforceable, but if you believe your waiver is not
17 enforceable you may present that theory to the appropriate
18 appellate court. I am not encouraging you to appeal or not to
19 appeal, your attorney I am sure will advise you more fully of
20 your rights to appeal if you should have any questions. I am
21 just merely advising you of your right to appeal. Do you
22 understand those rights, Mr. Turner?
23     THE DEFENDANT: Yes, Your Honor.
24     THE COURT: Do you have any questions regarding your
25 right of appeal?

## Page 56

1     THE DEFENDANT: No, Your Honor.
2     THE COURT: Is there anything else that we need to
3 take up before we adjourn this hearing?
4     MS. REDMOND: Yes, sir. On behalf of the United
5 States pursuant to the plea agreement entered into between
6 the government and the Defendant in this case, the government
7 at this time moves to dismiss or have dismissed count one and
8 count two of the indictment.
9     THE COURT: Without objection, counts one and two of
10 the indictment are dismissed. Anything else from the
11 government?
12     MS. REDMOND: No, sir.
13     THE COURT: Anything else from the defense?
14     MR. PARKMAN: Not at this time.
15     THE COURT: Mr. Turner, I wish you the best of luck.
16 You are remanded to the custody of the marshal.
17     MR. PARKMAN: Thank you, Your Honor.
18     THE COURT: This hearing will be in recess.
19     (At which time, 10:41 a.m., the hearing was
20 adjourned.)
21
22         *   *   *   *   *
23
24
25

Page 57

1    I certify that the foregoing is a correct transcript

2   from the record of proceedings in the above-entitled matter.

3   This the 20th day of October, 2005.

4

5   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　Plaintiff/Appellee,　　　　　*
　　　　　　　　　　　　　　　　　　*
V.　　　　　　　　　　　　　　　　*　　　Case No.  05-14897-DD
　　　　　　　　　　　　　　　　　　*
KEVIN W. TURNER　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　Defendant/Appellant.　　　　*

---

## OPENING BRIEF OF APPELLANT KEVIN W. TURNER

---

ON APPEAL FROM
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
CASE NO: 03-219-F

---

SUSAN GRAHAM JAMES
COUNSEL FOR APPELLANT
LAW OFFICE OF
SUSAN G. JAMES & ASSOCIATES
600 SOUTH McDONOUGH ST.
MONTGOMERY, AL 36104
(334) 269-3330
EMAIL: SGJAMESANDASSOC@AOL.COM
ALABAMA BAR. NO. ASB-7956-J64S


GOVERNMENT
EXHIBIT
E

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,     *

                            *

     Plaintiff/Appellee,     *

                            *

V.                         *     Case No. 05-14897-DD

                            *

KEVIN W. TURNER         *

                            *

     Defendant/Appellant.    *

---

## CERTIFICATE OF INTERESTED PERSONS

## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rule 26.1 Appellant Kevin W. Turner files this

Certificate of Interested Persons and Corporate Disclosure Statement.

    1.  Richard Martin Adams, Former Counsel

    2.  Honorable Mark E. Fuller, Chief Judge

    3.  John T. Harmon, AUSA

    4.  Susan G. James, Appellate Counsel for Turner

    5.  Honorable Vanzetta P. McPherson, Magistrate Judge

    6.  James W. Parkman, III, Former Counsel

C1-1

7. John M. Poti, Former Counsel

8. Susan Redmond, AUSA

9. Kevin W. Turner, Defendant/Appellant

Of Counsel

C1 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that oral argument would assist this Court in determining the issues raised herein.

## CERTIFICATE OF TYPE SIZE AND STYLE

Times New Roman 14-point-type - Wordperfect 12

## CERTIFICATE OF COMPLIANCE

I, Susan G. James, certify that I am filing this principal brief pursuant to Rule 32(a)(7)(B) and (C) and certify that it contains 6,419 words.

Susan G. James

i

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND

CORPORATE DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C1-2

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . i

CERTIFICATE OF TYPE SIZE AND STYLE . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. Course of Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C. Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ii

# TABLE OF AUTHORITIES

*Blakely v. Washington*, 124 S.Ct. 2231 (2004) . . . . . . . . . . . . . . . . . . . . . 18,25,26

*Crawford v. Washington*, 541 U.S. 361, 124 S.Ct. 2354,

    158 L.Ed 2d 177 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28

*Ohio v. Roberts*, 448 U.S. 56, 65 L.Ed 2d 597, 100 S.Ct. 2531 . . . . . . . . . . . . . 27

*United States v. Anderson*, 5 F.3d 795 (5th Cir. 1993) . . . . . . . . . . . . . . . . 8,20,22

*United States v. Black*, 116 F.3d 198, 202-03 (7th Cir. 1997) . . . . . . . . . . . . . 24

*United States v. Blas*, 360 F.3d 1268 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . 7,20

*United States v. Booker*, 543 U.S. __, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005)  15,25

*United States v. Canada*, 110 F.3d 260, 263 (5th Cir. 1997) . . . . . . . . . . . . . . . 24

*United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002) . . . . . . . . . . . . . . 8,20,22

*United States v. Laney*, 189 F.3d 954, 959 (9th Cir. 1999) . . . . . . . . . . . . . . . . 24

*United States v. Lorge*, 166 F.3d 516, 518 (2nd Cir. 1999) . . . . . . . . . . . . . . . 24

*United States v. Nibbler*, 159 F.3d 233, 238 (6th Cir. 1998) . . . . . . . . . . . . . . 24

*United States v. Pearl*, 324 F.3d 1210 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . 24

*United States v. Probel*, 214 F.3d 1285, 1289 (11th Cir. 2000) . . . . . . . . . 10,23,25

iii

RULES

Federal Rule of Criminal Procedure 11(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

F.R.Cr.P. 11(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

STATUTES

U.S.S.G. §5K2.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,10,19,20

U.S.S.G. §5K2.0 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,19,20

U.S.S.G. §5K1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,18

U.S.S.G. §2G2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,19,23,25

iv

## STATEMENT OF JURISDICTION

The District Court had jurisdiction of this case pursuant to 18 U.S.C. §3231.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF THE ISSUE

## I . WHETHER THE SENTENCE IMPOSED BY THE DISTRICT COURT WAS IMPOSED IN ERROR AND IF IT WAS REASONABLE.

## STATEMENT OF CASE[1]

### A. Course of Proceedings

On September 23, 2003 Kevin Turner was indicted in a seven count indictment in the Middle District of Alabama. Specifically he was charged with Sexual Exploitation of Children, 18 U.S.C. §2251(a) (Counts 1 and 2); (Counts 3-6) and activities contributing to or containing child pornography, 18 U.S.C. §2252(A) (Count 7). He was arrested on September 29, 2003. (D-2). Turner made an initial appearance and was released on bond. (D-4)

Turner was arraigned on October 8, 2003 at which time he entered a plea of not guilty. Turner filed a motion to suppress on November 13, 2003. (D-16)

On November 20, 2003 Turner filed a notice of intent to change plea. (D-19) An order issued on November 21, 2003 denying as moot his motion to extend time

---

[1] The record will be cited as docket entry (D-_) indicating docket entry and document number.

1

to file a motion to suppress.

On December 1, 2003, Turner appeared for a change of plea hearing before the Honorable Vanzetta P. McPherson. The plea agreement was filed on that date. (D-25)

The Magistrate Judge made a report and recommendation to the District Court Judge suggesting that the plea of guilty be accepted as to Counts 3-7 of the indictment. (D-27) Turner was released and continued on the same conditions as previously set out. (D-28)

On January 6, 2004 the District Court Judge accepted the plea of guilty and a adjudication of guilt as to Counts 3-7 of the indictment. The motions were denied as moot. (D-29)

On February 6, 2004 the court entered an order granting a motion for a preliminary order of forfeiture. (D-32) On March 2, 2004 a warrant was issued for Kevin Turner. (D-36) A hearing was held on March 4, 2004 at which time Turner in open court filed a motion to withdraw his guilty plea. (D-39) The court entered an oral order allowing Turner to withdraw his plea of guilty as to Counts 3-7.

A detention hearing was held on March 9, 2004 at which time Turner was ordered detained. (D-44)

On May 3, 2004 Turner entered a second notice of intent to change plea. (D-55)

A second plea agreement was filed on May 14, 2004. (D-60) On the same date Turner entered a change of plea of guilty as to Counts 3-6 and 7. (D-61) The Magistrate Judge made a report a recommendation suggesting that the plea be accepted. (D-62) On June 7, 2004 the District Court Judge accepted the guilty plea and the adjudication of guilt. (D-64)

On August 16, 2004 the District Court Judge entered an order directing Turner file in writing, no later than August 23, 2004, any *Blakely* objections that he may have. (D-66) A sentencing memorandum was filed by Turner's counsel on August 17, 2004. (D-67)  On August 10, 2005 the government filed a motion to decrease the offense level by an extra one level for acceptance of responsibility. (D-81)

Sentencing was conducted on August 26, 2005 at which time Counts 1 and 2 were dismissed by the government. As to Counts 3, 4, 5, and 6, he received 360 months and on Count 7, 120 months all to be served concurrently; 5 years supervised release on Counts 3, 4, 5, and 6, and three years on Count 7.  (D-84) The court entered an oral order for acceptance of responsibility on the government's motion.

3

Turner at sentencing made an oral motion for downward departure. The court

denied the motion.

On September 27, 2005 James W. Parkman, III, moved to withdraw as

counsel in this case and Attorney John M. Poti, was appointed. (D-96)  The motion

was granted for Parkman to withdraw. (D-97)  On October 31, 2005, the

undersigned entered an appearance as Appellate Counsel for Turner. (D-100)

This appeal follows.

**B. Statement of Facts[2]**

**December 1, 2003**

On December 1, 2003 Turner appeared with his lawyer to enter a change of

plea before the Honorable Vanzetta McPherson, United States Magistrate Judge.

The Court conducted the plea colloquy determining that Turner was competent to

enter a knowing and voluntary plea. This was confirmed also by his lawyer. (12-1-

03-p. 6)  Turner advised that he was undergoing psychological counseling and that

he was taking Prozac, Lithium, and Seraguel. (12-1-03- p. 4)  The plea agreement

was entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). (12-1-03-

p. 9)

---

[2]The record in this case as relates to transcripts will be cited as follows: (12-1-03-p.__), (3-4-04-p. __), (12-14-04-p. __), and (8-26-05-p. __) indicating hearing date and page number.

4

The court advised that if convicted after his plea of guilty to the offenses in Counts 3, 4, 5, and 6, the mandatory minimum was 5 years and that the court must sentence him to at least 5 years.  (12-1-03-p. 11) The court also advised that it could sentence him to no more than 30 years.  The court also advised that one of the provisions of the plea agreement was that the government had agreed that the court should sentence him to the minimum mandatory five years on each count **running concurrently with the other**.  That would include a two year minimum on Count 7. (12-1-03-p. 12)

Turner entered a plea of guilty as to Counts 3, 4, 5,6 and 7.  (12-1-03-p.14-15)  The plea agreement contemplated a waiver of his right to appeal with the exception of ineffective assistance of counsel and prosecutorial misconduct.  (12-1-03-p.15-16)

The court found that he was competent and capable of entering an informed plea and that he knowing and voluntarily waived his rights.  (12-1-03-p. 21)

**March 4, 2004**

Parkman on behalf of Turner at the detention hearing, and after consultation with AUSA Susan Redmond stated: "We've had discussions to try to resolve this. And at this time, I feel that the only way to resolve this matter at this moment on behalf of Kevin Turner, we're going to have to withdraw our pleas of guilty at this

5

time and move forward toward trial and on the motion to suppress, also, that was previously filed." (3-04-04-p.15) The court granted this request. (3-04-04-p.15)

**December 14, 2004**

The court noted that Turner had entered a plea before and proceeded to the district court level wherein he withdrew his plea and was now returning to reenter a plea. (12-14-04-pp.2-3) The defendant entered the plea before the Honorable Magistrate Judge. (12-14-04-p.3) The court went through the entire plea colloquy. (12-14-04-p. 7) The court indicated that the plea was being entered pursuant to F.R.Cr.P. 11 (c)(1)(A). (12-14-04-p.7)

The court indicated that at the bottom of page 4 if the terms of the plea agreement were not accepted by the court the defendant would be allowed to withdraw and proceed to trial. (12-14-04-p. 8) The defendant indicated that the government would file a motion for downward departure from the guidelines. (12-14-04-pp.8-9)

The court noted the gravamen of the plea agreement was substantial assistance. (12-14-04-p.9)

Explanation of rights (12-13-04-p.10-18) It was also noted that the presentence report had already been prepared. (12-14-04-pp.18-19)

Turner entered a plea of guilty to (Counts 3-7). (12-14-04-pp.22-26)

6

**August 26, 2005 (Sentencing)**

The court noted that there were objections to the presentence report and its obligation was to determine a reasonable sentence by consulting the United States Sentencing Guidelines as advisory and other factors pursuant to 18 U.S.C. §3353(a). The court also noted that the plea was pursuant to 11(c)(1)(A). (8-26-05-p. 2)

The Rule 11(c)(1)(A) plea required the government to file a three level downward adjustment for acceptance of responsibility and a three level downward adjustment for substantial assistance if it were determined that both were appropriate. (8-26-05-p.3)

Defense Counsel Parkman indicated that the government agreed to file a three level downward adjustment pursuant to 5K.1.1 of the Sentencing Guidelines and that the right to appeal was waived except under circumstances which might be unforeseen. For example the court making an upward departure without a factual basis. (8-26-05-p.4)

Defense Counsel Parkman objected to the suggestion by probation for an upward departure on the basis of 5K2.8 U.S.S.G. The basis was pain and suffering of the victim due to his identity being exposed. Attorney Parkman indicated that he did find only one circuit case that dealt with this. *United States v. Blas*, 360 F.3d

7

1268 (11th Cir. 2004). He also cited a Fifth Circuit case *United States v. Anderson*, 5 F.3d 795 (1993). (8-26-05-pp.10-11)

Parkman on behalf of Turner indicated that the case law was specific on what is required for an increase under this provision. He argued that the cases require sufficient psychological or behavioral function impairment. (8-26-05-p.11) He argued that all of the cases required a statement from the victim and/or psychologist, neither which were present in the instant case. (8-26-05-p-12)

The presentence report referenced a statement from the victim's mother. Parkman argued that was insufficient under the law as it exists at present. (8-26-05-p.12) Further Parkman argued that you could not guess or speculate as to the heinousness and cruelness of the conduct to conclude psychological harm and the guidelines required that psychological harm must be greater in the instant case than suffered by most victims of abuse. (8-26-05-p.12) He argued that both the Eleventh Circuit and Fifth Circuit cases previously cited revealed substantially greater harm than that even speculated in the instant case. (8-26-05-pp.13-14)

The probation officer directed the court to *United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002) in support where there was a ten level upward departure in a sexual case. (8-26-05-p.20)

8

The probation officer argued that this defendant "did not simply possess child pornography, did not simply produce or make child pornography, this defendant actually molested a 17 year old man, a boy, minor victim, who is unable to give consent being a minor, so he molested him. Unbeknownst to the victim the defendant video taped these. He even asked him before hand "do you mind if we make these tapes. To which the victim said no." The defendant continued.

Upon the victim saying he wanted to get out of the relationship, this defendant said "okay if you do, I will post these on the internet for your friends and family to receive them." The victim stayed in the relationship longer until - - approximately six months until he said "I'm out." It was the next day, Your Honor, the defendant posted these images. They were accessed 53 times until AOL could pull them off.

The victim sought counsel, went to a local attorney, the attorney contacted the district attorney, and so this victim did take steps to amend this situation. I think that does go to show that he was affected by the case, the severity of it. The family had to pay for his attorney to get involved. This was not free counsel they used. Based on all those factors, the probation officer's opinion is that a 300 month sentence is reasonable, whether the court goes according to the guidelines and makes an upward departure or whether the court goes under the statutory

9

circumstances in the case. Thank you." (8-26-05-pp.21-22)

The court indicated that in reviewing the case law it may consider as part of

an upward departure or an upward variance based upon the post *Booker-FanFan*

sentencing, it may consider an upward departure on the basis of the defendant's

knowledge, conduct, and gratuitous infliction of injury to the minor victim in this

case. The court noted for that reason it felt an upward deviation, upward departure

was warranted under either 5K2.8 or 5K2.0. The court overruled the objection. (8-

26-05-p.24)

Parkman objected to an enhancement of five levels pursuant to U.S.S.G.

2G2.2. (8-26-05-p.25) The objection dealt with whether or not there was

distribution with pecuniary gain. (8-26-05-p.25) Parkman conceded that the

Eleventh Circuit case law indicated that he was not on good footing to make the

argument but there was split in other circuits on this issue. The case discussed was

*United States v. Probel*, 214 F.3d 1285 (11th Cir. 2004). (8-26-05-p.26)

Parkman suggested that the scenario in the instant case, requesting that the

defendant come back to him in exchange for exoneration of a debt was not

pecuniary gain. (8-26-05-p.27)

He argued that there was no pecuniary gain because nothing actually

happened. In fact it worked in reverse as to what was supposed to have happened.

Parkman submitted that reading the law strictly as it should be read, no benefit was received by Turner concerning the distribution of a picture of the victim. (8-26-05-p.27)

The probation officer interjected that the defendant, in putting a monetary value on the computers that he gave the victim with the suggestion that the victim could keep the computers as long as he stayed in and provided sexual acts and sexual favors to the defendant, was pecuniary gain. (8-26-05-p.30)

Parkman offered that the distribution of the pictures was not for pecuniary gain, but an attempt to have him come back and enter into a voluntary relationship. He argued the computers were a side item and had nothing to do with the distribution. The distribution was not "if you don't give me my money or bring my computers back I am going to put it on there." (8-26-05-p.32)

Parkman brought to the courts attention that after receiving a letter from the victim's attorney, Turner did remove the photographs and wrote a letter of apology to the lawyer. (8-26-05-p.33) The district court indicated that as to the 2G2.2 objection the court could hardly see how the distribution of pictures would have the victim come back to a voluntary relationship. But the court felt that the Eleventh Circuit case law (*Probel*) made it clear pecuniary or other gain is not required for the enhancement to apply. (8-26-05-p.33) The court overruled the objection and

11

applied the minimum guideline enhancement. (8-26-05-p.34)

Parkman argued given the court's ruling on the upward departure that he should raise some issues with regard to a downward departure. Specifically he referred to a troublesome youth impacted by things that had happened to him as a minor. (8-26-05-pp.34-35). Parkman also added consideration should be given to the fact that Turner voluntary sought treatment for conditions leading up to this offense conduct. (8-26-05-pp.35-36)

The probation officer in response to Parkman's request for a downward departure based on voluntary psychiatric counseling and his being the victim of similar conduct at a youthful age, indicated that the Protect Act was still good law despite the advisory nature of the guidelines. He argued that the Protect Act prohibited departures for several factors unless they had been expressly addressed in the sentencing guidelines. He stated that lack of guidance as a youth, similar circumstances, or post-rehabilitative efforts sought by the defendant were precluded under the Protect Act. (8-26-05-p.40)

The probation officer argued that a downward departure may be prohibited by the guidelines and may be by the Protect Act. (8-26-05-p.41) In response Parkman indicated that the guidelines are not applicable and only advisory. (8-26-05-p.41)

12

The court indicated that it considered the defense request for a downward departure based on voluntary desire for mental health counseling and that he may have suffered from an abusive upbringing which might have caused the conduct to have been an involuntary response on his part. The court noted that the only addition to his finding that precluded a downward departure was contained in the presentence report as a history of Mr. Turner that he had turned into a sexual predator. Therefore, the court denied any kind of departure. (8-26-05-p.42)

The court adopted the actual findings under the guidelines of the Offense Level 32, Criminal History Score I, and the guideline range of 121-151 months. The supervised release for Counts 3-6 included five years, Count 7 was two to three years. He could be fined $17,500 to $175,000.

The court found an upward departure warranted pursuant to 5K2.0 and 5K2.8 based on the defendant's conduct. (manipulative, unusually heinous, cruel, brutal and/or degrading toward the young victim). Further the court found the guideline range should be 40 with the Criminal History Score creating guidelines of 292-360 months and a fine range of $25,000 to $250,000. (8-26-05-p.43)

The court noted that the victim did not want to testify. (8-26-05-p.44)

At that juncture the court indicated that it would pronounce the sentence. There does not appear to be a motion by the government for the three level

13

5K1.1downward departure.  (8-26-05-p.44)

The court determined that Turner was a repeat sexual predator who had demonstrated a history of selecting, stalking, and destroying the lives of young children.  The court indicated that Turner was the reason our society must have prisons.  "I notice for many years that you suffered from this problem and have yet done nothing to stop this type of criminal and pedophile desires that you have with young boys".  The court indicated that the only reasonable sentence available after considering 18 U.S.C. §3553(a), an advisory guideline range, and the applicable statutory factors was a period of confinement of 360 months on Counts 3, 4, 5 and 6, and 120 months on Count 7, all to run concurrently.  (8-26-05-p.45)

After stating the sentence, counsel to the defense objected to the pronouncement of sentence.  (8-26-05-p.51) He argued that the objections had been previously noted with an additional objection.  The defense argued that the 360 month sentence was maximum in this case.  The facts in this case were all less egregious than those cited to the court in the case law.  Parkman  argued that the sentence was unduly harsh and in violation of the Fourteenth and Fifteenth Amendments of the United States Constitution and was cruel and unusual punishment.  (8-26-05-p.51) The court noted that the objections were preserved.  The court responded that the sentence was reasonable.  Further the court noted that

14

there was a waiver of the right to appeal but that did not include any upward

departure pursuant to 5K2.0.  The court was confident that Parkman had reserved

his right to appeal in that regard.  (8-26-05-p.52)

## C.  Standard of Review

ISSUE I.  - Sentences are to be reviewed under the standard of

reasonableness determined with reference to the standards set forth in 18 U.S.C.

3553(a).  *United States v. Booker*, 124 U. S. 738, 757, 765-66.  It should be noted

Turner's plea was entered when the standard of review was clearly erroneous.

## SUMMARY OF THE ARGUMENT

Turner contends his 30 year sentence is unreasonable based on the facts and

disparity with others engaged in far more egregious conduct.  He further contends

that the ten levels added pursuant to 5K2.8 and 5K2.0 U.S.S.G. were clearly

erroneous.  His sentence is due to be vacated and he should be re-sentenced.

## ARGUMENT

## ISSUE I - WHETHER THE SENTENCE IMPOSED WAS IN ERROR

## AND WHETHER IT WAS REASONABLE

## A.  INTRODUCTION

Kevin Turner, an adult, engaged in a sexual relationship with a young man he

met on the internet.  Despite the inappropriateness of the relationship based on the

15

victims age and Turners marital status, the victim was savy and used Turner for financial renumeration. Concedely, Turner was distraught over the termination of the relationship by the young man. Turner has a documented history of bipolar disorder, other psychiatric conditions, and a history of his own victimization at the hands of a sex abuser when he was at a young tender age.

Turner overwhelmed with the realization the relationship was terminating and reacting out of emotion over his true love affair ending, engaged in a ploy to try to entice his lover back into the relationship.

Turner threatened to post images on the internet of he and his lover in sexually explicit scenes which had been recorded. Turner maintains that these images, while posted on a local computer "server" in Dothan, Alabama were never published or accessed. He contends the 53 hits referenced by probation resulted solely from his visits to the dormant cite to organize it and 3 from viewing by his estranged lover before the lover hired counsel and demanded the removal of the images. These were removed upon request and Turner offered an apology. (8-26-05-p.33) Turner's defense was that, symptomatic of his bipolar disorder, he lost control and judgment in even threatening the above.

The government in obvious recognition of the true facts of this case initially entered into a plea agreement with Turner for an aggregate five year term as to

Counts 3, 4, 5, 6 and 7 and dismissal of Counts 1 and 2.   (12-01-03-p.12) This is a

far cry from the 30 calendar years (no parole) Turner actually received at

sentencing.  (8-26-05-p.45)

On December 1, 2003 Turner with former counsel Jim Parkman entered into a

plea agreement, accepted by the Magistrate Judge with a recommendation to the

District Judge that an aggregate five year term agreement be accepted.  The initial

plea was pursuant to F.R.Cr.P. 11(c)(1)(C) and binding on the court.

What transpired subsequent to the December 1, 2003 change of plea and the

August 26, 2005 sentencing is less clear.

A review of the court docket entry sheet reveals that the district court

accepted the magistrate's report and recommendation to accept the binding plea

agreement on January 6, 2004 adjudging him guilty.  (D-29) The original sentencing

was set for March 2, 2004 before the Honorable Mark Fuller.  Objections to the

presentence report were due by February 9, 2004.  On March 1, 2004 Turner filed a

motion to continue sentencing.  (D-34) which was granted by the court the same

day.  (D-35) The basis was to **research complex issues**.

All the record reveals is that a status and detention conference was conducted

on March 4, 2004 at which time Parkman on behalf of Turner orally moved to

withdraw the guilty plea.  Specifically, the following occurred:

17

Parkman on behalf of Turner at the detention hearing, and after consultation with AUSA Susan Redmond stated: "We've had discussions to try to resolve this. And at this time, I feel that the only way to resolve this matter at this moment on behalf of Kevin Turner, we're going to have to withdraw our pleas of guilty at this time and move forward toward trial and on the motion to suppress, also, that was previously filed." (3-04-04-p.15) The court granted this request. (3-04-04-p.15)

The court orally granted the motion to withdraw. (D-39) It then appears that Turner, through counsel, was in further re-negotiation with the government for a new plea agreement. A new agreement was reached and Turner again changed his plea of not guilty to a plea of guilty on December 14, 2004. A plea agreement was filed. (D-60) The Magistrate Judge understood the plea to be pursuant to F.R.Cr.P. 11(c)(1)(A). The magistrate also understood the gravamen of the new plea to be **substantial assistance**.

Again absent and unclear from the record is the plea promised motion for a downward departure (5K1.1) of three levels despite defense counsels reference to the court the same had been promised. Further the record is void of any objection by defense counsel regarding the governments failure to file said motion or the courts failure to grant the same.

18

Sentencing was set for August 16, 2004. The district court accepted the plea and adjudicated Turner guilty. (D-64) The court entered an order continuing the sentencing until August 31, 2004. The district court ordered the filing of *Blakely* objections. (D-66) Turner filed a sentencing memorandum. (D-67) The August 31, 2004 sentencing was continued indefinitely by order of the court. (D-69) Sentencing was reset for June 14, 2005. (D-75) Turner's counsel filed yet another motion to continue sentencing on June 6, 2005. (D-76) The court granted the motion continuing the sentencing until July 7, 2005. (D-77) On June 23, 2005 Turner's counsel filed another motion to continue sentencing. (D-78) The court continued the sentencing until August 11, 2005. (D-79) The government on August 10, 2005 filed a motion for an extra level adjustment for acceptance of responsibility. (D-81) A minute entry reflects a status conference as to the August 11, 2005 sentencing. (D-82) An order issued continuing Turner's sentencing until August 26, 2005. (D-83) Sentencing was held on August 26, 2005. (D-84)

Turner through counsel objected to the suggested five level enhancement pursuant to U.S.S.G. §2G2.2; the five level enhancement and upward departure pursuant to 5K2.8 and an 5K2.0 U.S.S.G., and the courts failure to grant a downward departure from the guidelines based on voluntary post arrest treatment and the defendants having been a sexual abuse victim at a young age. The district

19

court denied all the objections and refused to downward depart. The court did grant the governments motion for an extra one level 3E1.1 downward adjustment for acceptance of responsibility.

The court in denying all of the defense requests imposed a term of 360 months on counts 3, 4, 5, and 6 and a term of 120 months on count 7 to run concurrent with the 360 months. (D-88) Three hundred and sixty months was the maximum term allowed by law.

Turner's objections and claimed errors will be addressed in turn as raised at sentencing.

## B. ERRONEOUS SENTENCING ENHANCEMENTS

1. **Upward Departure 5K2.8 or 5K2.0**

Probation suggested and the district court agreed that Turner's sentence should reflect an upward departure from the suggested guidelines based on extraordinary pain and suffering of the victim due to his identity being exposed. The defense objected. (8-26-05-pp.10-11) The defense argued that this case was distinguishable from *United States v. Blas*, 360 F.2d 1268 (11th Cir. 2004); *United States v. Anderson*, 5 F.3d 795 (F.3d 795 (1993); and *United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002). The district court disagreed and Turner appeals.

20

In the instant case the victim was threatened with his identity being exposed by the publishing of images over the internet. Although posted, Turner contends the images were not published. However, even if they were, arguendo, there is no evidence of psychological harm or impairment rising to the level of the egregiousness displayed in *Blas,* supra. (Adolescent exposed to HIV through several sexual acts and failure to notify her of his condition) The court held *Blas'* conduct to be unusually heinous, cruel, brutal or degrading. The court held his actions were incredibly risky, dangerous, and presented circumstances that clearly were not taken into account in formulating the guidelines.

In the instant case, as argued at sentencing, there was no more than speculation as to the alleged harm. There was no evidence from any mental health professional substantiating the alleged harm. This court should be reminded that the victim, albeit underage when the romantic relationship began, was a willing participant for financial renumeration.

Even under the egregious conditions in *Blas*, the guidelines were enhanced to a level 34 with a guideline range of 151 to 180 months, and an 180 month sentence. This court found the 180 month sentence reasonable. Surely, Turners sentence, double that of *Blas*, is not.

21

The *Anderson* case (5 F.3d 799 5th Cir. 1993) also addressed an upward departure from the suggested guidelines based on circumstances not otherwise taken into account by the guidelines such as psychological injury and the defendants extreme conduct.

In *Anderson* the defendants were charged with kidnaping. The victim was raped two or three times during the ordeal. The assault also included making the victim perform oral sex with threats of death, to burn the victim and the car. In *Anderson* the probation calculation of the guidelines was level 31. The court departed upward four levels for a total of 33 based on extreme psychological harm to the victim and the defendants extreme conduct. Based on a level 33 and Criminal History Score of III the suggested guidelines were 168 to 210 months. *Anderson* received a term of 200 months. 160 months (or 13 years) less than Turners in the instant case. Based on the comparison, Turner's sentence is clearly unreasonable and the conduct does not fall outside the heartland as addressed in *Blas* and *Anderson*. Even *Anderson's* co-defendant Barnett, with a Criminal History Score of V and a base level of 33 received a sentence of only 240 months (20 months less than Turner) with guidelines of 210 to 262 months.

In response to the defense objections the probation officer cited to the court *United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002) arguing that a ten level

22

upward departure had been upheld.

In *Hersh* the court based the departure on 20 years of predatory behavior including at least four, and countless unidentified victims (not charged). The *Hersh* court found the sexual exploitation was aggravated and prolonged and the likelihood of recidivism was high. Hersh's victims, unlike the victim this case, were extraordinarily vulnerable. Hersh's victims were Third World minor victims unlike the victim in this case, a willing participant for financial renumeration. Hersh was also noted to have combined his information and resources with others to sexually exploit minor victims of Third World countries. This case, too, is indistinguishable from the case at bar.

In the *Hersh* case the district court in departing 10 levels (from 32 to 42) imposed a sentence of 105 years.

## 2. **2G2.2 U.S.S.G. Enhancement**

Turner objected to the suggested five level 2G2.2 enhancement based on his alleged publication of the victim images for pecuniary gain. (8-26-05-p.25) The court relied on *United States v. Probel*, 214 F. 3d (11th Cir. 2004)

The conduct as recited in the statement of facts simply does not meet the required level of pecuniary gain necessary for application of a five level 2G2.2 enhancement. In *Probel* the court held that there was nothing in the guidelines that

23

suggested the term "distribution" was limited to instances of pecuniary or other

benefit. It should be noted that *Probel* involved application of 2G2.2(b)(2). Turner,

on the other hand, involved (at least as reported in the sentencing transcript) a

2G2.2 enhancement. When reviewing 2G2.2(b)(3) it recommends applying the

greatest offense level (five) when the offense involved distribution for pecuniary

gain or expectation of receiving a thing of value but not for pecuniary gain, or

distribution to a minor. None of these occurred at bar.

Unlike *Probel*, the victim in this case was not under the age of 12. Nor did

the material at bar involve sadistic or masochistic portrayals. To be sure the five

level enhancement is erroneous in this case this court should revisit the circuit splits

on the issue of pecuniary gain. The Seventh and Ninth Circuits have held pecuniary

gain is required while the Second, Fifth, Sixth, Eighth, and Eleventh have held that

pecuniary or other gain is not required.[3]

In all due respect, this courts decision in Probel, siding with the majority of

the circuits addressing the issue, causes a double penalty in requiring a five level

---

[3] *United States v. Pearl*, 324 F.3d 1210 (10th Cir. 2003) circuit split over whether an increase may be imposed absent a pecuniary gain. Compare *United States v. Laney*, 189 F.3d 954, 959 (9th Cir. 1999) and *United States v. Black*, 116 F.3d 198, 202-03 (7th Cir. 1997) (pecuniary gain required) with *United States v. Probel*, 214 F.3d 1285, 1289 (11th Cir. 2000); *United States v. Lorge*, 166 F.3d 516, 518 (2nd Cir. 1999); *United States v. Nibbler*, 159 F.3d 233, 238 (6th Cir. 1998) and *United States v. Canada*, 110 F.3d 260, 263 (5th Cir. 1997) (pecuniary gain not required in order to impose 5-level increase.

increase for "distribution" or publishing the images.

Turner respectfully disagrees with this courts holding in Probel and argues that pecuniary gain or receiving something of value is necessary in order to apply the five level enhancement. None of this was present here. Turner threatened to publish the victims images if the defendant did not stay in the relationship. The victim did not, instead reporting the matter ultimately to the authorities. There was no gain but instead a loss by the threat. U.S.S.G. 2G2.2 simply does not apply. As such the sentence should be vacated and the five level enhancement removed.

### 3. Downward Departure/Protect Act

Turner also argues that the probation officers suggestion to the court that a downward departure was most likely barred based on the Protect Act was incorrect. The probation officer relied on the Protect Act as good law. The Protect Act is directly related to the guidelines now rendered advisory by *Booker*. The Protect Act was enacted April 30, 2003. Under the Protect Act when a sentence was outside the guideline range it was reviewed de novo based on three factors. (See *Blas*, supra) The *Blas* case was decided February 19, 2004, four months before *Blakely v. Washington,* 542 U.S. _, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004), and 11 months before *United States v. Booker*, 543 U.S. _, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005). Turner argues the mandatory application of the Protect Act in barring

25

downward departures from the now advisory guideline system is no longer enforceable.

## C.  THIRTY YEAR SENTENCE UNREASONABLE

Lastly, Turner argues his sentence is unreasonable for all the above stated reasons.  Thirty years for this offense conduct is absolutely excessive.  Particularly when compared to the disparate treatment of *Blas* and *Anderson*, supra in much more egregious circumstances.   Turners sentence is due to be reversed.

## D.  APPLICATION OF SENTENCING ENHANCEMENTS SIXTH AMENDMENT VIOLATION

Turner contends that the sentence imposed was based upon an erroneous application of the Guidelines as recommended by the U. S. Probation Officer, and that when a district court uses the Guidelines as such a defendant's right to due process is applicable.

As to all of the applied sentencing enhancements Turner contends this is a violation of his rights pursuant to the Fifth and Sixth Amendments to the United States Constitution to punish him based upon a finding of fact that is not reflected in a jury's verdict beyond a reasonable doubt or admitted by the Defendant at the change of plea.  Justice Scalia in his majority opinion in *Blakely v. Washington*, 124 S.Ct. 2231 (2004) suggested that an obstruction of justice enhancement for perjury

26

would be a violation of the Sixth Amendment right to a jury trial.

Justice O'Conner suggested the same wherein she querried. "Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt as it has been for centuries, See 4 W. Blackstone, Commentaries on the laws of England 136-138 (1769), is unclear."

### E. REASONABLENESS ERRONEOUS STANDARD

In *Crawford v. Washington*, there was a divergence from the prior procedure approved in *Ohio v. Roberts*, 448 U.S. 56, 65 L.Ed 2d 597, 100 S.Ct. 2531, where [Roberts] framework was referenced unpredictable. In *Crawford* and in this case, whether a statement is deemed reliable depends on which factors a judge considers and how much weight he accords each of them. The same is true of the reasonableness standard now used to measure sentence validity post *Booker*.

The Sixth Amendment requires that any factor that increases punishment must be decided by a jury not a judge or admitted by the defendant. The reasonableness standard enunciated in *Booker*, Part II, allows for unpredictable and inconsistent application. The nebulous standard fails to interpret the Sixth Amendment right to jury trial in a way that secures its intended constraint on judicial discretion. The Sixth Amendment right to a jury trial must not be replaced by the courts own devise

27

- reasonableness.

Reasonableness is too broad.

The framework for a reasonableness analysis, if any, is so unpredictable that it fails to provide meaningful protection for Sixth Amendment violations.

Reasonableness, as **reliability** described in *Crawford,*541 U.S. 36 124 S.Ct. 1354 158 L.Ed 2d 177 (2004), is an amorphous, if not entirely subjective concept.

The vast inconsistencies and ambiguity in both District Courts and the Circuit Courts on *Booker* remand when making reasonableness analysis, reveals a fundamental failure in *Booker*, Part II to ensure Sixth Amendment jury trial rights, in a way that secures its intended constraint on judicial discretion.

As in *Crawford* on reliability and the Confrontation Clause, violence is done to the amendments design by replacing categorical constitutional guarantees with open-end balancing, tests in cases of reasonableness and the Sixth Amendment. "Vague standards are manipulable, and while that might be a small concern in run of the mill [assault] prosecutions like this one, the Framers had an eye toward politically charged cases like [Raleigh's] - great state trials where the impartiality of even those at the highest levels of the judiciary might not be so clear." *Crawford,* supra.

Turner's sentence is due to be reversed.

28

## CONCLUSION

Wherefore, for the foregoing arguments and citations to authority Turner prays

that this Court vacate his sentence and order a re-sentencing.

Respectfully submitted this 27th day of December 2005.

Susan G. James (JAM012)

Address of Counsel:
Law Offices of
Susan G. James & Associates
600 S. McDonough St.
Montgomery, AL  36104
(334) 269-3330

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing was served
upon


Susan Redmond
Assistant United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101


this 27th day of December 2005.

the above instrument was served via:
( ) personal service
(√) first class mail
( ) certified mail, return receipt requested
( ) facsimile
( ) overnight courier

of Counsel

29

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. 05-14897-DD

KEVIN W. TURNER,
Appellant

versus

UNITED STATES OF AMERICA,
Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

BRIEF OF APPELLEE

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

SUSAN R. REDMOND
Assistant U. S. Attorney
Post Office Box 197
Montgomery, Alabama 36101

ATTORNEYS FOR APPELLEE

GOVERNMENT
EXHIBIT
F

**United States of America v. Kevin W. Turner**

**Appeal No. 05-14897-DD**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

The following persons have an interest in the outcome of this case:

R. Martin Adams, Former Attorney for Appellant

Delores R. Boyd, United States Magistrate Judge

Leura Garrett Canary, United States Attorney

Louis V. Franklin, Sr., Assistant United States Attorney

Mark E. Fuller, Chief United States District Judge

John Harmon, Assistant United States Attorney

Susan G. James, Attorney for Appellant

Vanzetta Penn McPherson, United States Magistrate Judge

John M. Poti, Former Attorney for Appellant

Susan R. Redmond, Assistant United States Attorney

James W. Parkman, III, Former Attorney for Appellant

Kevin W. Turner, Appellant

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.    The facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. <u>See</u> Fed. R. App. P. 34(a)(2)(C).

## CERTIFICATE OF TYPE SIZE AND STYLE

The size and style of type utilized throughout Appellee's Brief is Times New Roman, 12pt 10 pitch (Legal).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

Appellee's brief is in compliance with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) in that it contains less than 14,000 words.

## TABLE OF CONTENTS

**PAGE**

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1 of 1

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Certificate of Type Size and Style . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Certificate of Compliance with Type-Volume Limitation. . . . . . . . . . . . . . . . . . . . . . . . ii

Authorities Cited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      (i)     Course of Proceedings and Disposition in the Court Below . . . . . . . . . . . . . . . . . 1

      (ii)    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      (iii)   Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument and Citations of Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      ISSUE I.     WHETHER THE DISTRICT COURT ERRED IN FINDING THAT
                      DEFENDANT SHOULD BE ENHANCED PURSUANT TO U.S.S.G.
                      2G2.2(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      ISSUE II     WHETHER THE DISTRICT COURT ERRED IN FINDING THAT
                      DEFENDANT SHOULD BE ENHANCED PURSUANT TO 5K2.0 AND
                      5K2.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      ISSUE II.    WHETHER SENTENCE IMPOSED ON DEFENDANT IS
                      REASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

## **AUTHORITIES CITED**

United States v. Anderson,

    5 F.3d 795, 802-804 (5th Cir. 1993) ..................................... 12, 13

United States v. Banks,

    347 F.3d at 1268-69 ...................................................... 8

United States v. Blas,

    360 F.2d 1268 (11th Cir. 1993) ........................................ 12

United States v. Booker,

    124 U.S. 738, 757, 765-66 ............................................... 8

United States v. Chau,

    426 F.3d 1318, 1324 (11th Cir. 2005) .................................. 16

United States v. Crawford,

    407 F.3d 1174, 1179 (11th Cir. 2005) .................................. 14

United States v. Guerra,

    293 F.3d 1279, 1291 (11th Cir. 2002), cert. denied, 537 U.S. 1141 (2003) .......... 8

United States v. Hersh,

    297 F.3d 1233 (11th Cir. 2002) ...................................... 12, 13

United States v. Martinez,

    434 F.3d 1318, 2006 WL 39541, at *3 (11th Cir. Jan.9, 2006) (per curiam) ........ 14

United States v. Petho,

    409 F.3d 1277, 1280 n. 1 (11th Cir.2005) .............................. 16

iv

United States v. Probel,

    214 F.3d 1285, 1290 (11th Cir. 2000) ........................................ 11

United States v. Shelton,

    400 F.3d 1325, 1330 (11th Cir.2005) ...................................... 16

United States v. Talley,

    431 F.3d 784, 788 (11th Cir, 2005) ....................................... 15

United States v. Williams,

    340 F.3d at 1239 ......................................................... 8

United States v. Williams,

    Slip Copy 2006 WL 463203, (11th Cir. 2006) ............................. 16

*STATUTES*

Title 18 U.S.C. § 3553(a) ..................................................... 14

Title 18 U.S.C. § 3553(b) ..................................................... 11

Title 18 U.S.C. § 2251(a) ..................................................... 1

Title 18 U.S.C. § 2251(c)(1)(A) ............................................... 2

Title 18 U.S.C. § 2252(a)(1) .................................................. 2

Title 18 U.S.C. § 2252(a)(2) .................................................. 2

Title 18 U.S.C. § 2252A(5)(B) ................................................. 3

Title 18 U.S.C. § 2252A(a)(1) ................................................. 2

Title 18 U.S.C. § 2252A(a)(3) ................................................. 2

Title 18 U.S.C. § 3553(a)(2) .................................................. 9

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) ........................... ii

v

## STATEMENT OF JURISDICTION

The instant case is an appeal from a conviction after entry of a plea of guilty to five counts of the indictment in the District Court. The jurisdiction of this Court rests upon Title 28, United States Code, Section 1291.

## STATEMENT OF THE ISSUES

| | |
|---|---|
| **ISSUE I.** | **WHETHER THE DISTRICT COURT ERRED IN FINDING THAT DEFENDANT SHOULD BE ENHANCED PURSUANT TO U.S.S.G. 2G2.2(b)(2)** |
| **ISSUE II.** | **WHETHER THE DISTRICT COURT ERRED IN FINDING THAT DEFENDANT SHOULD BE ENHANCED PURSUANT TO U.S.S.G. 5K2.0 AND 5K2.8** |
| **ISSUE II.** | **WHETHER THE SENTENCE IMPOSED ON DEFENDANT IS REASONABLE** |

## STATEMENT OF THE CASE

**(i)    Course of Proceedings and Disposition in the Court Below**.

On September 23, 2003, a grand jury sitting in the Middle District of Alabama issued a seven-count indictment against Kevin W. Turner (Turner). (R1-1.) Count 1 charged that from January 1998 through December 1998, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did use, persuade, induce and entice M.S., a person under the age of 18, to assist and engage in sexually explicit conduct, including but not limited to fellatio, and lascivious exhibition of the genitals and the pubic area of said minor for the purpose of producing visual depictions of such conduct, which visual depictions were produced using materials that had been transported in interstate commerce, in violation of Title 18 U.S.C. § 2251(a). Count 2 charged that from July 1, 2000 through July 5, 2000, exact dates being unknown to the grand jury, in Dothan,

1

Alabama, the defendant did knowingly make, print, publish and transport in interstate commerce by computer, a notice and advertisement, seeking or offering to display and distribute, visual depictions of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct, in violation of Title 18 U.S.C. § 2251(c)(1)(A). Count 3 charged that from July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly transport in interstate and foreign commerce by computer, visual depictions of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct, in violation of Title 18 U.S.C. § 2252(a)(1). Count 4 charged that from August 1998 through July 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly receive and distribute visual depictions that were mailed, shipped and transported in interstate and foreign commerce by any means, including by computer, and reproduced said visual depictions for distribution in interstate and foreign commerce and said visual depictions involved the use of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct, in violation of Title 18 U.S.C. § 2252(a)(2). Count 5 charged that on or about July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly mail, transport and ship in interstate commerce, by computer, child pornography, in violation of Title 18 U.S.C. § 2252A(a)(1). Count 6 charged that on or about July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, the defendant did knowingly reproduce child pornography for distribution through the mails and in interstate and foreign commerce by any means, including by computer, in violation of Title 18 U.S.C. §2252A(a)(3). Count 7 charged that on or about July 1, 2000 through July 5, 2000, the exact dates being unknown to the grand jury, in Dothan, Alabama, the defendant did knowingly possess film, video tape,

2

computer disk and other materials that contain images of child pornography that have been mailed, shipped and transported in interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, shipped, and transported in interstate and foreign commerce by any means including by computer, in violation of Title 18 U.S.C. § 2252A(5)(B). (R1-1.)

Turner made his initial appearance before United States Magistrate Judge Delores R. Boyd on September 29, 2003. (R1-3.) Turner was arraigned before United States Magistrate Judge Vanzetta P. McPherson on October 8, 2003, entering a plea of not guilty. (R1-10.)

On November 20, 2003, Turner filed a Notice of intent to change plea. (R1-19.)

On November 21, 2003, an Order was filed denying as moot Turner's Motion to Suppress by Magistrate Judge McPherson. (R1-23.)

On December 1, 2003, Turner entered a plea of guilty to counts 3,4,5,6, and 7 of the indictment before Magistrate Judge McPherson. (R1-26.)

On March 2, 2004, an arrest warrant was issued for Turner by District Court Judge Mark E. Fuller. (R1-36.)

On March 4, 2004, a status conference was held regarding Turner's release. An oral motion to withdraw plea of guilt was made by Turner and granted by District Court Judge Fuller. (R1-39.)

On March 9, 2004, a detention hearing was held and Magistrate Court Judge Vanzetta P. McPherson found that Turner should be detained. (R1-42,44.)

On May 3, 2004, Turner filed a Notice of intent to change plea. (R1-55.)

On May 14, 2004, Turner entered a plea of guilty to Counts 3,4,5,6, and 7 of the Indictment, pursuant to Rule 11(c)(1)(a) of the Federal Rules of Criminal Procedure. (R1-61.)

3

On August 26, 2005, sentencing was held. The district court found that an enhancement pursuant to USSG 2G2.2(b)(2) was warranted finding that Turner had distributed child pornography with the intent to receive a thing of value. Further, the district court found that an enhancement pursuant to 5K2.0 and 5K2.8 was warranted finding that Turner's conduct was extreme and outside of the "heartland" of cases. Turner was sentenced to 360 months imprisonment and 5 years supervised release on counts 3,4,5, and 6, 120 months imprisonment and 3 years supervised release on count 7, all counts to run concurrent, and $500 in special assessment fees. (R1-84.)

On August 31, 2005, Turner filed a timely Notice of Appeal. (R1-89.) Turner is currently incarcerated by the Bureau of Prisons.

### (ii) **Statement of the Facts**[1]

In early 1998, Turner initiated contact, via the internet, with the victim in this case, a minor male under the age of 18 years of age. Early in these communications, Turner told the victim that he was 19 years of age and the victim advised Turner that he was 16 years of age. (R1-86 at para. 15.)

The communications between Turner and the victim turned sexual when Turner asked the victim if he was interested in experimenting and allowing Turner to perform oral sex on him. Turner began offering to pay the victim $100 in exchange for a sexual encounter. Turner also offered to allow a friend to take pictures of the victim and Turner would pay the victim money for each piece of clothing that he (the victim) removed. The victim refused this offer. (R1-86 at para. 16.)

---

[1]The facts set out in the PSR were adopted by the District Court without objection by Turner.

4

In March or April 1998,the victim and Turner began a sexual relationship. The victim received $100 from Turner in exchange for allowing Turner to perform oral sex on him. Between March 1998 and July 1998, the sexual encounters were occurring every two to three weeks. In exchange for sex, the victim received either money or other items of value, such as computer equipment. (R1-86 at para. 17.)

In July 1998, the sexual encounters became a weekly occurrence. Turner opened a computer business next door to his residence. Turner purchased a laptop computer for the victim, which the victim began repaying at the rate of $100 per month. The victim was also expected by Turner to have sexual contact with Turner in exchange for the laptop. The sexual encounters were now occurring at the shop and at the defendant's residence located in Dothan, Alabama. (R1-86 at para. 18.)

In the summer of 1998, the victim began trying to end the sexual encounters with Turner. In response, Turner began threatening to expose their relationship to the victim's family and friends. Therefore, the victim continued to meet Turner for sex.(R1-86 at para. 19.)

In late November or early December 1998, Turner revealed that he had made a video tape of the victim. Turner showed the victim the video which Turner had loaded onto his computer. At that time, the victim saw two videos on Turner's computer, depicting the victim and Turner engaging in explicit sexual conduct on two separate occasions. Both videos were recorded inside Turner's residence, without the knowledge of the victim. Both videos were produced when the victim was 17 years old. One video depicted the victim engaging in a sexual encounter on a couch in Turner's residence, and the other depicted the victim engaging in a sexual encounter in Turner's bed. Turner used the existence of these videos to blackmail the victim into maintaining

5

the sexual encounters. (R1-86 at para. 20.)

After learning of the existence of the pornographic videos in November/December 1998, the victim located additional pornographic videos of himself on Turner's computer. Turner had up to five videos involving the victim. These videos were located on videotapes, computer CD's and on Turner's computer. The victim deleted the videos from Turner's computer and also destroyed the CD's and videotapes which contained the pornographic images of himself. Despite destroying the tapes, CD's and deleting the images from Turner's computer, Turner reloaded the sexually explicit images of the victim on his computer. (R1-86 at para. 21.)

The sexual relationship between Turner and the victim continued until July 1, 2000, when the victim broke off the relationship. Turner again threatened to expose the relationship to the victim's family and friends.(R1-86 at para. 22.)

On July 2, 2000, Turner sent an e-mail message to the victim. This message included a link to an internet website created by Turner. When the victim accessed the website, he discovered that Turner had posted the pornographic videos of the victim on the internet. The videos included the victim's name and e-mail address. These were the same videos that the victim had viewed on Turner's computer in late 1998. The videos posted on the internet clearly showed the victim's face, but Turner concealed his identity on the videos. Turner also posted still images of the victim, taken from the videos on the website.(R-1-86 at para. 23.)

Subsequently, the victim contacted America Online (internet service provider) asking that the site be removed. Prior to the site being removed by AOL, the counter on the site reached as high as 53, meaning the site had been accessed 53 times. (R1-86 at para. 24.)

6

On July 21, 2000, the victim reported this matter to the Federal Bureau of Investigation (FBI)in Dothan, Alabama. On that date the victim was interviewed and advised that he had met Turner on the internet in a chat room. He ultimately described how Turner began offering him money in exchange for sex. The victim indicated that he ultimately met Turner and allowed Turner to perform oral sex on him for $100. The victim described how the sexual encounters continued until he stopped them on July 1, 2000. (R1-86 at para. 27.)

On August 8, 2000, a search warrant was executed at Turner's home and business. Several computer systems were seized, as well as numerous computer disks. The computer systems were examined by the FBI, and analysis revealed the sexually explicit videos involving the victim and Turner, as well as the website where Turner had posted the images. Also located on the computer were electronic messages between Turner and the victim, relating to the sexual encounters. The computer software analysis revealed sexually explicit videos and images of Turner and the victim. The FBI also located on the computer software, from Turner's shop, approximately 800 images of child pornography. The vast majority of the images are of nude male juveniles engaged in various sex acts, including masturbation, oral sex and anal sex. (R1-86 at para. 28.)

The FBI's search of Turner's computer also revealed a letter Turner sent to the victim advising victim that he wanted all of the computer equipment back from the victim if he was going to end the relationship. In that letter, Turner mentions that there is another minor working for him and advising the victim that the other individual will "work out fine". Finally, the search of Turner's computer revealed other e-mails sent on May 11, 1999 and May 14, 1999, to an unidentified male where the defendant was offering to pay the individual

7

$100 and a new car stereo if the individual would allow Turner to perform oral sex on him. (R1-86 at para. 29.)

**(iii) <u>Standards of Review</u>.**

Generally, "[i]nterpretation of the Sentencing Guidelines is reviewed *de novo*, with factual findings reversible if clearly erroneous...Review of the district court's application of the Guidelines to the facts is for the abuse of discretion" <u>United States v. Guerra</u>, 293 F.3d 1279, 1291 (11th Cir. 2002), *cert. denied*, 537 U.S. 1141 (2003).

Where a determination on the evaluation of facts that are more accessible to the district court than to the court of appeals, [this Court] will defer to the district court's application of the law to the facts and apply "clear error" review. <u>United States v. Williams</u>, 340 F.3d at 1239; accord, <u>United States v. Banks</u>, 347 F.3d at 1268-69.

This court reviews a sentencing court's determination of sentences under the standard of reasonableness determined with reference to the standards set forth in Title 18, U.S.C. § 3553(a). <u>United States v. Booker</u>, 124 U.S. 738, 757, 765-66.

## SUMMARY OF THE ARGUMENT

The district court properly applied section 2G2.2(b)(2)of the Sentencing Guidelines and increased Turner's offense level five levels based on that guideline. The district court properly calculated and applied the Sentencing Guidelines as to Turner and found that the appropriate advisory sentencing guideline range, prior to departure, was an offense level of 32 and a criminal history category of 1, making the advisory sentencing range 121 months to 151 months.

The record supports the district court's upward departures pursuant to Sections 5K2.0 and 5K2.8 in that the district court properly found that the defendant was a repeat sexual offender, was likely to re-offend, and that the behavior of Turner towards the minor victim was manipulative, unusually heinous, cruel, brutal and/or degrading and, therefore, was due to be upwardly departed by eight levels pursuant to U.S.S.G. 5K2.0 and 5K2.8. The district court upwardly departed eight levels and found that the corresponding advisory sentencing guideline range was an offense level of 40 and a criminal history category of 1, making the sentencing range 292 months to 360 months. The district court properly sentenced Turner within the advisory Sentencing Guidelines range.

The facts and record in this case establish that the sentence imposed by the district court, pursuant to Title 18 USC 3553(a)(2), is reasonable. This case should be affirmed.

9

### ARGUMENT AND CITATIONS OF AUTHORITY

ISSUE I.    THE DISTRICT COURT PROPERLY INCREASED
            TURNER'S OFFENSE LEVEL BY FIVE LEVELS UNDER
            U.S.S.G. SECTION 2G2.2(b)(2)BECAUSE THERE WAS
            EVIDENCE PRESENTED THAT HE DISTRIBUTED CHILD
            PORNOGRAPHY WITH INTENT TO RECEIVE A THING OF
            VALUE

In his brief, Turner argues that the conduct recited in the statement of facts does not meet the

required level of pecuniary gain necessary for application of a five level 2G2.2 enhancement.

It should be noted that §1B1.11 of the United States Sentencing Guideline Manual states that,

"The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."

The sentencing guidelines used to determine the appropriate range of sentencing in Turner's

case was the 1998 edition of the Guidelines Manual. According to the PreSentence Report, the

probation officer used the 1998 Guidelines Manual because,"... it is less onerous than the guideline

manual in effect on the day of sentencing pursuant to §1B1.11." (R1-86 at para. 33.) Neither party

objected to the use of the 1998 edition of the Guidelines Manual.

The 1998 edition of the Guideline Manual at 2G2.2 states that, "... if the offense involved

distribution, increase by the number of levels from the table in 2F1.1 corresponding to the retail

value of the material but in no event by less than 5 levels." United States Sentencing Commission

Guideline Manual (1998).

Turner pled guilty to three counts of distribution and the probation officer was unable to

determine the retail value of the material. (R1-86 at para. 37.)

The district court increased Turner's offense level by five levels under 2G2.2(b)(2)finding

that, "... I don't think the 11ᵗʰ Circuit has made it any clearer that their opinion that has been cited

10

in response to your objection, [United States v. Probel, 214 F.3d 1285, 1290 (11th Cir. 2000)], in which they indicate that based upon the plain language of the guideline and the application notes, pecuniary or other gain is not required for the enhancement to apply. I find that pecuniary gain to Mr. Turner in this particular case is not required in a monetary sense, but it is the gain or benefit, or as the 11th Circuit has cited on page 1290 of that opinion, any other gain that Mr. Turner intended to receive by the distribution of these photographs or these pictures on the internet." (R3 page 33-34.)

The record is clear that Turner distributed child pornography with the intent to force the minor victim to return to the sexual relationship. (R1-86 at para. 20-24.)

The district court properly found that Turner had distributed child pornography with the intent to receive a thing of value, the sexual relationship, and properly enhanced Turner pursuant to that finding.

**ISSUE II.    THE DISTRICT COURT DID NOT ERR IN FINDING THAT DEFENDANT SHOULD BE ENHANCED PURSUANT TO U.S.S.G. 5K2.0 AND 5K2.8**

United States Sentencing Guideline §5K2.0 Grounds for Departure states: Under 18 U.S.C. §3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different for that prescribed." Circumstances that may warrant departure from the guideline range pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The

11

decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis.

United States Sentencing Guideline 5K2.8 Extreme Conduct states: If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of te conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain and humiliation.

Turner argues that the district court's imposition of an eight-level upward departure pursuant to §5K2.0 and 5K2.8 of the Sentencing Guidelines is not warranted because there is no evidence of psychological harm or impairment to the victim, no evidence of defendants extreme conduct, no evidence of aggravated and prolonged sexual exploitation and no likelihood of high recidivism as in the three cases, United States v. Blas, 360 F.2d 1268 (11th Cir. 1993), United States v. Anderson, 5 F.3d 795, 802-804 (5th Cir. 1993), and United States v. Hersh, 297 F.3d 1233 (11th Cir. 2002), he relies upon.

In United States v. Blas, the district court upwardly departed finding that the conduct of Blas in knowingly exposing his minor victim to HIV through sexual acts and failing to notify the victim of his condition was unusually heinous, cruel, brutal or degrading. United States v. Blas, 360 F.2d 1268 (11th Cir. 1993).

In United States v. Anderson, the district court upwardly departed finding that extreme psychological harm to the victim and the defendant's extreme conduct were not taken into account by the guidelines. In Anderson, the victim was kidnaped, repeatedly sexually assaulted

12

and forced to perform oral sex, all while being threatened with death and burning. United States v. Anderson, 5 F.3d 795, 802-804 (5th Cir. 1993).

In United States v. Hersh, the district court upwardly departed based on a finding that the sexual exploitation of the minor victims was aggravated and prolonged and the likelihood of recidivism of the defendant was high. United States v. Hersh, 297 F.3d 1233, 1251 (11th Cir. 2002).

The cases cited by Turner supports the governments position. The victim in the instant case was subjected to continued sexual abuse by use of threats and blackmail, over a prolonged period of time. In addition, the evidence located in Turner's e-mails supports the likelihood of recidivism. That is, Turner had already initiated, pursued and stalked another minor male victim using the same tactics used to lure the minor victim in the instant case.

Turner does not deny that he enticed the minor victim into a sexual relationship prior to 1995. Turner does not deny that he repeatedly victimized the minor victim in this case for nearly two years. Turner does not deny that he blackmailed his minor victim into staying in the sexual relationship by threatening to expose the relationship to the victim's friends and family. Turner does not deny that he recorded sexual acts between the victim and himself, threatened the victim with exposure again and then uploaded those images to an internet site. Turner does not deny that while he was engaged in this behavior he was simultaneously engaged in developing another sexual relationship with another minor victim. (R1-86 at para. 19-23, 29.)

The fact that the cases are distinguishable is because none of these cases fit within the "heartland" of cases considered by the Sentencing Commission in formulating the Guidelines.

13

Each of these cases, to include Turner, is different from each other and any other case presented to the Court for review and therefore properly come within the framework of a 5K2.0 and 5K2.8 departure.

The district court properly found that the defendant was a repeat sexual offender, was likely to re-offend, and that the behavior of Turner towards the minor victim was manipulative, unusually heinous, cruel, brutal and/or degrading and, therefore, was due to be upwardly departed by eight levels pursuant to U.S.S.G. 5K2.0 and 5K2.8.

**ISSUE III.    WHETHER THE SENTENCE IMPOSED ON DEFENDANT IS REASONABLE**

The Court has held that,"...a post-*Booker* appeal based on the 'unreasonableness' of a sentence, whether within or outside the advisory guidelines range, is an appeal asserting that the sentence was imposed in violation of law pursuant to §  3742(a)(1)." United States v. Martinez, 434 F.3d 1318, 1322 (11th Cir. 2006) (per curiam).

Following *Booker*, the Court stated, "the district court must calculate the Guidelines range accurately... After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable, see [United States v. Booker, 543 U.S. 220, 263,125 S. Ct. 738, 766 (2005)]." first correctly calculate the defendant's Guidelines range, then, using the 18 U.S.C. § 3553(a) sentencing factors, the court "may impose a more severe or more lenient sentence as long as it is reasonable." United States v. Crawford, 407 F.3d 1174, 1179 (11th Cir. 2005).

14

The § 3553(a) factors include the available sentences, the applicable Guidelines range and policy statements, the nature and circumstances of the offense, and the need for the sentence to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, (2) afford adequate deterrence to criminal conduct, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with needed correctional treatment. 18 U.S.C. § 3553(a).

The Court held in United States v. Talley that, "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir, 2005).

Turner fails in his attempt to establish that his sentence is unreasonable in light of the record and the factors in section 3553(a).

The district court clearly reviewed the uncontested facts of this case, correctly computed and applied the correct advisory sentencing guideline range and considered the factors set out in 3553(a) in reaching the sentence. (R3 page 42- 44.)

Turner argues that his sentence is unreasonable because thirty years for his offense conduct is "absolutely excessive" when compared to the sentences in Blas and Anderson.

The district court found that Turner was a repeat sexual offender who, while in treatment, began the nearly two-year sexual molestation of the victim, and continued to engage in inappropriate conduct with minors after the relationship with the victim ended. The district court correctly sentenced Turner to a sentence that would reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence

15

to criminal conduct, protect the public and provide Turner with the needed treatment in the most effective manner without endangering society. (R3 page 50-51.)

Finally, Turner argues that the application of the sentencing enhancements is a violation of the Sixth Amendment to the United States Constitution in that he is being punished based upon a finding of fact that is not reflected in a jury's verdict beyond a reasonable doubt or admitted by the defendant at the change of plea.

The Court has held, "...failure to dispute the facts contained in the PSI operates as an admission of those facts and, since he admitted the facts underlying the upward departure, there is no Sixth Amendment violation. United States v. Williams, Slip Copy, 2006 WL 463203, (11th Cir. 2006) and See United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir.2005) (factual statements in PSI were deemed admitted as true because defendant raised no objections to them); United States v. Petho, 409 F.3d 1277, 1280 n. 1 (11th Cir.2005) ("Because Petho admitted to the facts underlying these enhancements, there is no Sixth Amendment error.").

Therefore, because Turner raised no objections to the factual findings of the PSI, the claim that his Sixth Amendment rights were violated, is without merit.

In any event, under Booker, sentencing based on judicial fact-finding is permissible, as long as the district court treats the sentencing guidelines as advisory. See United States v. Chau, 426 F.3d 1318, 1324 (11th Cir. 2005).

The record supports that the district court did treat the sentencing guidelines as advisory. (R3 page 2, 24.)

16

## CONCLUSION

Because the district court correctly calculated and applied the advisory sentencing guidelines and correctly evaluated the facts of the case and the factors of 3553(a), Turner's conviction and sentence should be AFFIRMED.

Respectfully submitted this 6th day of March, 2006.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Susan R. Redmond
Assistant United States Attorney

17

## CERTIFICATE OF SERVICE

I, Susan R. Redmond, Assistant United States Attorney, hereby certify that I have served a

copy of the foregoing by depositing a copy of same in the United States mail, first class, postage

prepaid and properly addressed on this the 6th day of March, 2006, on the following:

Ms. Susan G. James
Susan G. James and Associates
600 South McDonough Street
Montgomery, Alabama 36104


Susan R. Redmond
Assistant United States Attorney

18

# United States Court of Appeals

## For the Eleventh Circuit

| No. 05-14897 | FILED<br>U.S. COURT OF APPEALS<br>ELEVENTH CIRCUIT |
|---|---|
| District Court Docket No.<br>03-00219-CR-F-S | Jun 29, 2006<br>THOMAS K. KAHN<br>CLERK |

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

versus

KEVIN W. TURNER,

        Defendant-Appellant.

------------------------------------------------------------------

Appeal from the United States District Court
for the Middle District of Alabama

------------------------------------------------------------------

## J U D G M E N T

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.



| | |
|---|---|
| Entered: | June 29, 2006 |
| For the Court: | Thomas K. Kahn, Clerk |
| By: | Gilman, Nancy |

ISSUED AS MANDATE
JUL 2 8 2006
U.S. COURT OF APPEALS
ATLANTA, GA.



GOVERNMENT
EXHIBIT
6



[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2006
THOMAS K. KAHN
CLERK

No. 05-14897
Non-Argument Calendar

D. C. Docket No. 03-00219-CR-F-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEVIN W. TURNER,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

**(June 29, 2006)**

Before ANDERSON, BIRCH and BLACK, Circuit Judges.

PER CURIAM:

Kevin Turner appeals his 360-month sentence imposed after he pled guilty to various counts of distributing, producing and possessing child pornography. He raises three grounds on appeal. First, he asserts the district court erred in imposing a 5-level enhancement under U.S.S.G. § 2G2.2(b)(2)[1] because the crimes involved distribution of child pornography absent pecuniary gain. Second, he contends the district court abused its discretion by upwardly departing by 8 levels under U.S.S.G. §§ 5K2.0 and 5K2.8. Third, he claims his sentence is unreasonable pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005). We affirm Turner's sentence.

## I. DISCUSSION

### A. *U.S.S.G. § 2G2.2(b)(2)*

We have held pre-*Booker* standards of review concerning the district court's application of the sentencing Guidelines still apply post-*Booker*. *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). We review a sentencing court's application of the Guidelines to the facts de novo and its findings of fact for clear error. *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002).

Turner's base offense level is 17, pursuant to U.S.S.G. § 2G2.2—entitled "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving,

---

[1] Turner was sentenced under the 1998 version of the Sentencing Guidelines. Thus, all citations to the Sentencing Guidelines are to the 1998 version.

2

Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation

of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with

Intent to Traffic." Under "Specific Offense Characteristics," U.S.S.G.

§ 2G2.2(b)(2) provides as follows: "If the offense involved distribution, increase

by the number of levels from the table in § 2F1.1 corresponding to the retail value

of the material, *but in no event by less than 5 levels*." (emphasis added). The table

in § 2F1.1 provides for increased offense levels dependent on the loss due to fraud.

For purposes of § 2G2.2, "'[d]istribution' *includes* any act related to

distribution for pecuniary gain, including production, transportation, and

possession with intent to distribute." U.S.S.G. § 2G2.2, comment. (n.1) (emphasis

added). The general application principles of the Guidelines provides: "The term

'includes' is not exhaustive." U.S.S.G. § 1B1.1, comment. (n.2). Thus, we held

the term "distribution" in this respect does not require a showing of pecuniary or

other benefit. *United States v. Probel*, 214 F.3d 1285, 1288-89 (11th Cir. 2000).

Rather, we determined "[t]he reference to the fraud table does not limit the

application of the enhancement to individuals who receive a pecuniary benefit

from the distribution of child pornography." *Id.* at 1290. "The threshold five-level

enhancement is appropriate" where "[a]ny distribution of child pornography,

3

gratuitously or for profit, results in the continued exploitation of the victims depicted in the images." *Id.* at 1291.

We are bound to follow our decision in *Probel*. *United States v. Smith*, 934 F.2d 270, 274 (11th Cir. 1991) (noting "a panel of this court cannot overrule binding precedent issued by a prior panel"). Turner pled guilty to three counts of distribution of child pornography, and did not dispute the facts supporting those charges, including that he posted images of the victim on the internet which he used to blackmail the victim into continuing sexual contact with him. Accordingly, the district court did not err in determining  no pecuniary gain was required when Turner distributed the child pornography with the intent to force the victim to return to the sexual relationship.

B. *Upward Departure*

We review a district court's decision to depart from the Guidelines for an abuse of discretion, giving the district court's determination "substantial deference." *United States v. Melvin*, 187 F.3d 1316, 1320 (11th Cir. 1999). A district court may depart upward from the Guidelines if it determines "'there exists an aggravating or mitigating circumstance of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Id.*

4

(citation omitted). "Whether a case is unusual enough to fall outside the heartland is determined in large part by comparison with other Guidelines cases." *Id.*

The extent of a district court's departure from the Guidelines must be reasonable. *Id.* at 1322. The reasonableness of the departure is evaluated in light of the factors to be considered in imposing the sentence and the reasons the district court provided for departing. *Id.* at 1322-23. "Among the factors a sentencing court must consider are the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense." *United States v. Blas*, 360 F.3d 1268, 1273-74 (11th Cir. 1993).

Under U.S.S.G. § 5K2.8, entitled "Extreme Conduct," "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct." U.S.S.G. § 5K2.8. "Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." *Id.*

In *Blas*, we held the district court did not abuse its discretion by imposing a 7-level upward departure under § 5K2.8, on the basis the defendant knowingly exposed his minor victim to HIV through sexual acts. *Blas*, 360 F.2d at 1273-74. We noted "Blas's actions with regard to his young victim were incredibly risky and

5

dangerous, and presented circumstances that clearly were not taken into consideration in formulating the applicable guidelines." *Id.* at 1274.

In *United States v. Hersh*, 297 F.3d 1233, 1251 (11th Cir. 2002), we held a 10-level upward "prophylactic"[2] departure was not an abuse of discretion. The district court based the departure on a finding the appellant had engaged in prolonged sexual exploitation of minors, the victims (children from Third World countries) were "extraordinarily vulnerable," and the appellant had a 20-year history of committing sexual abuse, which we determined was an adequate basis upon which to find the "alternative sentence" was appropriate. *Id.* at 1251-53.

Here, the district court based its departure upon the determination Turner's conduct was manipulative, extreme, and heinous. Specifically, it noted the "crime of sex and violence" took place over a 20-month period, Turner created a "atmosphere of fear" in the area, he had a prior conviction for a similar crime, and he began to engage in another similar relationship after the victim in the present case reported the situation to the FBI. The court also determined Turner's actions of blackmailing the victim to continuing a sexual relationship, including

---

[2]Specifically, the district court had noted in a sentencing order that if we reversed as to a certain sentencing computation, it "would still achieve the same sentence by granting an upward departure" of 10 levels. *See Hersh*, 297 F.3d at 1251.

videotaping the victim without his knowledge and posting the images on the

internet, constituted extreme conduct.

The facts adopted by the district court and undisputed by Turner include that

he solicited sex from the victim, a minor, paid the victim to perform sexual acts

and expected the victim to engage in sexual acts as payment for computer

equipment. It is similarly undisputed he blackmailed the victim into continuing to

engage in sexual contact, in part, by videotaping the acts without the victim's

knowledge and posting them on the internet. In light of these facts, the departure

did not constitute an abuse of discretion. Further, the 8-level departure is not

unreasonable in light of the grounds set forth by the district court.

C. *Reasonableness*

In light of *Booker*, we review a final sentence under the advisory Guidelines

for reasonableness. *Crawford*, 407 F.3d at 1178-79. The district court must first

accurately calculate the Guideline range, and then it "may impose a more severe or

more lenient sentence" after considering the § 3553(a) factors. *Id.* Factors include

the available sentences, the applicable Guideline range, the nature and

circumstances of the offense, and the need for the sentence to reflect the

seriousness of the offense, promote respect for the law, and provide just

punishment for the offense. 18 U.S.C. § 3553(a). We have clarified the district

7

court is not obligated to specifically address and analyze on the record every § 3553(a) factor. *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005).

Here, the district court correctly calculated the applicable advisory range under the Guidelines. The court then specified Turner's case was aggravated by his criminal history, the nature and seriousness of the crime, and the need to promote respect for the law, encourage deterrence, and protect to the public, before imposing a sentence at the high end of the Guidelines range of 360 months. *See* 18 U.S.C. § 3553(a). We conclude Turner's ultimate sentence is reasonable.

### III. CONCLUSION

The district court did not err in enhancing Turner's sentence under U.S.S.G. § 2G2.2(b)(2) or abuse its discretion by upwardly departing 8 levels under U.S.S.G. §§ 5K2.0 and 5K2.8. Further, Turner's ultimate sentence is reasonable.

AFFIRMED.

8

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KEVIN W. TURNER,          )
                               )
PETITIONER,            )
                               )
V.                           )   CIVIL ACTION NO: 1:07cv863-MEF
                               )
UNITED STATES OF AMERICA,    )
                               )
RESPONDENT.          )

### AFFIDAVIT OF JAMES W. PARKMAN, III

STATE OF ALABAMA
COUNTY OF JEFFERSON

Before me, the undersigned authority, personally appeared JAMES W. PARKMAN, III, who is known to me, and who after being first duly sworn according to the law did depose and state as follows:

This was prepared only due to an Order by the United States District Court and for no other reason.

On October 9, 2003, I was hired to represent the Petitioner, Kevin Turner, on seven counts of a federal indictment in the United States District Court, Middle District of Alabama.

The federal indictment consisted of seven counts: Counts One and Two alleged sexual exploitation of children (these were the worst counts and involved the defendant spending the rest of his life in prison if convicted); Counts 3-5 were Distribution of Child Pornography; Count 6 was Production of Child Pornography; and Count 7 was Possession of Child Pornography.

These charges in the indictment began in early 1998 when Kevin Turner initiated contact,

1



by use of a computer, with a 16 year old juvenile boy (name withheld by me from this answer). By Spring 1998, Kevin Turner began having sexual relations with the now 17 year old juvenile in exchange for money. These sexual encounters were being held at the home of the Petitioner. This sexual relationship continued until July 1, 2000 when the juvenile broke off the relationship.

On July 2, 2000, Turner sent an e-mail message to the juvenile. This message included a link to an internet website created by Turner. When the juvenile accessed the website, he discovered that Turner had posted the pornographic videos of the juvenile on the internet, including the juvenile's name and e-mail address. These were the same videos that the juvenile had viewed on Turner's computer in late 1998. The videos included images of the juvenile masturbating. The juvenile is clearly identifiable in the videos. Turner had also posted still images of the juvenile taken from the videos. The juvenile contacted AOL asking that the site be removed. These videos were done by Turner without the consent or knowledge of the juvenile. Thereafter, the juvenile contacted Attorney Mac Borland in Dothan, Alabama, who sent a letter to Kevin Turner asking him to cease, desist and destroy the material. On July 10, 2000, Kevin Turner hand delivered a letter to Attorney Mac Borland acknowledging the crimes and apologizing.

On August 8, 2000, the FBI issued a search warrant on the Turner property and seized several computer systems and disks. Upon examination of these computer materials, sexually explicit videos involving the juvenile and Turner were found; the posted website; electronic massages between them; and approximately 800 images of child pornography and various sex acts with children were also found on the computer.

Based on the foregoing, the indictment was rendered on September 23, 2003. Petitioner Turner was released from custody on September 29, 2003 to await trial.

2

On November 13, 2003, I filed a very detailed Motion to Suppress with an accompanying brief. (See Exhibit A). This was the first of its kind to be filed in our district. However, the problem was that even if granted it would not do away with counts one and two, but only counts three through seven. Such would still leave use with our biggest problem, especially in light of the extra judicial confession to Attorney Borland. ( The problem was compounded by the fact that Kevin Turner had previously been convicted of sexual abuse 2nd degree I Houston County, Alabama on October 28, 1995 involving another young juvenile male).

Because of the motion, an offer was made by prosecutors to drop counts one and two; Petitioner Turner to plead guilty to counts three through seven; and the sentence to be somewhere in the ten year range.

We accepted the offer and pled guilty on December 1, 2003. However, when we discovered that the court would not accept that range, we withdrew the guilty plea on March 4, 2004.

Thereafter, the court, on its own motion, in March, 2004, moved for Petitioner Turner to be incarcerated pending trial due to the fact that he was not suppose to be released on these charges in the beginning and that another juvenile was located on Petitioner Turner's property with Turner. A full detention hearing was conducted and thereafter Petitioner Turner was detained in custody.

On April 30, 2004, we filed another notice of change of plea; a plea agreement was executed on May 14, 2005 and Petitioner Turner pled guilty on August 26, 2005. A pre-sentence report was filed recommending an extreme upward departure in Turner's sentence. I filed an objection and brief to these. (See attached Exhibit B).

After an oral hearing, the court departed upward, from a guideline range of 121 to 151 months (which we anticipated) to a sentence of 360 months. Furthermore, I spent numerous hours

3

talking to Turner's doctors, psychiatrists and counselors as well as going to the jail to try to correct problems of medication and unstable behavior.

Not only was every tactical decision discussed with my client, but numerous hours spent discussing this with his wife, Mary Leon Turner. Kevin Turner was aware of all evidence and decisions by me, including the decision to withdraw from the case as his attorney. In so doing, I protected Kevin Turner's rights for filing a notice of appeal, obtaining court authority and discussing the appellate issues with his new attorney. I withdrew because this sentence was high, problems with the client, and I wanted another attorney to review what I did.

Other members of my firm handled preliminary matters. One of the problems we encountered was that during the sentencing phase, the United States Supreme Court ruled that the guidelines were not mandatory anymore, but only advisory. Such caused delays and continuances by the court itself in order to decide what to do on our sentencing.

## ANSWER TO SPECIFIC ALLEGATIONS

1.    To the allegations that I did not object to the sentencing report on enhancements, this is totally not true. (Please see Exhibit B). Other cases were argued at the sentencing with proper objections made so such could be presented on appeal. The following cases were all read by me in preparation: **U.S. v. Prabel, 214 F.3d 1285 (11th Cir.2000); U.S. v. Blas, 360 F.3d 1268(11th Cir.2004); U.S. v. Anderson, 5 F3d 795 (5th Cir.1993); U.S. v. Boneshirt, 86 Fed. App.(8th Cir. 2003); U.S. v. QueensBoroughs, 227 F3d 149 (3rd Cir.2000); U.S. v. Kise, 369 F3d 766 (4th Cir. 2004); U.S. v. Espinoza, 350 F3d 978 (9th Cir.2003); U.S. v. Hill, 258 F3d 355, (5th Cir. 2001); U.S. v. Caro, 309 F3d 1748 (11th Cir. 2002); U.S. v. Bender, 290 F3d 1279 (11th Cir.2002); Ashcroft v. Freespeech, 535 U.S. 234 (2002); U.S. v. Laney, 189 F.3d 954 (9th Cir.1999); U.S.**

4

**v. Brown**, 333 F3d 850 (7ᵗʰ Cir.2002); **U.S. v. Hibbler**, 159 F3d 233 (6ᵗʰ Cir. 1998); **U.S. v. Lange**, 166 F3d 516 (2ⁿᵈ Cir. 1998); **U.S. v. Black**, 116 F3d 198 (7ᵗʰ Cir. 1997).

2.     As to the allegation that I should have enforced the plea agreement as to the five years incarceration. Unfortunately, it was not the government that rejected the plea agreement but the court, leaving the defendant without an agreement and without any knowledge as to a sentencing range. Once this occurred, I discussed this situation with the Petitioner Turner and it was Petitioner Turner that insisted we withdraw the plea at this time. I did concur with the Petitioner Turner's position. At the time, I clearly felt it was in Petitioner Turner's best interest to withdraw the plea.

3.     As to the allegation that at the second plea the defendant was not mentally competent, such was not the case. I took measures to make sure Petitioner Turner understood the nature of the plea and the consequences, which included the following:

     a.     In discussions with the Petitioner Turner it was obvious to me that he was well aware of what was happening, both at the plea and sentencing.

     b.     That prior to the sentencing the petitioner sent me several letters which clearly indicate a very clear thought pattern showing competency and clarity. (See Attached Exhibit C).

     c.     Furthermore the petitioner wrote the judge a letter which is clear and concise and which the court received a medical letter from Dr. Cox (See attached Exhibit D).

     d.     That I also obtained medical records from the doctor prior to sentencing with a final diagnosis that Petitioner Turner now has "normal behavior". (Ex.E)

     e.     That I sent an associate to the jail on August 23, 2005 to talk to the jail

personnel and Petitioner Turner. Again, Petitioner was coherent, aware, and fully understood. (See attached Exhibit F).

f.    That I reviewed Petitioner's medical records and went to see his doctor at the Dothan Behavioral Medicine Clinic. (See attached Exhibit G). Neither the records nor the doctor indicated any legal insanity or medical condition that would prevent a trial or a plea.

4.    As to any breach of an agreement, it was my understanding that if Petitioner Turner provided substantial assistance to the government and the government accepted, the information as "substantial", then the government would move for a 5K1.1 departure. I was aware of the information provided to the government and up until I withdrew from the case I called the government prosecutor to inquire about the investigation and the much needed motion for departure from the government. I do not know the reason the government did not except the petitioner's assistance and why a 5K1.1 motion was not filed after the sentencing.

5.    As to the argument of "maximum sentence", there is no question that Petitioner Turner received the maximum sentence according to the court's interpretation of the guidelines, but not the maximum he could have received had we gone to trial. At the time of the second plea, it was my belief that Petitioner Turner would be in the 10 year range. This was based on my discussions with the prosecutor, my checking the guidelines and the fact that my investigation revealed that the trial court judge had never departed upward in a sentence. The petitioner is correct that he received no benefit by the plea. Since my withdrawal was immediate, I wonder if subsequent counsel moved to withdraw the plea or press for a 5K1.1 departure. At no time did I <u>assure</u> Petitioner Turner of the sentence he would receive or that the government would indeed file a 5K1.1 departure. At no time

6

did I <u>coerce</u> the petitioner into pleading guilty or failed to prepare for this case.

6.    As to the argument that I neglected this case for my work on the <u>Richard Scrushy</u> case in Birmingham, such is not true. That case did not prevent attention to all matters of this case and for carefully examining the evidence and understanding the different aspects of the case, including a common sense approach to the petitioner's decisions.

7.    As to the allegations of not seeing the client or talking to him; This was untrue because we did communicate with him and his wife. He is correct that his wife did call the State Bar and I did meet with her. I informed her that I was going to withdraw as Kevin Turner's attorney because of the unfounded complaint, but she apologized and asked me to stay on the case. I never had any other complaints during the trial process.

This is the first I have heard of any blocked communications with any telephone system.

8.    As to the argument that I failed to look into Petitioner's medical background, such is not true. Not only did I obtain his medical and treatment records, but I also went to see Dr. Nelson Handel in person. (See Exhibit G). These records were also forwarded to the Probation Officer. At sentencing, I had to be careful to state the true facts about the petitioner's condition. I did not wait to the last minute to talk to Dr. Handal since the medical record showed that I visited him on December 3, 2003 and made several inquiries about the petitioner's medical and mental situation. (See Exhibit G). Dr. Handal made it very clear to me that medication and treatment does not prevent Petitioner Turner from seeking out young boys to engage in sex with. As Dr. Handal noted, Petitioner was convicted of the same acts with juvenile boys in 1995 and Petitioner was suppose to be on medication and treatment when this case occurred with another juvenile male. Even

7

Petitioner's counselor, in a telephone interview, could only confirm that Petitioner is a pedofile and that he would continue. Such proved to be the case when Petitioner attempted a sexual move on an inmate during the pendency of this case. While it was brought out that Petitioner did have a bipolar diagnosis, such was not indicative of Petitioner being incompetent or that the bipolar condition caused the sexual actions or that the petitioner could be cured through medication or treatment of his homosexual, juvenile tendencies.

9.  I did not argue that the victim juvenile was an equal aggressor because I did not believe that to be the truth in light of the fact that:

> a.  The petitioner was approximately 38 years old at the time of the beginning of these events and the victim was 17 years of age;
>
> b.  That the petitioner has committed these same acts to others and was far more wiser;
>
> c.  That the petitioner secretly video taped their sex acts;
>
> d.  That the petitioner then placed these images on the internet as "blackmail" for the victim to continue the relationship, of which this does not have anything to do with the victim being an aggressor.

10.  As to the failure to argue the law and facts for the upward departures, I argued each point based on the facts and the cases. Unfortunately, the trial court disagreed. Such clearly left grounds for appeal on this issue.

11.  As to the petitioner's actual "innocence", such is absolutely not true. Beside his confession to the victim's lawyer, the petitioner also admitted the same to me. There was no doubt at the time, the victim was under the age of 18 years when the sex on the video occurred and that

8

such was not with the consent of the victim.

12.    Finally, I have no idea why the trial court imposed this sentence against Petitioner

Turner. I certainly did not expect this type of sentence or else I would have proceeded to trial.. (See

Exhibit H).

Done this the $\underline{11}$ day of October, 2007.

_____
JAMES W. PARKMAN, III
PARKMAN, ADAMS & WHITE, LLC
505 20TH STREET NORTH
SUITE 825
BIRMINGHAM, AL 35203
(205) 244-1920
(205) 244-1171 FAX

STATE OF ALABAMA
COUNTY OF JEFFERSON

I, the undersigned authority, a Notary Public, in and for the said County and State, hereby
certify that JAMES W. PARKMAN, III, whose acknowledged before me this day, that being
informed of the contents of this AFFIDAVIT, he executed the same voluntarily on the date the same
bears date.

Given under my hand and seal this the $\underline{11}$ of October 2007.

_____
NOTARY PUBLIC  Comm. Exp 8-3-2010

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed the original of the  foregoing Affidavit  with the United
States District Court Clerk, and have sent a copy to the United States Attorney, P.O. Box 197,
Montgomery, AL 36101, Susan G. James, Attorney for Petitioner Kevin Turner, 600 S. McDonough
St, Montgomery, AL 36104,  by placing a copy of same in the U.S. mail, postage prepaid, properly
addressed on this the 10th day of October, 2007.

_____
OF COUNSEL

9

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,      *

V.                             *   CR NO:03-219-S

KEVIN W. TURNER,               *

DEFENDANT.                     *

## MOTION TO SUPPRESS

COMES NOW the defendant, Kevin W. Turner, in the above styled cause, and moves this Honorable Court to suppress for use as evidence against the defendant any evidence related to or obtained by the search and seizure conducted at the premises known as 14 Leon Drive, Dothan, Alabama and 30 Leon Drive, Dothan, Alabama on or about August 20, 2000.  In support of said motion, Defendant assigns the following grounds:

1.    The search warrant made the basis of the search and seizure was overbroad and thus invalid;

2.    The search warrant was merely an "all records warrant", and thus illegal;

3.    The information for the probable cause was stale, thus exhibiting no reason to believe evidence was still there;

4.    The search warrant did not limit the scope of the search and seizure to the time frame when any

EXHIBIT
A

suspected criminal activity took place;

5. The search warrant did not limit the scope of the search and seizure to the alleged items for which the alleged probable cause was only established in the affidavit;

6. The search warrant allowed officers to seek items, and seize them, where no probable cause existed for the search or seizure;

7. The search warrant did not describe with sufficient particularity or specificity the items to be seized;

8. The information in the affidavit for the probable cause consisted of insufficient and invalid expert opinions;

9. The search warrant illegally allowed evidence to be seized which produced another alleged crime that was not charged until after the search and seizure;

10. The search exceeded the scope of the search warrant;

11. The officers acted in bad faith and with intent to seize items beyond the scope of the warrant;

12. The search warrant violated the particularity requirement of the Fourth Amendment;

13. The warrant was insufficiently particular since it authorized the seizure of hardware, but the affidavit

only allows probable cause to seize information;

14. The search and seizure violated Rule 41 of the Federal Rules of Criminal Procedure;

15. The affidavit upon which said search warrant was based is insufficient to support the issuance and/or execution of said search warrant; and

16. The issuance and execution of said search warrant violated and continued to violate the defendant's constitutional guarantees provided by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Done this the 13th day of November, 2003.

Respectfully submitted,

JAMES W. PARKMAN, III (PAR032)
ATTORNEY FOR DEFENDANT
739 WEST MAIN ST
DOTHAN, AL 36301
(334) 792-1900
(334) 712-1352 FAX

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Ms. Susan Redmond, Assistant United States Attorney, P.O. Box 197, Montgomery, AL 36101 by placing a copy of same in the United States mail, postage prepaid and properly addressed on this the 13Th day of November, 2003.

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,        *

V.                               *   CR NO: 03-219-S

KEVIN W. TURNER,                 *

DEFENDANT.                       *

## BRIEF AND ARGUMENT IN SUPPORT OF MOTION TO SUPPRESS

Generally, the Fourth Amendment to the United States Constitution clearly provides that any search warrant be issued only on a showing of probable cause "...supported by oath or affirmation" and that the warrant itself..."particularly describe the place to be searched, and the persons or things to be seized." **Berger v. New York**, 383 U.S. 41, 55, 87 S.Ct. 1873, 1882 (1967); **Texas v. Brown**, 460 U.S. 730, 747, 103 S.Ct. 1535, 1546 (1983); **Horton v. California**, 496 U.S. 128, 143, 110 S.Ct. 2301, 2311 (1990). This "particularity" requirement in search warrants protects privacy interests of the general public, prevents general searches and "...prevents the seizure of one thing under a warrant describing another." **Marron v. United States**, 275 U.S. 192, 196, 48 S.Ct. 74, 76 (1927); **Horton v. California**, 496 U.S. 128, 143, 110 S.Ct. 2301, 234

1

**(1990).** Furthermore, as has been stated by the United States
Supreme Court:

> The scope of a search is limited to those
> places in which there is probable cause to
> believe an item particularly described in
> the warrant might be found... Similarly,
> once all of the items particularly
> described in a warrant have been found, the
> search must cease and no further invasion
> of privacy is permitted. **Horton v.**
> **California, 496 U.S. 128, 143, 110 S.Ct.**
> **2301, 2311 (1990).**

**General Warrants**

General warrants and searches have always been held
illegal pursuant to the Fourth Amendment. **Anderson v.**
**Maryland, 427 U.S. 463, 478, 96 S.Ct. 2737, 2747 (1976); U.S.**
**v. Weber, 923 F.2d 1338, 1342 (9th Cir.1990); U.S. v. Abrams,**
**665 F.2d 541, 547 (1st Cir.1980).**

General warrants are condemned as a violation of the
probable cause rule or the particularity requirement of the
Fourth Amendment. **U.S. v. Hillyard, 677 F.2d 1336, 1339 (9th**
**Cir. 1982). U.S. v. Abrams, 615 F.2d 541, 543 (1st Cir.1980).**
In order to determine what constitutes a general warrant, one
must examine:

1. Any time or date limitation established; **Lafayette**
   **Academy, 610 F.2d 1, 3-4 (1st Cir.1979);**

2

2. Specific description of what specific items are to be seized;

3. Whether the warrant leaves the discretion entirely to the officers as to what specific items are to be seized;

4. Whether the warrant authorizes seizure of all records, documents, or computer records,

5. Whether the warrant provides for an "explanatory rummaging in a person's belongings", or

6. Whether the warrant does not "prevent the seizure of one thing under a warrant describing another" **U.S. v. Abrams**, 615 F.2d 541 (1st Cir.1980); **U.S. v. Weber**, 923 F.2d 1338 (9th Cir.1991); **Standford v. Texas**, 379 U.s. 476, 85 S.Ct. 506 (1965).

7. Whether the warrant does not contain an explanation of the search strategy. **Nat'l Trading Camp v. U.S.**, 635 F.2d 1020, 1026 (2nd Cir.1980); **Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations**, U.S. Dept. of Justice (July 2002). The strategy should also consist of an on-site search versus off-site search. **Searching and Seizing**, supra.

In examining the facts of this case, there were no time limitations under which records were to be seized; There was no specific description of which computer records were to be seized, despite specific allegations in the affidavit; Discretion was left entirely up to officers; and this warrant simply authorized wholesale seizure of computer instruments, data, records, discs, items, and files.

Search warrants do not permit officers to "...search for evidence of other crimes but only to search for and seize evidence relevant..." to the facts contained in the affidavit. **U.S. v. Andressen**, 427 U.S. 463, 481-482 (1976).

**Particularity Requirement**

Since a warrant must particularly describe the things to be seized, such failure renders the warrant "...indistinguishable from the general warrants repeatedly held by this court". **U.S. v. Kimbraugh**, 69 F.3d 723, 727 (5th Cir. 1995); **U.S. v. Kow**, 58 F.3d 423, 427 (9th Cir. 1995); **U.S. v. King**, 227 F.3d 732, 750 (6th Cir.2000). In this case the warrant, based on the specifics contained in the affidavit, could and should have contained detailed particularity of the computer items to be seized, instead of the generic classification and language contained therein. **U. S. v.**

4

**Kimbraugh**, 69 F.3d 723, 727 (5th Cir.1995); **U.S. v. Kow**, 58 F.3d 423, 427 (9th Cir.1995). The plaintiff knew in detail the precise computer records it was looking for, but instead used generic terms. **U.S. v. Shilling**, 826 F.2d 1365, 1369 (4th Cir.1987).

Specifically, it also required "the likelihood that evidence sought is still in place and, hence, that information in support of the warrant is not stale." **U.S. v. Musson**, 7=650 F.Supp. 525, 534 (U.S.D.C. 1986); **U.S. v. Johnson**, 461 F.2d 285 910th Cir.1972); **U.S. v. Tehfe**, 722 F.2d 1114, 1119 (3rd Cir.1983); **Andressen v. Maryland**, 427 U.S. 463, 478 (1976).

"Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time." **U.S. v. Johnson**, 461 F.2d 285, 287 910th Cir.1972). In Defendant's case, approximately two years had passed between the isolated incident of e-mail with a minor and the date of the search on August 2, 2000.

The failure of the plaintiff to state a time frame in the warrant also violated the "particularity rule". While a time frame is mentioned in the affidavit, the plaintiff "...did not limit the scope of the seizure to a time frame within which the

suspected criminal activity took place". **U.S. v. Kow**, 58 **F**.3d 423, 427 (9th Cir.1995). This is exactly the situation in this case, since the plaintiff did have specific time periods listed in the affidavit. **U.S. v. Shilling**, 826 F.2d 1365, 1369 (4th Cir.1987); **U.S. v. Ford**, 184 F.3d 566, 576 (6th Cir.1999).

In a case on point dealing with computer searches it was recognized that "computer programs store information in a wide variety of formats" and contain a wide variety of formats, programs and files. **U.S. Carey**, 172 **F**.3d 1268, 1275 (10th Cir.1999). Therefore, in order to prevent wholesale rummaging, not only should the search be limited to the screen names, key words on specific file names contained in the affidavit, but the search method should also be reviewed by the magistrate. **U.S. Carey**, 172 **F**.3d 1268, 1272, 1275, and 1276 (10th Cir. 1999). Specific information was contained in the affidavit, however, the search herein consisted of a wholesale search of the computer files and folders.

Furthermore, the warrant should be particular as to whether the search was for "...the computer hardware itself or merely the information that the hardware contains". **Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations**, U.S. Dept. of Justice (July 2002).

6

**Overbreadth**

The "overbreadth rule" is violated when the widespread seizure of items is not justified by the warrant or affidavit. **U.S. Kow**, 58 F.3d 423, 427 (9th Cir.1995); **U.S. v. Hunter**, 13 F.Supp 574, 583-584(U.S.D.C. 1998). It is simply a warrant that contains broad language. **U.S. v. Lebron**, 729 F.2d 533, 537 (8th Cir.1984); **U.S. v. Musson**, 650 F.Supp. 525, 532 (U.S.D.C.Col. 1986). In order to pass constitutional muster, "...the search warrant itself, or material incorporated by reference, must have specified the purpose for which the computers were seized and delineated the limits of their subsequent search". **U.S. v. Hunter**, 13 F.Supp.2d 524, 584 (U.S.D.C.1998). Such was not done in this case. While the affidavit for the search warrant did contain some specific evidence, the affidavit was not incorporated or made a part of the general search warrant. Such an affidavit can only cure a general or overbreadth warrant when "(1) The warrant expressly incorporated the affidavit by reference _and_ (2) The affidavit is attached physically to the warrant." **United States v. Towne**, 917 F.2d 517, 544 (9th Cir.1993); **U.S. v. George**, 975 F.2d 72, 76 (2nd Cir. 1992). In Defendant's case, neither was done by the searching officers.

7

A "general warrant" or complete record seizure may also be authorized where probable cause establishes that an "entire business is merely a scheme to defraud or that all of the business records are likely to evidence criminal activity". **U.S. v. Brien**, 617 F.2d 299 (1st Cir.1980); **U.S. v. Kow**, 58 F.3d 423, 427 (9th Cir.1995); **U.S. v. Musson**, 650 F.Supp.525, 535 **(D.Crol.1986)**.  The defendant's business was subject to search on the warrant, but no evidence existed or was found that it was a complex criminal scheme.

As it strictly pertains to computer searches, it has been held that:

> The underlying premise in **Carey** is that officers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive.  Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the "intermingling" of documents and a consequent invasion of privacy when police execute a search for evidence on a computer. See **id at 1275**, **see also United States v. Tamura**, 694 F.2d 591, 595-596 (9th Cir. 1982).  Thus, when officers come across relevant computer files intermingled with irrelevant computer files, they "may seal or hold" the computer pending "approval by a magistrate of the conditions and limitations on a further search" of the computer. **Carey, 172 F.3d at 1275**.  Officers must be clear as to what

8

it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant. **Id at 1276**. **U.S. v. Walser**, **275 F.3d 981, 986 (10th Cir.2001)**.

This concept was also upheld in the case of **U.S. v. Tamura**, 694 F.2d 591, 595-596 (9th Cir.1982); **U.S. v. Carey**, 172 F.3d 1268, 1275 (10th Cir.1999); **U.S. v. Shilling**, 826 F.2d 1365, 1369 (4th Cir.1987).

Thus, where search warrants are not sufficiently particularized and overbreadth in nature, then a total, "wholesale" suppression can be granted. **U.S. v. Kow**, 58 F.3d 423, 428 (9th Cir.1995); **U.S. v. Liu**, 239 F.3d 138, 140 (2nd Cir.2000).

**Probable Cause**

The Fourth Amendment provides that a search warrant cannot be issued unless there exists probable cause. Therefore, a warrant "must clearly state what is sought and its scope must be limited by the probable cause on which the warrant is based." **Solid State Devices, Inc. v. U.S.**, 130 F.3d 853, 856 (9th Cir.1997); **U.S. v. Hendricks**, 743 F.2d 653 (9th Cir.1984). **Illinois v. Gates**, 462 U.S.213, 103 S.Ct. 2317 (1983); **State of Washington v. Nordlund**, 113 Wash. App.171, 183-184 53 F.3d 520, 525-526 (Wash. App. D.V.2 2002). Simply put, a warrant

9

cannot be enlarged from the probable cause used for its establishment. **U.S. v. Weber**, 923 F.2d 1338, 1345 (9th Cir.1999); **Maryland v. Garrison**, 480 U.S. 29, 84 (1987).

In order to help establish the necessary probable cause for a wholesale computer search, the plaintiff presented expert opinion. However, in order for the expert's opinion to have any relevance, "the affidavit must be drafted with the facts of this case or this particular defendant in mind". **U.S. v. Weber**, 923 F.2d 1338, 1345 (9th Cir.1991). The defendant contends that the expert portion of the affidavit was nothing more than a "rambling boilerplate recitations which neither addressed the facts of the defendant's case nor gave any specific conclusions about the facts or the defendant. **Weber supra at 1345 (1978); Zurcher v. Daily**, 436 U.S. 547, 565, 98 S.Ct. 1970, 198).

Thus, the "foundationless expert testimony may have added fact to the affidavit, but certainly no muscle". **Weber supra at 1346.**

While the expert opinion in this affidavit did discuss pornography, such was only a general conclusion and was not based on any particular facts. **Sovereign News Co. v. U.S.**, 690 F.2d 569, 575 (6th Cir.1983). Therefore, when the computer

10

was later searched and approximately seven hundred pornographic pictures seized, such was not based on sufficient probable cause. Furthermore, when the pornographic pictures were first discovered, the search should have immediately ceased until further approval by the magistrate was obtained. **U.S. v. Carey**, 172 F.3d 1268, 1275 (10th Cir. 1999); **U.S. v. Walser**, 275 F.3d 981, 987 (10th Cir. 2001); **Horton v. California**, 496 U.S. 128, 141, 110 S.Ct. 2301, 2310 (1990)b.

Finally, the defendant contends that the government agents "flagrantly disregarded" the terms and scope of the warrant/affidavit by conducting a general or widespread seizing of items for items "that were not within the scope of that warrant". **U.S. v. Liu**, 239 F.3d 138, 140 (2nd Cir. 2000). As such, a blanket suppression should be ordered. **Horton supra at 140.**

**Rule 41**

Rule 41 provides that, unless otherwise specified the search pursuant to a warrant must be conducted within a specified time no longer than ten days of its issuance. Federal Rules of Criminal Procedure, Rule 41 (e)(2)(a). In the instant case, the defendant contends that the officers searched and seized the computer equipment, disks, records, and files.

11

However, the search and seizure of the hard drives, disks, files and software did not take place until after the search warrant expired. Since the computer equipment was in the possession of law enforcement, there no longer existed any "exigent circumstances or practical reason to permit officers to rummage through all of the stored data". **U.S. v. Carey**, 172 **F.3d 1268, 1275 (10th Cir.1999)**. Another warrant should have been attained in this case. **U.S. v. Walsen**, 275 **F.3d 981, 987 (10th Cir.2001)**; **U.S. v. Brunette**, 76 **F.Supp. 20, 30 (D.Me.1999)**.

### Standing

The defendant contends that he has standing concerning his motion to suppress since the search was of his home, office, and personal computer system. **U.S. v. Runyun**, 275 **F.3d 449, 458 (5th Cir. 2001)**; **Steagald v. U.S.**, 451, **U.S. 204, 212, 101 S.Ct. 1642, 1647 (1981)**; **U.S. v. Abram**, 830 **F.Supp. 551, 554 (D.C.**

12

**Kan.1993).**

Dated this the 13th day of November, 2003.

Respectfully submitted,

JAMES W. PARKMAN, III (PAR032)
ATTORNEY FOR DEFENDANT
739 WEST MAIN ST
DOTHAN, AL 36301
(334) 792-1900
(334) 712-1352 FAX

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Ms. Susan Redmond, Assistant United States Attorney, P.O. Box 197, Montgomery, AL 36101 by placing a copy of same in the United States mail, postage prepaid and properly addressed on this the 13th day of November, 2003.

OF COUNSEL

13

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

UNITED STATES OF AMERICA,              *

     PLAINTIFF,                              *

V.                                      *    CASE NO: CR-03-219-S

KEVIN TURNER,                           *

     DEFENDANT.                              *

## DEFENDANT'S REVISED OBJECTIONS TO PRESENTENCE REPORT

PART A: THE OFFENSE

PARAGRAPH 14: THE OFFENSE

(Charges and Convictions)

Defendant objects to the inclusion of this paragraph regarding alleged contact between Defendant Turner and another inmate, Jeffrey Spurlock.. Defendant has not been charged with any offense related to this allegation. The inclusion of the said allegation can only be an effort by the Government to cause prejudice against Defendant Turner for sentencing purposes.

PARAGRAPH 37: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the five level increase pursuant to USSG §2G2.2(b)(2). There is simply no evidence that any distribution was for "profit" or other thing of value". Therefore,

EXHIBIT
B

this is an improper enhancement.

Dated this the 10th day of June, 2005.

_____
JAMES W. PARKMAN, III(PAR032)
ATTORNEY FOR DEFENDANT
739 WEST MAIN ST
DOTHAN, AL 36301
(334) 792-1900
(334) 712-1352 FAX

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| PLAINTIFF, | * | |
| V. | * | CASE NO: CR-03-219-S |
| KEVIN TURNER, | * | |
| DEFENDANT. | * | |

## DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT

PARAGRAPHS 35: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the two level increase pursuant to USSG § 2G2.2 (b)(1). To allow this enhancement of two levels is in violation of the prohibition recently decided in **Blakely v. Washington, 2004 WL 1402697 (U.S. Wash. June 24, 2004)**, wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner. Furthermore, the objection is based on the fact that there is no proof of any of the persons depicted in any images. There is also no proof that such images are not digitally enhanced. Therefore, any increase is only based upon opinion, surmise and conjecture.

PARAGRAPH 36: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the five level increase pursuant to USSG §2G2.2(b)(2). To allow this enhancement is in violation of the prohibition recently decided in **Blakely v. Washington, 2004 WL 1402697 (U.S. Wash. June 24, 2004)**, wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner. There is simply no evidence that any distribution was

for "profit" or "other thing of value". Therefore, this is an improper enhancement.

PARAGRAPH 37: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the four level increase pursuant to USSG §2G2.2 (b)(3). To allow this enhancement  is in violation of the prohibition recently decided in **Blakely v. Washington, 2004 WL 1402697 (U.S. Wash. June 24, 2004)**, wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner.   Furthermore, Defendant contends that there exists no proof of any age or date of birth of any alleged person depicted.  Furthermore, there is no proof that any of the images have not been digitally or graphically enhanced.  Defendant further objects that such images are sadistic or masochistic.

PART A: THE OFFENSE

Defendant Turner objects to paragraphs 15, 16, 17, 26 and 27 and does not stipulate to the provisions contained therein as violative of the decision in **Blakely v. Washington, 2004 WL 1402607 (U.S. Wash. June 24, 2004)**.

PART E: FACTORS THAT MAY WARRANT DEPARTURE

PARAGRAPHS 92, 93 AND 94

To allow this enhancement  is in violation of the prohibition recently decided in **Blakely v. Washington, 2004 WL 1402697 (U.S. Wash. June 24, 2004)**, wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner.

Defendant objects to this portion of the sentencing report since it fails to include the plea agreement filed pursuant to Rule 11 (c), which this defendant relies and stands on.

Furthermore, there was no consideration given for the treatment of any illness or physical

problems for which the defendant has voluntarily sought treatment.

        Dated this the 17th day of August, 2004.

                                                 JAMES W. PARKMAN, III(PAR032)
                                               ATTORNEY FOR DEFENDANT
                                             739 WEST MAIN ST
                                             DOTHAN, AL 36301
                                             (334) 792-1900
                                             (334) 712-1352 FAX

### CERTIFICATE OF SERVICE

        I hereby certify that I have served a copy of the foregoing upon the United States Attorney by placing a copy of same in the United States Mail, postage prepaid and properly addressed on this the 17th day of August, 2004.

                                               OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| PLAINTIFF, | * | |
| V. | * | CASE NO: CR-03-219-S |
| KEVIN TURNER, | * | |
| DEFENDANT. | * | |

## DEFENDANT'S REVISED OBJECTIONS TO PRESENTENCE REPORT

PARAGRAPHS 35: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the two level increase pursuant to USSG § 2G2.2 (b)(1). To allow this enhancement of two levels is in violation of the prohibition recently decided in **Blakely v. Washington, 2004 WL 1402697 (U.S. Wash. June 24, 2004),** wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner. Furthermore, the objection is based on the fact that there is no proof of any of the persons depicted in any images. There is also no proof that such images are not digitally enhanced. Therefore, any increase is only based upon opinion, surmise and conjecture.

PARAGRAPH 36: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the five level increase pursuant to USSG §2G2.2(b)(2). To allow this enhancement of two levels is in violation of the prohibition recently decided in **Blakely v. Washington, 2004 WL 1402697 (U.S. Wash. June 24, 2004),** wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner. There is simply no evidence that any

distribution was for "profit" or "other thing of value". Therefore, this is an improper enhancement.

PARAGRAPH 37: SPECIFIC OFFENSE CHARACTERISTICS

Defendant Turner objects to the four level increase pursuant to USSG §2G2.2 (b)(3). To allow this enhancement of two levels is in violation of the prohibition recently decided in **Blakely v. Washington**, 2004 WL 1402697 (U.S. Wash. June 24, 2004), wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner.  Furthermore, Defendant contends that there exists no proof of any age or date of birth of any alleged person depicted.  Furthermore, there is no proof that any of the images have not been digitally or graphically enhanced.  Defendant further objects that such images are sadistic or masochistic.

PART A: THE OFFENSE

Defendant Turner objects to paragraphs 15, 16, 17, 26 and 27 and does not stipulate to the provisions contained therein as violative of the decision in **Blakely v. Washington**, 2004 WL 1402607 (U.S. Wash. June 24, 2004).

PART E: FACTORS THAT MAY WARRANT DEPARTURE

PARAGRAPHS 92, 93 AND 94

To allow this enhancement of two levels is in violation of the prohibition recently decided in **Blakely v. Washington,** 2004 WL 1402697 (U.S. Wash. June 24, 2004), wherein this sentencing enhancement would be the result of a judicial determination and not one determined by a jury beyond a reasonable doubt or stipulated to by Defendant Turner.

Defendant objects to this portion of the sentencing report since it fails to include the plea agreement filed pursuant to Rule 11 (c), which this defendant relies and stands upon.

Furthermore, there was no consideration given for the treatment of any illness or physical

problems for which the defendant has voluntarily sought treatment.

PARAGRAPH 14: THE OFFENSE

(Charges and Convictions)

Defendant objects to the inclusion of this paragraph regarding alleged contact between Defendant Turner and another inmate, Jeffrey Spurlock.. Defendant has not been charged with any offense related to this allegation. The inclusion of the said allegation can only be an effort by the Government to cause prejudice against Defendant Turner for sentencing purposes.

Dated this the 31ST day of MAY, 2005

_____
JAMES W. PARKMAN, III(PAR032)
ATTORNEY FOR DEFENDANT
739 WEST MAIN ST
DOTHAN, AL 36301
(334) 792-1900
(334) 712-1352 FAX

Jim,                                               8-17-05

These idiots have me in Lock down And Are gonna write A diciplinary on me. Right now, I have A spotless Record, I've been in no trouble.

Jim, if they would give me 5 minutes with An honest Officer in the Nurses Station, I can prove that they Are not giving me Any Bi-Polar medication. Here is how I can prove it. You have a certified letter saying that as of Aug 10th I was on Depacote. Well the Officers push Around A cart that has everyone's medication in it. They have these plastic containers with the meds All sorted out for the whole week for each inmate. The container looks like this: ⊞ it has 4 seperate slots for each day of the week. Each of the 4 slots is for certain times of the day. 6 AM, 12 pm, 6 pm And 9pm. I get meds at 6am And 6pm. I showed one inmate and two guards my container last night and this morning, and they all verified that no "Depacote" was in my container At All. No depacote is in the cart they push Around. But they sent a letter saying I was on it since the 10th. Jim, we can nail them Right now while they haven't thought About covering their ass And putting Depacote in my Medicine Dispenser I swear to you they Are lying, And I can prove it Right now! Today. I also have 2 inmates who will back me up.

Jim, here Are the exact dates of what has happened, and what this idiot Doctor has done, and Also some of the things he has said.

EXHIBIT
C

2

On June 25th, I saw Dr. Cox and told him the Lithium was giving me constant ~~die~~ diarrhea. I asked him if he would put me on Triliptol. It's a new drug, and another one of Dr. Cox's patients was Inmate Jamie Byrd who is also Bi-Polar. His medicine is payed for by the State because he is Doc. Dept of Corrections. He's on Triliptol.

I asked Dr. Cox about Triliptol ~~or~~ ~~triliptor~~ ~~and~~ ~~one or another~~, and he told me for the first time that quote, " it is too expensive," and he asked me if I had tried Depacote. I told him all I've used was lithium, so he said let's try Depacote. I agreed. This is very important now. I asked Dr. Cox if he was aware that you have to be gradually taken off Lithium. You decrease the dosage until you are at a level where you can stop. Jim, if you want specific details, call Dr. Handel to help us on the details of coming off Lithium. I was on 1200 mg.

Dr. Cox said he was aware of this, but yet he took me off Lithium <u>completely</u> on June 26th or 27th, it took a day or two to get the Depacote, anyway, he took me off Lithium 1 or 2 days later and put me on Depacote. "No gradual reduction of Lithium at all." I don't know what those side effects could be. Dr. Handel will know.

So on approx. June 26th I started Depacote. By Friday that week, Fri the 28th, the Depacote was giving me indigestion and heart burn no matter what I ate.

3

My diet was the same old Jail Food, the only thing that had changed was the Medication.

So, on June 28th, I ~~had already~~ quit taking the Depacote. Now here is where you start counting the Days. I've been (4 days) without as of Aug 2nd ~~For (2) days after~~ On August 2nd I saw Dr. Cox again and told him the Depacote was "burning me up."

I asked once again for Trilipton. He said for the second time, "No, it's too expensive." I told him "I'm a Federal inmate and the US Marshall service paid for my medication." He verified this with ~~this~~ Nurse Singleton in front of me. She agreed.

The he said, your on enough medication now with the Prozac and Seroquel and he wanted to see if that alone would treat my Bi-Polar.

Remember, Dr. Cox is a GP, and Dr. Handel is a brilliant Psychiatrist, and Jim, Dr. Handel gave me several tests before deciding what meds to give me. He was not just guessing which that's all Dr. Cox can do.

I told Dr. Cox, quote "I don't agree with this idea, because I knew how I felt before Dr. Handel diagnosed me as Bi-Polar." It did not change his mind so I left on August 2nd with only Prozac and Seroquel on the Medication Cart.

On August 5th I think, 5th or 6th, I wrote to Nurse Singleton telling her I was very Depressed, and irritated, and angey and needed so medication for Bi-Polar. I've been (8 day) now with no Bi-Polar

medicine. She came to see me the day AFteR she got my Request And all she did was hollaR At me from the Pod entrance Across the Day Room to my Room. Quote, "MR. TURNER, do you have thoughts of committing Suicide? do you need to go up feont?" I said, "No!" She then said quote, "if you think your gonna commit Suicide, will you let me know?" I said, "Yes." This was so stupid.

Anyway, I'm (8 days) without, And August the 9th I go see DR. Cox. Now I'm (11 days) without Bipolar medicine. I Ask for TRilipto1 AGAiN. DR. Cox makes a "Big Issue" out of me wanting off Lithium, then I wanted off Depacote, but I only wanted off because the side effects were getting to me. Nothing is wrong ER Abnormal About that is it, Jim?

Jim, he told me then that, quote "I can put you back on Lithium, otherwise there is nothing I can do for you anymore. When you go to PRison, maybe they can help you." He said this word for word Jim, I promise!

I have court on the 11th you saw me. I had been (13 days) off Bi. Polar medicine.

Cowoley called Nurse Singleton shortly AFter he was told, because when I got back to the jail, She had already been looking for me. She did come back around 3 pm that day, and I Asked her if she met MR. Cowoley. She said she only talked to him on the phone. I Asked her when I would

get put back on Bi Polar Medication. She said very sarcastically, "whenever Dr. Cox decides to write a prescription."

So, last night, I'm called to the doctors office. I thought he was going to help me. He only asked me how my DIARRHEA was. I asked him to increase my Fiber Tabs to 2 pills, 2 times a day. He agreed, then told me that was it.

Well, I started asking about me Bi-Polar medicine. We started arguing. I told him the cost wasn't his concern. he agreed.

Then that witch Nurse Singleton started talking above me, and I told her very Stern to let me Finish talking. She said she was gonna have me locked down, no to mess with her!
And Jim, I know she could see the Devil in my eyes, but I couldn't help it.

I promise, I never called anyone names, nor did I curse. I just spoke loudly, and it wasn't even hollaring.

Last night, I have been off Bi-Polar meds for 18 DAYS. Friday when you get this letter will be 21 days. ~~Whatever~~ ~~Anything~~ ~~are days I have~~ ~~been off my Bi-Polar meds~~.
30 days A month will be gone soon. I have Court in 9 DAYS! What's gonna happen then?

6

Do something Jim. Please

MR. Bowers is the Jail Administrator
~~Sheriff~~ Sheriff Bill Franklin is the Top dog.

Due to being locked down today, 8/17/05
I will not be Allowed to buy snacks from the
jail. Today is order day, and Friday they
deliver. I still turned in a slip.
Store wont run again for 2 weeks.
I cannot go 2 weeks with no snacks. They
don't feed enough for that.

Thanks

Kevin

P.S.
So, the letter that says I have been on Depacote
is a straight out lie, and I can prove it
right now, if I get the chance. Help me.

Jim,                                                8-18-05

The 2 Dates on my letter need to be changed. After I sent it, I realized I forgot that July comes before August, not June.

So in the letter, change June 18ᵗʰ to July 19ᵗ and June 25ᵗʰ to July 26ᵗʰ. Everything else stays the same.

I'm slipping. My old thoughts and desires are coming back. I'm dreaming bad things, unhealthy things. These SOB's are messing me up.

Except for my slip at Montgomery Jail, I've done good the whole time I've been locked up. Never any problems with any Officer and no problems with anyone else to speak of that would mess up my good Inmate Record. Now these idiots have me so messed up I can't think straight, I've gotten myself "Locked Down" and I should have my Disciplinary Hearing in the next day or so. Actually night, I think they do these hearings on 2ⁿᵈ or 3ʳᵈ shift.

Locked in a room with the Door shut is extremely Hot and unbearable. I smell. They haven't told me I could Shower. My bed is soaked with sweat!

The Weather Man tells people to bring their "Pets" inside out of the Heat, yet these people lock us up in it as a way to Punish us. It's unhealthy and barbaric. There is No Air Conditioning in the PODs of this Jail, so it's HOT!

Jim, you're in the Spot light since your Recent victory. Your words carry the weight of a



Locomotive. ~~To start~~ I wish you would try to change things At this Jail for me and the rest of the suffering inmates. Not everyone can stand the heat, I'm one of them, ask Mary.

I've seen inmates with bed soars so bad they look like they have a disease.

This Jail is New, And when it was built, Sheriff Bill Franklin made his big speach that it wouldn't be Air Cond, cause it ain't no Holiday Inn. It isn't a POW camp either.

Franklin is a smart man though. He is in his early 50's. Dresses in nice Suits like an Attorney or businessman. Yet what he does in here is cruel.

Please get me out of here As soon as possible.

What Are we gonna do About court on the 26th. I might be OK, wont know til that morning. Still no Medicine. Jim, they're lying I swear.

If you were here, I could show you proof, There Are 2 guys (inmates) who have witnessed it, And one Guard who is a good guard who has Already tried to get me out of lock down.

I wont get my store this week, And Mary can tell you that when I get real hot And my Blood Sugar level drops, I get the shakes and have to get something sweet immediately. I'm boedeeline Diabetic and the weight I've gained has made all

my symptoms worse. My dad is the same way but he is A Diabetic, so is his brothers and was his father.

I don't mean to sit here and cry about everything, but these people have lied to you, to Conoley, to my wife. I can prove that certified letter wrong. Whoever signed it would probably be terminated after I finished.

They are saying in so many words (with that letter) that I am lying. Judge Fuller probably thinks I'm lying now. I need to prove to all of you that the letter is false, and I can.

This morning Jim, when they brought my meds, there was still no Depacote in there which they say I've been gettin since the 10th. Help me straighten out this mess.

Whoever signed the letter should take responsibility for their actions, as I have too by being locked down for not being able to control myself the other night ~~and~~ because of no medicine, and getting in trouble.

Can't you see how everything snowballs. Please send someone here to fix this. I don't trust Conoley, he would love to turn all this on me, and he would never give me A chance to say anything.

Sincerely
Ken

Jim,                                              8-23-05

My meeting with Mark was OK, I don't feel like we Accomplished anything. I did find out that this man I've been calling Dr. Cox, his real name is Stevin Smith who works for a Doctor Cox, and Mr. Smith is a NURSE!

Can you believe that crap. So every kind of medicine change or treatment given to me in this jail was ordered or changed by a Male Nurse!

I told you that certified letter was a lie, although the Nurse here told Mark it was a TYPO! Yea, the whole letter was a TYPO!

They said they increased my Prozac to 40 mg. Jim, Dr. Handle put me on 40 mg. 3 years ago.

They told Mark, they were using the Prozac and Seroquel to treat my Bipolar. It wasn't used to treat it before, why do they think it will treat it now, because I don't take Lithium or Depakote.

Jim, I think I'm Bipolar II. Seroquel is used to treat Bipolar I, but in a much larger dose than they give me. I'm on 200 mg. The Article I gave Mark to give to you says 300 mg. to 600 mg. Handel gave me Seroquel to help me sleep. 200 mg. is barely working for that. It needs increased also.

1st lets get this straight. "Prozac" does not treat Bipolar in any form or fashion. It is an antidepressant. So all they are giving me is Seroquel. So, why did Handel give me Lithium? Even if Seroquel

will treat me, the Dosage they are giving me is definitely not enough. I know this cause I know how I feel right now!

Look, I got locked down on the 16th for raising my voice to ~~(scribbled)~~ Nurse Singleton + Nurse Mr. Smith. I raised my voice because I couldn't get them to understand, that they were saying I was getting Depakote, but yet they weren't giving it to me. That's why I raised my voice. It was like talking to a brick wall. I said, "Yes you say you are giving me Depakote, but I never get the pill like they were forgetting to give it to me. I got locked down for that, and my statements about the letter were true, until they talk to Mark and tell him the letter was a typo. So, do you think I should remain in lockdown? Sometimes you have to speak loud to make people listen.

Whatever they say they are using to treat me isn't working! Maybe you can get me another Psychological evaluation. At the least, I guess I need to be back on Lithium with something very strong to counteract Diarrhea! Please bring those articles back to me Friday. Make yourself some copies

See, if you can get me out of lockdown.     Thanks

Jim, do you think that maybe Judge Faller was so unfair because the Victim moved to Enterprise and he and his new wife had a still born baby and that was plastered in the Dothan Eagle for everyone to read.

Would it make any difference that the Victim's brother in Dothan still was doing business with me. Obviously, he doesn't think bad of me.

Why can't any of the Victim's sexually explicit emails be brought in front of the court as they do with my letters or email

Jim, I'm not asking you to answer this question, it's just something to think about since Mark is a Paralegal soon to be an attorney, do you think your office could use a Paralegal to fill his

current position. Mary is a Paralegal, and
a Magistrate, and when she worked with you
and Stormley, she was bonded and was even
a Private Investigator. She works very hard.
She makes no mistakes when typing or
preparing legal documents. She is very
loyal and would drop whatever she was
doing to work for you. She is very
personable and caring, and she is 48
years old working for Manpower out of
Panama City just so she can work.
Working for Tim Parham would be
a blessing and a Dream come true. She
has talked about working for you for
the past 10 years and you won't find a
better person than this woman. If you
might consider this, you can't imagine
the Burden it would lift from this
descent hard working and God fearing
woman. You knew this woman well.

Jim, wasn't there a decision from the Blakely vs. Washington case concerning "Upward Departures." Didn't it say that Upward Dep. had to be agreed to in a plea, or had to be found guilty by a jury? That's what started all this Guideline mess.

So the way I understood you Friday is we are trying to get 10 years new, right? OK! And then are we still looking to get the 3 level downward departure from the Govr. and and an additional 1 level down for acceptance of responsibility? Would you send me what the 14th & 15th Amendment say please?

One last thing. What can we do if anything about the testimony that the victim has told. Yes alot of it is true, but some of it is not.

Especially the part about me Blackmail him for sexual favors. He made many of the deals and offered sexual favors and he knew that was my downfall and he used it to gain from me.

By the end of the relationship, there was no Blackmail. There was so much Hatred from both of us that we were trying to destroy each other. He of course had the most leverage playing the innocent boy. After the relationship started and had been going for some time, he wanted me to start a Computer Business where he could work and he knew that would mean being around me daily vs us meeting once a week for a trade. Some form of sex for Computer Equipment. He made those deals, he wanted to do what we did, it is in his emails. Talk with soon Jim, Thanks.        Kevin

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
#### United States Courthouse
#### One Church Street, A-300
#### MONTGOMERY, ALABAMA 36104

Mark E. Fuller
Chief Judge

TELEPHONE (334) 954-3640
FAX (334) 954-3649

August 16, 2005

Ms. Susan Redmond
Mr. John Harmon
Office of the U.S. Attorney
One Court Square
Montgomery, AL 36104

Mr. James Parkman
739 West Main Street
Dothan, AL 36301

     RE:    *USA v. Kevin Turner*, 1:03-cr-219-F

Dear Counsel:

    As a follow-up to our telephone status conference held this date, please find enclosed the letter I had received from Nurse Smith and Dr. Cox regarding the current medicine regime Mr. Turner is under for his bi-polar disorder while in local custody.

    In this afternoon's mail, I also received the enclosed, three-page letter from Mr. Turner regarding his view of the events following the sentencing hearing which was continued from August 11.

    As is my policy, I would require the clerk to place the original copies of any correspondence I receive in the court file and am forwarding a copy to counsel.

    With best regards, I am

                          Respectfully yours,

                          Mark E. Fuller
                          Chief United States District Judge

MEF/mdd
Enc.



# DRS. HIGHLEY & COX P.C.
440 Taylor Road Suite 3100
Montgomery, Alabama 36109
Telephone (334) 277-5900
Fax (334) 277-6049

August 10, 2005

Debbie Brewer
U.S. Marshall's Office

From: Steven Smith, CRNP

RE: Kevin Turner

Dear Madame:

I have seen Mr. Turner repeatedly over the past several weeks at sick call. He came to us with a diagnosis of Bipolar Disorder. He wanted to be taken off of Lithium because of diarrhea. I honored his request and replaced Lithium with Depakote. He returned and claimed Depakote caused indigestion. He asked that he be taken off Depakote and wanted to be placed on Trileptal, a seizure medicine. I was told that he had a pod-mate who was on Trileptal and was able to sleep all of the time. I denied his request. He is currently on two psychotrophic medications, Depakote which is indicated for Bipolar disorder and Prozac for depression. He is reported to have normal behavior on observation in the pod on this current medication regimen.

Sincerely,

Steven M. Smith, CRNP                    Harold W. Cox, M.D.

SMS/ng

The Honorable Judge Fuller,                                          8-15-05

Today is Monday August 15th, 2005. I want to apologize
for being an emotional wreck last Thursday August 11th, on my
scheduled Sentencing day. I know my Attorney Mr. Parkman
explained to you that morning my emotional state of mind
was shakey, and that the Doctor here at Elmore Co. Jail
had taken me off my Bi-Polar medication completely.

I want to thank you for continuing my court date to
August 26th to allow me to be back on the medicine for a
couple of weeks prior to my new court date. But I also want
to tell you the chain of events that led Dr. Cox to his decision
to take me off the medicine. I think you will be suppised
at his reasoning.

I was told by my Attorney and my family that you ordered
Mr. Conoley to personally come to the Elmore Co. Jail and
straighten out my medication. I found out last Thursday
at around 2:00 pm from Nurse Singleton, that in fact Mr.
Conoley did not come to the jail, and that he only made a
phone call to the jail. If he was in fact ordered to visit
the jail in person, I believe that alone would show the
urgency and importance the medicine is and the immediate
concern of everyone involved.

But when I saw the nurse on Thursday, I asked when my
medication would start back, and she told me whenever Dr.
Cox decided to write a prescription. Four days later, I still
haven't received any medicine for Bi-Polar, haven't spoken to
a nurse or the doctor, and don't know of any scheduled app-
ointment.

When I saw Dr. Cox four weeks ago, I told him the Lithium

had given constant diarrhea for the last year, and was also making me bleed. So he immediately took me off Lithium, and substituted it with Depacote. He told me to see him the following week to report how the Depacote was reacting.

After four days, I had to quit taking the Depacote because it aggrivated my Acid Reflux Disease. I saw Dr. Cox three days later and told him the side effect. He then said he was going to take me off of Depacote, and just see if my Prozac (for Depression) and my Seroquel (for Sleep) would also treat my Bi-Polar. I told him I was uncomfortable with this decision because I had gone thru extensive tests with Dr. Nelson Handel, a psychiatrist in Dothan, to determine what medicine I needed for my three symptoms, and I have been on the medicine three years prior to being incarcerated. And now Dr. Cox, a GP, wants to experiment with me and see if I can function with nothing to treat Bi-Polar.

I asked Dr. Cox to let me try Trileptol. It's a new drug and an inmate I'm housed with has taken the Lithium and Depacote with the same side effects, and he said the Trileptol worked great. But Dr. Cox told me and quote, " it was too expensive, we can't afford it." I told him I was a Federal Inmate and that the U.S. Marshall Service was paying for my treatment, and he verified this with Nurse Singleton. Yet he insisted I go a week just to see what happens.

I wrote Nurse Singleton a Request, a few days later, asking to be put on something for B-Polar because I was having alot of mood swings. She scheduled me to see Dr. Cox a few days later. I told Dr. Cox to let me try Trileptol

AND for the second time he told me "NO," it was too expensive And that he couldn't help me Any more, And when I got sent to Prison maybe they would put me on something. And today, I still have no medication, And I truly believe that if Mr. Conoley had come in person, things would be different.

Judge Fuller, we all have read my PSI report. And the first day my wife And I met Mr. Conoley in his office, he explained how he was <u>NOT</u> biassed, And that he reported the good And the bad. Yet when you read my PSI report, he gives me NO consideration At All, not even for seeking the treatment I had found on my own. And he is Always been against me in the court room, yet he is <u>not</u> biassed.

What I'm trying to show you, is that Mr. Conoley is biassed, he is for the Prosecution no doubt. And if he would have followed thru with your order to visit the jail to straighten out my medication, I would be on something by now Yet, being that he is totally against me, coming to the jail was a low priority, and I'm still waiting for treatment. If I don't get Any medicine this week, I may not be ready for court on the 26th.

Do you think that maybe Mr. Conoley could contact the jail again in person or by phone And do a follow up on my treatment? Thank You.

Sincerely,

Kevin L. Turner

# DRS. HIGHLEY & COX P.C.
440 Taylor Road Suite 3100
Montgomery, Alabama 36109
Telephone (334) 277-5900
Fax (334) 277-6049

August 10, 2005

Debbie Brewer
U.S. Marshall's Office

From: Steven Smith, CRNP

RE: Kevin Turner

Dear Madame:

I have seen Mr. Turner repeatedly over the past several weeks at sick call. He came
to us with a diagnosis of Bipolar Disorder. He wanted to be taken off of Lithium
because of diarrhea. I honored his request and replaced Lithium with Depakote.
He returned and claimed Depakote caused indigestion. He asked that he be taken
off Depakote and wanted to be placed on Trileptal, a seizure medicine. I was told
that he had a pod-mate who was on Trileptal and was able to sleep all of the time. I
denied his request. He is currently on two psychotrophic medications, Depakote
which is indicated for Bipolar disorder and Prozac for depression. He is reported to
have normal behavior on observation in the pod on this current medication
regimen.

Sincerely,

Steven M. Smith, CRNP                    Harold W. Cox, M.D.

SMS/ng

EXHIBIT
E

Case 1:07-cv-00863-WC Document 20-9

. 8-11-05

David,

On 7-11-05 Kevin Turner requested to discontinue his Lithium. He was started on Depakote. On 8-1-05 Kevin Turner requested to discontinue his Depakote. See all attached request forms. Call me if you have any questions.

S. Singleton RN

2.

AUG-12-05 FRI 11:09 AM   UNITED STATES PRETRIAL    FAX NO. 1 334 206 6388    P. 05

**ELMORE COUNTY JAIL INMATE REQUEST FORM**

NAME (PRINT) _Kevin Turner_    CELL _C_    DATE _8-4-05_

**USE ONE FORM PER REQUEST**
BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFIC

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.   IN MANY CASES, YOUI
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.   IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUE
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQ
WILL BE DISCARDED.

INMATE REQUEST: _Dr Cox, Please help me. Since I've gotte_
_off Lithium, I'm very Anxious and agitated. I get_
_angry and stay angry at everything. I have a knot_
_in my stomach like something bad is going happen_
_Sometimes I cry and shake. I need something. →_

**DO NOT WRITE BELOW THIS LINE          DO NOT WRITE ON BACK OF THIS FO**

REPLY: _8/5/05 (Emers S) @ this time          Singleton_

_____

_____ _it_ _____

_____

_____


JAIL ADMINISTRATOR OR DESIGNEE _____    DATE _____

FORWARDED TO:
( ) INMATE                ( ) TRUSTY OFF            ( ) PHYSICIAN
( ) INMATE FILE           ( ) EXP/SUPP OFF _____  ( ) NURSE
( ) SHERIFF               ( ) NOTARY OFF _____  ( ) MED OFF
( ) WARDEN                ( ) PX OFF                ( ) CHAPLAIN
( ) LT                    ( ) MAINT OFF _____   ( ) STEWARD
( ) SGT _____         ( ) PROGRAMS OFF          ( ) OTHER _____
( ) SPV _____
( ) CO _____          **ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL**
                          **WRITE THE DISPOSITION IN THE REPLY SECTION AND**
                          **RETURN FORM TO JAIL ADMINISTRATOR.**

## ELMORE COUNTY JAIL INMATE REQUEST FORM

NAME (PRINT) _Kevin Turner_ CELL _C/D_ DATE _8-1-05_

**USE ONE FORM PER REQUEST**
**BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFIC**

**READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.   IN MANY CASES, YOU!**
**QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.**

**IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.   IN THAT**
**CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUE**
**REQUIRED NO FURTHER ACTION.**

**YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.**

**DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQU**
**WILL BE DISCARDED.**

**INMATE REQUEST:** _I need to see Dr. Cox. The Depacote he put_
_me on for Bi-Polar gives me severe heartburn no matter_
_what I eat. I quit taking the Depacote on 7-28-05._
_My Heartburn is gone now. Please put me on "Trileptal"_
_I'm A Federal Inmate, they can afford it. Thank You Kevin T_

**DO NOT WRITE BELOW THIS LINE**            **DO NOT WRITE ON BACK OF THIS FOR**

**REPLY:** _① Indigestion & Depacote IV not proven_
_② NTABD 207 @ BS_

_Ⓐ Zantac   Ⓒ H2R)_
_Ⓑ Ranitidine 150mg BID_
_Ⓓ on Serequal 200mg Psy._

**JAIL ADMINISTRATOR OR DESIGNEE** _Bruin_ **DATE** _8/1_
_④ Dc Depacote_
**FORWARDED TO:**

| | | |
|---|---|---|
| ( ) INMATE | ( ) TRUSTY OFF | (✓) PHYSICIAN |
| ( ) INMATE FILE | ( ) EXP/SUPP OFF | ( ) NURSE |
| ( ) SHERIFF | ( ) NOTARY OFF ___ | ( ) MED OFF |
| ( ) WARDEN | ( ) PX OFF ___ | ( ) CHAPLAIN |
| ( ) LT | ( ) MAINT OFF ___ | ( ) STEWARD |
| ( ) SGT ___ | ( ) PROGRAMS OFF | ( ) OTHER |
| ( ) SPV ___ | | |
| ( ) CO ___ | **ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL** | |
| | **WRITE THE DISPOSITION IN THE REPLY SECTION AND** | |
| | **RETURN FORM TO JAIL ADMINISTRATOR.** | |

AUG-12-05 FRI 11:10 AM   UNITED STATES PRETRIAL    FAX NO. 1 334 206 6398                P.07

**ELMORE COUNTY JAIL INMATE REQUEST FORM**                                        f/4

NAME (PRINT)  _Kevin Turner_   CELL __C__   DATE _8/1/05_

**USE ONE FORM PER REQUEST**
BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFICE

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.   IN MANY CASES, YOUR
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.   IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUE
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQU
WILL BE DISCARDED.

INMATE REQUEST: _____Reck_____

_____

_____

_____

**DO NOT WRITE BELOW THIS LINE          DO NOT WRITE ON BACK OF THIS FOR**

REPLY: (S) _emotional, needs file_
_Lithium caused dimished; can't take Jopakota_
(C) _140/92_
(A) _Roman_
(P) _cont current meds_
_Follow on # 8 am_                                    8/8/05

JAIL ADMINISTRATOR OR DESIGNER _____ DATE _____

FORWARDED TO:
( ) INMATE              ( ) TRUSTY OFF          ( ) PHYSICIAN
( ) INMATE FILE         ( ) EXP/SUPP OFF ____   ( ) NURSE
( ) SHERIFF             ( ) NOTARY OFF _____   ( ) MED OFF
( ) WARDEN              ( ) PX OFF              ( ) CHAPLAIN
( ) LT                  ( ) MAINT OFF _____   ( ) STEWARD
( ) SGT                 ( ) PROGRAMS OFF        ( ) OTHER
( ) SPV _____
( ) CO _____        ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL
                        WRITE THE DISPOSITION IN THE REPLY SECTION AND
                        RETURN FORM TO JAIL ADMINISTRATOR.

## ELMORE COUNTY JAIL INMATE REQUEST FORM

NAME (PRINT) _Kevin Turner_    CELL _C/D_    DATE _7-22-05_

**USE ONE FORM PER REQUEST**
BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFICE

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.   IN MANY CASES, YOUR
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.   IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUES
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQU
WILL BE DISCARDED.

INMATE REQUEST: _Nurse, would you move my 6 pm medication to_
_9 pm. Taking my Seroquel at 6 and trying to go to sleep before_
_9 pm lock down isn't working well for me at all, too much commotion_
_going on in the POD. Taking the medication at bedtime would_
_be more appropriate.              Thank You  Kevin Turner_

**DO NOT WRITE BELOW THIS LINE          DO NOT WRITE ON BACK OF THIS FOR**

REPLY: _Done. See MAR  PE, RN  7/22/05_

_____

_____

_____

_____

_____

JAIL ADMINISTRATOR OR DESIGNEE _____ DATE _____

FORWARDED TO:
( ) INMATE                ( ) TRUSTY OFF              ( ) PHYSICIAN
( ) INMATE FILE           ( ) EXP/SUPP OFF _____    ( ) NURSE
( ) SHERIFF               ( ) NOTARY OFF _____      ( ) MED OFF
( ) WARDEN                ( ) PX OFF                  ( ) CHAPLAIN
( ) LT                    ( ) MAINT OFF _____       ( ) STEWARD
( ) SGT _____           ( ) PROGRAMS OFF            ( ) OTHER _____
( ) SPV _____           **ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL**
( ) CO _____            **WRITE THE DISPOSITION IN THE REPLY SECTION AND**
                          **RETURN FORM TO JAIL ADMINISTRATOR.**

AUG-12-05 FRI 11:11 AM     UNITED STATES PRETRIAL     FAX NO. 1 334 206 6398     P. 09

## ELMORE COUNTY JAIL INMATE REQUEST FORM

NAME (PRINT) _Kevin Turner_     CELL _C-I_  DATE _7-11-05_

**USE ONE FORM PER REQUEST**
BRIEFLY OUTLINE YOUR REQUEST BELOW.  GIVE THIS FORM TO ANY JAIL OFFICE

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.  IN MANY CASES, YOUR
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.  IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUE:
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQU
WILL BE DISCARDED.

INMATE REQUEST: _I need to see Dr. Cox about my medication. I am
severe having a side effects._

---

DO NOT WRITE BELOW THIS LINE PLN          DO NOT WRITE ON BACK OF THIS FOR

REPLY: ① Wants ④ Lithium B/c desribes # &
② 100/78 ③ AS 20# NT/ND

④ 3 Zinlan

⑤ ① Taper off Lithium D/c Lithium
  ② Depakote 250mg #60 (@c BI).          7-12-05

JAIL ADMINISTRATOR OR DESIGNEE _Brown_  DATE _7/11_

FORWARDED TO:
( ) INMATE          ( ) TRUSTY OFF          ( ) PHYSICIAN
( ) INMATE FILE     ( ) EXP/SUPP OFF        ( ) NURSE
( ) SHERIFF         ( ) NOTARY OFF ____     ( ) MED OFF
( ) WARDEN          ( ) PX OFF ____         ( ) CHAPLAIN
( ) LT              ( ) MAINT OFF ____      ( ) STEWARD
( ) SGT ____        ( ) PROGRAMS OFF ____   ( ) OTHER ____
( ) SPV ____
( ) CO ____         ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL
                    WRITE THE DISPOSITION IN THE REPLY SECTION AND
                    RETURN FORM TO JAIL ADMINISTRATOR.

**ELMORE COUNTY JAIL INMATE REQUEST FORM**

NAME (PRINT) _Kevin Turner_ CELL _C-1_ DATE _6-16-05_

**USE ONE FORM PER REQUEST**
**BRIEFLY OUTLINE YOUR REQUEST BELOW. GIVE THIS FORM TO ANY JAIL OFFICER.**

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS. IN MANY CASES, YOUR QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK. IN THAT CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUEST REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQUES WILL BE DISCARDED.

INMATE REQUEST: _Nuce, will you put me on a regular Dosage of Diamod or some other Anti-Diarrhea medicine. The Lithium I take keeps me irregular And I wipe so much that I Bleed. If you can put some on the Medication CART, I will only Ask for it when I need it. Usually 3 dosages would keep me Regular for a whole week_

**DO NOT WRITE BELOW THIS LINE          DO NOT WRITE ON BACK OF THIS FORM**

REPLY: _Lucks c inmate. Anti desired in cart. DE RN 6/17/05_

_____

_____

_____

_____

JAIL ADMINISTRATOR OR DESIGNEE _____ DATE _____

FORWARDED TO:
( ) INMATE
( ) INMATE FILE
( ) SHERIFF
( ) WARDEN
( ) LT
( ) SGT _____
( ) SPV _____
( ) CO _____

( ) TRUSTY OFF
( ) EXP/SUPP OFF _____
( ) NOTARY OFF _____
( ) PX OFF
( ) MAINT OFF _____
( ) PROGRAMS OFF

( ) PHYSICIAN
( ) NURSE
( ) MED OFF
( ) CHAPLAIN
( ) STEWARD
( ) OTHER _____

**ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL WRITE THE DISPOSITION IN THE REPLY SECTION AND RETURN FORM TO JAIL ADMINISTRATOR.**

AUG-12-05 FRI 11:12 AM   UNITED STATES PRETRIAL    FAX NO. 1 334 206 6398    P. 13

**ELMORE COUNTY JAIL INMATE REQUEST FORM**

NAME (PRINT) _Kevin Turner_    CELL _5/15_  DATE _5-19-05_

**USE ONE FORM PER REQUEST**
BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFICE

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.   IN MANY CASES, YOUR
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.   IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUES
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQU
WILL BE DISCARDED.

INMATE REQUEST: _Dr. Cox, please read Reverse side._

---

**DO NOT WRITE BELOW THIS LINE        DO NOT WRITE ON BACK OF THIS FOR!**

REPLY: ⑤ _want to ↑ Seroquel 100 mg for increase_
_frequent Blns from Lithium_

© _"_

Ⓐ _①①↑ Seroquel to 200 mg HS_
_② note to JN for Seroto T.D._

JAIL ADMINISTRATOR OR DESIGNEE _Baun_  DATE _5-23_

FORWARDED TO:
( ) INMATE                ( ) TRUSTY OFF        ( ) PHYSICIAN
( ) INMATE FILE           ( ) EXP/SUPP OFF ____  (✓) NURSE
( ) SHERIFF               ( ) NOTARY OFF ____    ( ) MED OFF
( ) WARDEN                ( ) PX OFF            ( ) CHAPLAIN
( ) LT                    ( ) MAINT OFF         ( ) STEWARD
( ) SGT                   ( ) PROGRAMS OFF       ( ) OTHER ____
( ) SPV ____
( ) CO ____       **ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL
                  WRITE THE DISPOSITION IN THE REPLY SECTION AND
                  RETURN FORM TO JAIL ADMINISTRATOR.**

Request Form

TO: NURSE                                    4-18-05
FROM: Kevin Turner      POD 5/cell 6

I need to see the Doctor for 3 different reasons.
1st I have a problem under my arm pit that Dr. Mendez
at Mont. city was supposed to help me with this.

2nd I have had 2 back surgeries. I need an extra Blanket
to put between my knees to ~~reler~~ relieve the pressure which
is the only way ~~I~~ I can sleep.

3rd I currently weigh 270 and would like an extra mattress
if at all possible. It's also for my ~~back~~.

Lithium 600 BID
Prozac 40
Seraquel 100 ×tid

Meds  listed  on  no  refill  sheet.
Please  order.

①P Skin tags  Caxilla stays raw—
  ② wants extra mat B/C back surgery
  ③ wants meds renewed

⑥ skin tags  many ~~you~~ irritated several
#25/32

④ Skin tags , XBP , Depression
⑧ ① Get him some deodorant
  ② Extra mat if available
  ③ Lithium 300 mg   #90 ↑ pc × D      2
  ④ Prozac 40 mg    # 30 ↑30 ¥ Q       2
  ⑤ Seraquel 100 mg  # 30 ↑30 ↑ Supper 2

AUG-12-05 FRI 11:12 AM    UNITED STATES PRETRIAL    FAX NO. 1 334 206 6398    P.15

## ELMORE COUNTY JAIL INMATE REQUEST FORM

NAME (PRINT) _Kevin Turner_    CELL _5/6_    DATE _5/2/05_

USE ONE FORM PER REQUEST
BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFICE

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.   IN MANY CASES, YOUR
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.   IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUES
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQUI
WILL BE DISCARDED.

INMATE REQUEST: _You omitted my NOON OR Lunch medication As I Re-_
_quested, thank you. Although you did not increase my morning and_
_evening to make up the difference. I need 600mg of Lithium at_
_morning and evening like I was taking before I came here 2 weeks_
_ago. I Am Bi-Polar, My Lithium "CANNOT" be increased OR →_

DO NOT WRITE BELOW THIS LINE          DO NOT WRITE ON BACK OF THIS FORM

REPLY: _C-A_

_Got Lithium 300 y-to 4 go BID_
_@ Lithium level in 2 weeks_

JAIL ADMINISTRATOR OR DESIGNEE _Brown_    DATE _5L_
_(3 Cont Seroquel 100 y @ HS_    _5/2/05_

FORWARDED TO:
( ) INMATE              ( ) TRUSTY OFF           ( ) PHYSICIAN
( ) INMATE FILE         ( ) EXP/SUPP OFF _____   (✓) NURSE
( ) SHERIFF             ( ) NOTARY OFF           ( ) MED OFF
( ) WARDEN              ( ) PX OFF               ( ) CHAPLAIN
( ) LT                  ( ) MAINT OFF            ( ) STEWARD
( ) SGT _____           ( ) PROGRAMS OFF         ( ) OTHER _____
( ) SPV _____
( ) CO  _____           ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL
                        WRITE THE DISPOSITION IN THE REPLY SECTION AND
                        RETURN FORM TO JAIL ADMINISTRATOR.

AUG-12-05 FRI 11:13 AM   UNITED STATES PRETRIAL    FAX NO. 1 334 206 6398    P. 16

## ELMORE COUNTY JAIL INMATE REQUEST FORM

NAME (PRINT) _Kevin Turner_____    CELL _5/6_  DATE _4-25-05_

USE ONE FORM PER REQUEST
BRIEFLY OUTLINE YOUR REQUEST BELOW.   GIVE THIS FORM TO ANY JAIL OFFICER

READ YOUR INMATE HANDBOOK BEFORE MAKING REQUESTS.  IN MANY CASES, YOUR
QUESTIONS OR CONCERNS WILL BE ANSWERED IN THE HANDBOOK.

IN SOME CASES, YOU WILL NOT RECEIVE A COPY OF THIS FORM BACK.  IN THAT
CASE, IT WAS FORWARDED DIRECTLY TO WHOMEVER CAN HELP YOU, OR THE REQUEST
REQUIRED NO FURTHER ACTION.

YOUR REQUEST WILL NOT BE FORWARDED TO ANYONE OUTSIDE THIS FACILITY.

DUPLICATE REQUESTS, REQUESTS IN THE FORM OF PETITIONS, OR UNSIGNED REQUE
WILL BE DISCARDED.

INMATE REQUEST: _When I saw the Doctor last week I asked to have my_
_Seroquel increased to "2 tablets" OR (200mg) because I absolutely cannot_
_sleep. Instead, my Lithium was changed to 3 dosages per day instead of 2. I_
_want my lithium at breakfast and evening. (Nothing at Lunch) I am on this_
_medication because I am Bi-Polar. Please help me fix this. Thank You._
DO NOT WRITE BELOW THIS LINE          DO NOT WRITE ON BACK OF THIS FORM

REPLY: _____

_____

_____

℞ Change lithium to BID         4/26/05

JAIL ADMINISTRATOR OR DESIGNEE ___Brown___  DATE __425__

FORWARDED TO:
( ) INMATE                ( ) TRUSTY OFF           (✓) PHYSICIAN
( ) INMATE FILE           ( ) EXP/SUPP OFF _____  ( ) NURSE
( ) SHERIFF               ( ) NOTARY OFF _____ ( ) MED OFF
( ) WARDEN                ( ) PX OFF               ( ) CHAPLAIN
( ) LT                    ( ) MAINT OFF _____ ( ) STEWARD
( ) SGT _____           ( ) PROGRAMS OFF         ( ) OTHER _____
( ) SPV _____
( ) CO  _____           ANY OFFICER TO WHOM THIS FORM IS FORWARDED WILL
                          WRITE THE DISPOSITION IN THE REPLY SECTION AND
                          RETURN FORM TO JAIL ADMINISTRATOR.

5

Dear Dr. Cox,

I saw you on Tuesday 17th and asked what was the reason for denying my previous three requests to increase my Seroquel dosage so that I can sleep.

You told me the reason was because "everyone" wants their Seroquel increased in jail so they can sleep all day.

Dr. Cox, I am just trying to get six to eight hours at night. "Would you please review my situation and medical history on an individual basis?"

I understand where you're coming from, as probably all your patients try to beat you out of some drug. But I assure you sir that I am not one of them. My other two prescriptions have been increased in the past year. Nothing I'm taking is Narcotic. I don't know if it's the Lithium or Prozac that keeps me going, but if I can't get my sleep medication increased, I will have to stop taking my other medication.

Insomnia, sleep deprivation, whatever you want to call it, is very exhausting and probably not healthy. I don't know what's worse, the lack of sleep, or the depression which will come back when the drugs clear out of my system.

I didn't have any problems before incarceration because my doctor cared and took care of me. But now I'm denied proper treatment because of a decision you made based on "everyone else." This type of decision is unethical and needs to be addressed.

Dr. Cox, I know of only one correct way to solve my sleep issue, and that is to increase my Seroquel. If I quit taking my other meds, depression and mood swings will start back so that isn't the cure.

You're a doctor and I'm in need of medical attention. Will you please help me?

Regards

Kevin Tamer

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHTERN DIVISION

UNITED STATES OF AMERICA     )
     )
     )
V.     )    CASE NO. 1:03-cr-219-F
     )
     )
KEVIN TURNER     )

### AFFIDAVIT OF MARK JOHNSON

STATE OF ALABAMA

COUNTY OF HOUSTON

Before me, the undersigned authority, personally appeared MARK JOHNSON who is known to me, and after being duly sworn according to the law did depose and state as follows:

On August 23, 2005 I went to the Elmore County Jail to see Kevin Turner and to determine what kind of medication if any he was currently receiving to treat his Bipolar condition.

Upon arrival I asked to speak with the jail nurse and I was directed to the nursing office. The nurse on duty was C. McLaughlin RN. Nurse McLaughlin looked in Kevin's medical record and then told me that she needed to get clearance from a nurse Singleton prior to releasing any information to me. Nurse Singleton was located on her cell phone and she asked to speak to me. Nurse Singleton informed me that she was familiar with Kevin's case and that he was not at the present time being given Lithium or Depakote. As of August 1, 2005 his prescription for Depakote was canceled by Steven Smith, CRNP. Nurse Singleton advised me that Kevin's condition was being treated with Seroquel and prozac and that those drugs were adequate to treat his disorder.

I asked nurse Singleton why Steven Smith CRNP and Harold Cox M.D. had sent a letter to the Marshall's office on August 10, 2005 stating that Kevin was currently taking Depakote for his Bipolar disorder and Prozac for depression. Nurse Singleton replied that she was aware of the letter and had a copy in her file, but that the indication stating Kevin was currently on Depakote was a mistake and



should have read Seroquel and Prozac.  This decision was apparently
made by Steven Smith, a nurse practitioner, and not Dr. Cox.  Nurse
Singleton also stated that the Seroquel was not a new treatment but a
drug that Kevin had been on all along and had taken in addition to
the Lithium and the Depakote.

I also spoke with Kevin Turner and he said that he merely wanted
to try other types of medicine to see if the upset stomach issues
that occurred with the Lithium and Depakote could be eliminated.
However he would rather be back on the Lithium and deal with the
upset stomach than nothing at all.

Dated this the 25th day of August, 2005

MARK JOHNSON

STATE OF ALABAMA
COUNTY OF HOUSTON

    I, the undersigned authority, a Notary Public, in and for the said County and State, hereby certify that MARK JOHNSON, whose acknowledged before me this day, that being informed of the contents of this AFFIDAVIT, he executed the same voluntarily on the date the same bears date.

    Given under my hand and seal this the 25th of AUGUST, 2005.

Tracie Sue Bragen

NOTARY PUBLIC

My Commission Exp : 7-9-08

**Dothan Behavioral Medicine Clinic**
Nelson M. Handal, M.D.
Jerlyn McCleod, M.D.
101 Medical Drive
Dothan, Alabama 36303
(334) 702-7222

## PROGRESS NOTE

| | |
|---|---|
| **Patient Name:** | **Kevin Turner** |
| **Patient Number:** | 2373 |
| **Date:** | 12/03/03 |

---

Patient presents today for evaluation and management. Patient is present with his attorney, Jim Parkman. He states that patient has been charged with child pornography. Patient pled guilty to charges and "will do some time", per Mr. Parkman. Mr. Parkman was inquisitive about the treatment for sexual addiction. Mr. Parkman asked if the current medication treatment is used to treat the patient's desire for pornography and sexual desires. Mr. Parkman was informed the current medication was "indirectly" used to treat such behaviors. Mr. Parkman also asked if the use of illicit drugs could exacerbate symptoms associated with mania. Mr. Parkman was informed the use of drugs could exacerbate mania. Therefore, drug use treatment could assist with decreasing the impulsivity or mania episodes. Mr. Parkman requests a letter outlining recommendations to the courts.

The patient is reportedly sleeping well. Appetite is good per patient. The patient is cooperative, alert, and awake during evaluation. Patient denies feeling depressed or suicidal at this time. No medication side effects reported per patient. The patient denies having H/A, palpitations, vomiting, tics, rash, hallucinations, constipation, dry mouth, cramps, dizziness, agitation, EPS, sedation, diarrhea, blurred vision, insomnia, lack of appetite or symptoms associated with mood instability, irritability, or anger. Patient is much improved and appears to benefit from current treatment regimen. Will continue treatment under the same protocol.

REVIEW OF SYSTEMS:
Constitutional: Negative
Eyes: Negative
Ears, Nose, Mouth, Throat: Negative
Cardiovascular: Negative
Respiratory: Negative
Gastrointestinal: Negative
Genitourinary: Negative
Musculoskeletal: Negative
Skin and/or breasts: Negative
Neurological: Negative
Endocrine: Negative
Hematologic/Lymphatic: Negative
Allergic/Immunologic: Negative

EXHIBIT
G

CONFIDENTIAL

Kevin Turner                                                                    Page 2

DIAGNOSIS:
AXIS I:          1. Bipolar Disorder, Type II, Mixed
                 2. Generalized Anxiety Disorder
AXIS II:         Deferred
AXIS III:        Back problems
AXIS IV:         5, legal implications associated with child pornography
AXIS V:          Current GAF 60

RECOMMENDATIONS:
1. Continue Lithium 900 mg qam
2. Continue Prozac 40 mg qd
3. Continue Seroquel 100 mg 1t abs qhs
4. Return in one week for a Lithium level, BUN, creatinine
5. Provide Mr. James Parkman, Attorney at Law-739 West Main Street, Dothan, Alabama 36301
with recommendations for treatment while incarcerated. Requesting information, patient does
not require constant supervision while incarcerated. He is employed and sought treatment for
Bipolar Disorder after allegations occurred.
6. Return to clinic in 3 months


_____
NELSON M. HANDAL, M.D.
Diplomate of the American Board
of Psychiatry and Neurology

CONFIDENTIAL

**Dothan Behavioral Medicine Clinic**
Nelson M. Handal, M.D.
Jerlyn McCleod, M.D.
101 Medical Drive
Dothan, Alabama 36303
(334) 702-7222

## PROGRESS NOTE

| | |
|---|---|
| **Patient Name:** | **Kevin Turner** |
| **Patient Number:** | **2373** |
| **Date:** | **03/18/04** |

The patient's wife came to talk about the patient's medication treatment. She reports that the patient is in jail and was moved to the county jail in Montgomery by U.S. Marshals about two weeks ago. Wife said that the patient has been charged with "violent crimes" and this past Tuesday had a detention hearing and was told "he is a danger to society and a threat" and the trial process has to be restarted and has been sent to the magistrate again. Wife said "these violent charges are new and we did not know about them". The patient's wife is requesting records and is concerned about medication management for the patient while he is jail. According to our files, the patient and his lawyer have been provided with medical records.

His wife reports that the patient has benefited from his current medication regimen and that he has been stable.

DIAGNOSIS:
| | |
|---|---|
| AXIS I: | Bipolar Disorder, Type II, Mixed |
| | Generalized Anxiety Disorder |
| AXIS II: | Deferred |
| AXIS III: | Back problems |
| AXIS IV: | 5, legal implications associated with child pornography |
| AXIS V: | Current GAF 60 |

RECOMMENDATIONS:
1. Continue Lithium 900 mg qam
2. Continue Prozac 40 mg qd
3. Continue Seroquel 100 mg 1t abs qhs
4. Return in one week for a Lithium level, BUN, creatinine
5. Return to clinic in 3 months

NELSON M. HANDAL, M.D.
Diplomate of the American Board
of Psychiatry and Neurology


CONFIDENTIAL

**Dothan Behavioral Medicine Clinic**
Nelson M. Handal, M.D.
Jerlyn McCleod, M.D.
101 Medical Drive
Dothan, Alabama 36303
(334) 702-7222

## PROGRESS NOTE

| | |
|---|---|
| **Patient Name:** | **Kevin Turner** |
| **Patient Number:** | **2373** |
| **Date:** | **10/14/03** |

Patient presents today for evaluation and management. Patient sates that he has been arrested by the FBI and that he has 7 felony counts associated with sexual issues and minors. He has a court date on December the 8th and his attorney is Jim Parkman. The patient stated, "I do not have the sexual deviant thoughts I had before, the medicine has helped me, I do not feel like that anymore I do not have a sexual drive". The patient is reportedly sleeping well. Appetite is good per patient. The patient is cooperative, alert, and awake during evaluation. Patient states he feels depressed because of the "situation". Denies suicidal ideations at this time. No medication side effects reported per patient. The patient denies having H/A, palpitations, vomiting, tics, rash, hallucinations, constipation, dry mouth, cramps, dizziness, agitation, EPS, sedation, diarrhea, blurred vision, insomnia, lack of appetite or symptoms associated with mood instability, irritability, or anger. Patient is much improved and appears to benefit from current treatment regimen. Will continue treatment under the same protocol.

REVIEW OF SYSTEMS:
Constitutional: Negative
Eyes: Negative
Ears, Nose, Mouth, Throat: Negative
Cardiovascular: Negative
Respiratory: Negative
Gastrointestinal: Negative
Genitourinary: Negative
Musculoskeletal: Negative
Skin and/or breasts: Negative
Neurological: Negative
Endocrine: Negative
Hematologic/Lymphatic: Negative
Allergic/Immunologic: Negative

RECOMMENDATIONS:
1. Continue Lithium 900 mg qam
2. Continue Prozac 40 mg qd
3. Continue Seroquel 100 mg 1tabs qhs
4. Return in one week for a Lithium level, BUN, creatinine

CONFIDENTIAL

Kevin Turner                                                                          Page 2

5. Return to clinic in 3 months
6. Encouraged patient to see Rose Blake

DIAGNOSIS:
AXIS I:        1. Bipolar Disorder, Type II, Mixed
               2. Generalized Anxiety Disorder
AXIS II:       Deferred
AXIS III:      Back problems
AXIS IV:       5, legal implications associated with child pornography
AXIS V:        Current GAF 60


NELSON M. HANDAL, M.D.
Diplomate of the American Board
of Psychiatry and Neurology

CONFIDENTIAL

**Dothan Behavioral Medicine Clinic**
Nelson M. Handal, M.D.
Jerlyn McCleod, M.D.
101 Medical Drive
Dothan, Alabama 36303
(334) 702-7222

## PROGRESS NOTE

| | |
|---|---|
| **Patient Name:** | Kevin Turner |
| **Patient Number:** | 2373 |
| **Date:** | 07/16/03 |

Patient presents today for evaluation and management. He states that he is functioning well. The patient is reportedly sleeping well. Appetite is good per patient. The patient is cooperative, alert, and awake during evaluation. Patient denies feeling depressed or suicidal at this time. No medication side effects reported per mother. The patient denies having H/A, palpitations, vomiting, tics, rash, hallucinations, constipation, dry mouth, cramps, dizziness, agitation, EPS, sedation, diarrhea, blurred vision, insomnia, lack of appetite or symptoms associated with mood instability, irritability, or anger. Patient is much improved and appears to benefit from current treatment regimen. Will continue treatment under the same protocol.

REVIEW OF SYSTEMS:
Constitutional: Negative
Eyes: Negative
Ears, Nose, Mouth, Throat: Negative
Cardiovascular: Negative
Respiratory: Negative
Gastrointestinal: Negative
Genitourinary: Negative
Musculoskeletal: Negative
Skin and/or breasts: Negative
Neurological: Negative
Endocrine: Negative
Hematologic/Lymphatic: Negative
Allergic/Immunologic: Negative

RECOMMENDATIONS:
1. Continue Lithium 300 mg TID
2. Continue Prozac 40 mg qd
3. Continue Seroquel 100 mg 1-2 tabs qhs
4. Return in one week for a Lithium level, BUN, creatinine
5. Return to clinic in 3 months

DIAGNOSIS:
AXIS I:        1. Bipolar Disorder, Type II, Mixed

CONFIDENTIAL

Kevin Turner                                                                                     Page 2

              2. Generalized Anxiety Disorder
AXIS II:      Deferred
AXIS III:     Back problems
AXIS IV:    5, legal implications associated with child pornography
AXIS V:     Current GAF 60


_____
NELSON M. HANDAL, M.D.
Diplomate of the American Board
of Psychiatry and Neurology

CONFIDENTIAL

Dear Jim,                                                    8-29-05

A couple more questions. When we made the
original or actually the 2nd Plea, he turned
the original 5yr Plea down remember. Anyway, we
made the 2nd Plea according to the current PSI
we were looking at. It didn't have Conoley's
Upward Departures at the time of the Plea a year
ago. He just kept adding to it and my plea
was never changed or updated. He wasn't asking
for 300 months at the Plea date. It took so
long to get me sentenced, and so many things
happened during that time for example, there have
been some horrible child molestation cases lately,
just a week ago a 6 year old girl was raped by
a 50 year old black man in Prattville. And the
State of Al. is trying to pass new laws which even
include castration of a Class A Felony of child
rape or molestation type charges. All this is happening
while I'm waiting for sentencing and I believe it had
a tremendous effect on my sentence. Fuller hasn't
been "fair" for lack of a better word, to me since
the beginning. Jesus Jim, if I was pleading to
30 years, we should've gone to trial. I know you
weren't expecting 360 months either, so I'm not at
all blaming you, I feel that they had an agenda
and they knew they could manipulate the Plea
Bargain. If at the Plea hearing, Conoley had
told us he was going to ask for 300 months at
sentencing, we probably wouldn't have taken the

2

Plea, and Susan wouldn't have been happy 'cause she didn't want to go to trial any more than we did, so she would have struck a deal with Condy to not ask for 300 months and so on.

I'm just looking for some "hope", I'm sure you can imagine how I feel right now. I sure picked a bad time to get my medicine screwed up.

I did get to call Mary at 11:00 pm Friday night. Thank you for arranging that. I will be off lock-down in 2 more days.

Jim, with a 30 yr. sentence, will I still go to a Low Security, or will I have to go to a higher Security.

Will you send me copies of the appeal and what-ever else you file so I will have something to look at for some "hope." I need something, anything. I don't know my reasons for appeal but you said there were 4 things. I'd like to know what they were. I didn't realize that Fuller enhanced me so much cause I was in a Daze, do you remember his reasons. I know one was he said a Henous crime, I don't know how to spell that. → I don't remember much else. I remember him saying Level 40 so he enhanced 8 levels.

✗    Something I read on that Westlaw about Distribution that was interesting. If I remember correctly it said that if one of the crimes was "Distribution," that alone added to your offence level, and then to enhance an additional

3

Distribution for pecuniary or non-pecuniary gain was "double charging" or something. Like that. Mary has the papers that I made notes on.

That sounds like a good argument doesn't it? I think you gave these Westlaw documents to Mary so you have a copy. I will ask her for the details as soon as I can call her, then I will get her to leave a message for you as to which one it was.

Something else Jim, ■ since Conley sent that letter I wrote (remember the filthy letter to J Spurlock) to Fuller which that letter had nothing to do with this case, don't you think that also had alot to do with Fuller's decision. There was nothing illegal about the letter although yes it was rather distasteful and I am ashamed that I did that.

Thanks again for everything.

Karen